[No. S014021. Aug. 15, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
DEAN PHILLIP CARTER, Defendant and Appellant.

## Counsel

Phillip H. Cherney, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood, Carl H. Horst and Jeffrey J. Koch, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**GEORGE, C. J.**—Following the guilt phase of the trial, a Los Angeles County jury found defendant Dean Phillip Carter guilty of the forcible rape (Pen. Code, § 261)[1] and first degree murder of Jillette Mills (§§ 187, subd. (a), 189), and found true the special circumstances that the murder was committed in the course of a forcible rape and in the course of a first or second degree burglary (§§ 460, 190.2, subd. (a)(17)(C), (G).)

The jury also found defendant guilty of the first degree murder of Susan Knoll (§§ 187, subd. (a), 189) and of residential burglary (§ 459), and found true the special circumstance that the murder was committed during the commission of a burglary. (§ 190.2, subd. (a)(17)(G).)

The jury further found defendant guilty of the forcible rape (§ 261) and first degree murder of Bonnie Guthrie (§§ 187, subd. (a), 189) and of residential burglary (§ 459), and found true the special circumstances that the murder was committed in the course of a forcible rape and in the course of a burglary. (§ 190.2, subd. (a)(17)(C), (G).)

In addition, the jury found true the special circumstance that defendant was convicted in the present proceeding of more than one offense of murder. (§ 190.2, subd. (a)(3).)

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

At the conclusion of the penalty phase, the jury returned a verdict of death. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

We affirm the judgment in its entirety.

## FACTS

### I. *Guilt Phase Evidence*

#### A. *The Prosecution's Case*

##### 1. *The Death of Tok Kim*

The prosecution commenced its case by introducing, over defendant's objection, evidence that pertained to the death of Tok Kim, who was 42 years of age, in Alameda County in early April 1984. The evidence, summarized below, was introduced under Evidence Code section 1101, subdivision (b), for the purpose of demonstrating defendant's identity and criminal intent in the charged offenses relating to the murders of Jillette Mills, Susan Knoll, and Bonnie Guthrie on April 10 and 11, 1984.

In the early evening of Sunday, April 1, 1984, defendant entered the Rocking Horse Bar and Grill, located in Lafayette, California. The bartender, Nicole Didion, testified that business was slow that evening when defendant sat down at the bar, ordered a drink, and introduced himself to her as "Phil." He wore casual pants, which she believed were jeans, and a sweatshirt inscribed with the words "Tenakee Tavern—Southeast Alaska's Classiest Joint." He told Didion that he worked as a cameraman. Cocktail waitress Margo Fulton observed defendant sitting at the bar, and joined his conversation with Didion.

Approximately one-half hour later, Tok Kim entered the bar, sat down a few barstools apart from defendant, and ordered a glass of white wine. She departed from the bar soon thereafter, only to return a few minutes later, declaring that she had been unable to start her Honda automobile. Defendant offered to assist her and left with her.

After a few minutes, defendant returned to the bar and asked whether anyone had "jumper cables." A restaurant employee obtained cables; the car thereafter was started, and defendant returned to the bar to gather his belongings. Defendant remarked to a cocktail waitress that he was getting a ride to the local BART station.

Approximately 9:00 p.m. the same evening, defendant and Kim walked into Jim Sutton's Lafayette Shell gasoline station and reported car trouble.

David Hogan, an employee at the station, assisted the couple in bringing the disabled vehicle to the station. Because the alternator apparently was malfunctioning, the vehicle was left at the station overnight for repairs.

The next day, April 2, Kim and defendant returned to the Shell station. Hogan noticed that defendant wore a black "Members Only" jacket that "was in style back then," as well as mirrored sunglasses on top of his head. Hogan, observing that defendant's neck bore a "big—like a hickey on his neck," told defendant, "Well[, i]t looked like you had fun last night." Defendant replied: "I don't even know what I'm doing here, I don't even know her."

At approximately 11:00 p.m. on Tuesday, April 10, or Wednesday, April 11, Kim's neighbor, Connie Santos, heard Kim arguing with someone. Santos knew the voice of Kim's boyfriend, Ray Blevins, and testified that the person with whom Kim was arguing "was not [Blevins] definitely, but instead belonged to someone 'younger.' " Santos could not discern the precise words spoken, but recalled that the persons arguing sounded "really angry." Santos thought that perhaps she should call the police, but instead she went to bed, pulling the bedcovers over her head in an effort to block the noise.

On Thursday, April 12, Kim failed to arrive at her job at the Concord Macy's department store. Her manager at Macy's, Ingrid Maleska-King, telephoned Kim's apartment manager, William Elson, to request that he ascertain whether she was at her apartment. Elson, who had observed defendant standing near Kim's apartment mailbox earlier that same week, did not find Kim at her apartment. Elson also observed that Kim's vehicle was not in its designated parking space or anywhere in the vicinity. When Kim did not appear for work on Friday, April 13, Maleska-King again contacted Elson and asked him to recheck whether Kim was at her apartment. As Elson approached the apartment on this second occasion, he "felt extinctively [sic] that she was in there because of the odor that I smelled." Elson found Kim's lifeless body sprawled upon the floor of her bedroom.

Oakland Police Detective Raymond Conner investigated Kim's death, arriving at her apartment on the morning of April 13. Beneath Kim's neck, he discovered a curtain tie approximately 18 to 24 inches in length.

Kim's body had decomposed to an extent that it precluded a determination of a cause of death. The pathologist who performed the autopsy, Thomas Rogers, testified over defendant's objection that the tie found beneath Kim's neck could have been used to fatally strangle her. On cross-examination, Rogers acknowledged that in view of the body's advanced state of decomposition, he could not eliminate the possibility that Kim might have died from natural causes.

## 2. *The Deaths of Susan Knoll and Jillette Mills*

Susan Knoll and her sister, Sandra Pender, grew up in Wisconsin. Knoll's best friend was Bonnie Guthrie. In 1972, Pender relocated to San Diego, and in 1979 Knoll journeyed west to live with her. Guthrie also relocated to the Los Angeles area at some point and resumed her close friendship with Knoll. In March 1984, Knoll moved into a Culver City apartment with Jillette Mills. Knoll and Mills each were 25 years of age.

On April 10, 1984, Knoll appeared at work at Mitsubishi Bank, according to Annette Cheng, Knoll's colleague. On April 11, Knoll was absent from work, and Cheng received a telephone call from a male who declined to identify himself. The caller informed Cheng that Knoll was "just involved in a traffic accident and she have some minor injury [*sic*] and would like to go to hospital for the checkup, but she asked me to call the bank to let the bank know that she won't be in today." Cheng asked the caller if he was a friend of Knoll's, and the caller replied: "No, I just happened to be in the accident scene and she asked me to call for her." When Cheng asked for the caller's name, he hung up the telephone. Cheng never saw Knoll alive again. On cross-examination, Cheng acknowledged that when she spoke to the caller, she believed he was a Black man with a southern accent.

For a few days prior to April 10, 1984, Jillette Mills's brother, Jeff, tried without success to contact Jillette. On April 11, 1984, Jeff and his friend, Christopher Thurman, began searching for her. Jeff and Christopher traveled to Jillette's Culver City apartment, to her place of employment (Laird Studios), and to a local community college where she had attended classes, but were unable to locate Jillette or her automobile, a distinctive white Datsun 280 ZX that bore the license plate "PHANTM Z."[2] Jeff and Christopher thereafter returned to the apartment building, scaled a security fence, and approached the apartment. Jillette's apartment door was unlocked.

Upon searching much of the apartment without success, Jeff and Christopher encountered a framed piece of artwork leaning against the doors of a bedroom closet. Opening the closet doors, Christopher noticed "feet on the floor" and advised Jeff that "we have a problem." The fully clothed bodies of Susan and Jillette were lying on the floor of the closet, one stacked upon the other. Jeff called the police, and Christopher went outside to await their arrival.

---

[2] In addition to its personalized license plate, Jillette Mills's white Datsun was easily identifiable by a black, front-fender car cover (or "bra") emblazoned with the vehicle model "280 ZX," black engine cover vents, dual-colored pinstripes, a tinted glass "T-top" roof, black "sports slats" that covered much of the rear window, a black rear stabilizer, and dual-colored wheel rims shod with Goodyear Eagle GT tires.

While Christopher waited by the curb, he leaned on the left front fender of a blue Honda that investigators subsequently determined belonged to Tok Kim. Inside the vehicle, investigators recovered a pair of sunglasses identified at trial by David Hogan, the Lafayette gasoline station attendant, as matching the pair he observed resting atop defendant's head.

Police investigators examined Jillette's apartment for fingerprints and other physical evidence. Two wine glasses found in the kitchen appeared to have been wiped clean to eliminate any traces of fingerprints. A latent palm print was retrieved from the bathroom sink. Martin Collins, a latent print investigator employed by the California Department of Justice, testified that the latent print matched defendant's right palm print with "100 percent" certainty.

Dr. Lakshmanan Sathyavagiswaran, Chief of Forensic Medicine at the Los Angeles County Medical Examiner's Office, testified that Jillette Mills died of asphyxia due to ligature strangulation. He added that "considerable force" had to have been "continuously applied" for approximately two minutes or more in order to cause death. Jillette also suffered "blunt force type trauma" to her head, and injury to her genital area consistent with "traumatic sexual assault" including "penile penetration . . . and ejaculation." Sam Le, a Los Angeles County criminalist, testified that a white nightgown found in the apartment contained seminal fluid consistent with defendant's PGM type and that of 15.8 percent of the population. Seminal fluid recovered from Mills's vaginal area "was [of an] insufficient quantity for typing."

Dr. Sathyavagiswaran further testified that Susan Knoll died of asphyxia due to manual strangulation, the result of "considerable compression force." Susan also suffered blunt force injuries and hemorrhages consistent with having struggled against her assailant. Dr. Sathyavagiswaran stated: "[W]hen Miss Knoll was strangulated and was asphyxiated, this was probably a terminal event [—] that she vomited and aspirated. [¶] The very fact that the vomitus did not go to the distal parts of the lung, that is, [the] distal bronchi, she did not live very long after this vomitus—after this vomiting episode." Seminal fluid recovered from Knoll's vaginal area was of an insufficient quantity for typing.

Each victim had been dead for a minimum of 15 hours prior to the time the autopsies were performed upon their bodies.

### 3. *The Death of Bonnie Guthrie*

In the early afternoon of April 11, 1984, Bonnie Guthrie, then 34 years of age, and a friend, Geula Vehab, purchased fruit together in Santa Monica. The two parted company at approximately 1:20 p.m. Between 3:00 p.m. and 4:00

p.m., Matty Spiro, the manager of the apartment building in which Guthrie resided, entered her West Los Angeles apartment, accompanied by Manny Gleberman, to repair a leaky bathroom faucet. As Gleberman worked on the faucet, Spiro observed Guthrie lying on her stomach on the bedroom floor: "So I says to Manny, the plumber—I said, 'Look at that, Manny. She's sleeping on the floor.' I said, 'I better close the door and let her sleep.'"

The next morning, April 12, Spiro noticed that Guthrie's automobile was still in the garage. Wondering why Guthrie apparently had not gone to work, he returned to Guthrie's apartment and knocked on the door. Upon entering the apartment, Spiro noticed Guthrie lying in the same position as he previously had observed. He then notified the police.

Dr. Sathyavagiswaran testified that Guthrie died of ligature strangulation. He added that Guthrie's body bore the signs of having suffered blunt force injury as well as genital abrasions consistent with traumatic sexual assault. Vaginal area samples revealed the presence of spermatozoa.

Two days later, on April 14, Adolph Romero III, a commercial fisherman, noticed a white Datsun 280 ZX parked in front of a San Diego shipyard. Approximately 50 feet from the vehicle, Romero retrieved Guthrie's wallet from beneath some bushes. When Guthrie could not be reached, the wallet ultimately was turned in to the local police.

### 4. The Death of Janette Cullins

The prosecution, pursuant to Evidence Code section 1101, subdivision (b), presented evidence over defendant's objection that on or about April 12, 1984, Janette Cullins, who was 24 years of age, died by strangulation. Janette originally had encountered defendant in a San Diego bar in February 1984, and saw him socially the following month. Lee Ann Johnson, who resided across the street from Janette's apartment, reported that during April 1984 she observed a distinctive-looking vehicle arrive and depart from the area on several occasions. At trial, Johnson testified that the vehicle, a white Datsun 280 ZX, resembled the one owned by Jillette Mills. One night that April, Johnson observed the vehicle parked across the street, its engine running for 10 or 15 minutes, "[a]nd then all of a sudden I heard the car start—take off, and it sort of screeched and made a u-turn and came up past my house to the corner and didn't stop for the stop sign and went through the stop sign." Johnson never saw the vehicle again.

Approximately midday on April 13, Cullins's previous roommate, Nancy McEachern, drove to Cullins's apartment because they had planned to conduct a yard sale on the following day, a Saturday, and McEachern wanted

to drop off some items to sell. As she was parking her vehicle in front of the apartment, defendant drove up in a white Datsun 280 ZX. He asked McEachern whether Cullins was home. McEachern replied, "Her car is not here. She hasn't answered a phone call" placed by McEachern earlier that morning. Defendant left, and McEachern entered the apartment. Inside, the drapes were drawn and the venetian blinds were closed, causing the apartment to appear dark, which McEachern testified was "unusual" for that time of day because "We had the habit of opening everything up and making it real bright first thing in the morning." McEachern left a note for Cullins on the dining table and departed from the apartment. McEachern returned the next day to discover Janette's body lying in the bedroom closet. The cause of her death was asphyxiation due to strangulation.

Records of Great American Bank revealed that on April 13, 1984, a withdrawal from Janette Cullins's account in the amount of $60.00 (leaving an account balance of $4.06) was made from an automatic teller machine located at the bank's Point Loma Branch. A four-minute videotape of the transaction, introduced into evidence and shown to the jury, depicted a man wearing a black jacket.[3]

### 5. *Defendant's Arrest*

Approximately 10:50 p.m. on April 17, 1984, Arizona Highway Patrolman Robert Dapser was completing a traffic stop on Interstate 40 in northern Arizona, when he received a call from a truck driver on the citizen's band radio located in his patrol vehicle. The caller advised that "an erratic vehicle had been driving in his location, passed by him twice and nearly cut him off both times," and identified the California license plate on the car as "PHANTOM 2." The subject vehicle, a Datsun 280 ZX, drove by as Officer Dapser was receiving this information.

Officer Dapser pursued the vehicle, which he observed "swerving across the center line of the highway." He activated the emergency lights on his patrol vehicle and initiated a traffic stop. After illuminating the Datsun with a spotlight, Dapser approached the car and requested that the driver produce identification. Defendant, the lone occupant of the vehicle, produced an expired driver's license issued by the State of Alaska. Dapser asked for the vehicle registration documents. Defendant searched the center console and

---

[3] In a separate proceeding conducted in San Diego County, defendant was charged with and found guilty of the first degree murder of Janette Cullins; the jury in that case also found true several special circumstances and returned a verdict imposing a sentence of death, and the San Diego court thereafter imposed a judgment of death. The facts of that case, and defendant's appeal from the judgment rendered in that case, form the basis of the companion case, *People v. Carter* (2005) 36 Cal.4th 1211 [32 Cal.Rptr.3d 759, 117 P.3d 476] decided simultaneously with this case.

glove box and then stated, "I can't find it, she must not have it in here." Dapser thought he observed a burnt marijuana cigarette in the center console of the Datsun and, having witnessed the vehicle's erratic movement, decided to take defendant into custody. He advised defendant of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*) and placed him in the patrol vehicle.

Officer Dapser returned to the Datsun to search for the burnt marijuana cigarette. He noticed beer bottles, one of which was empty, located on the passenger side floorboard. While searching for the marijuana cigarette, Dapser observed a bank identification card located in the crevice between the driver's seat and the center console. The name on the card was that of Janette Cullins. Believing that the truck driver who originally noticed the Datsun had misidentified the license plate, Dapser transmitted a message over his police radio, advising that the license plate was not "PHANTOM 2," but "PHANTM Z." Within several minutes, a dispatcher instructed Dapser to detain the vehicle and all occupants at the request of California law enforcement officials. Dapser discontinued his search of the Datsun and arranged for it to be towed to a locked police storage area.[4]

Officer Dapser administered a Breathalyzer test to defendant, which revealed that his blood-alcohol content was .078 percent approximately 80 to 90 minutes after the traffic stop. Defendant was transported to the Yavapai County jail in Prescott, Arizona.

### 6. *The Contents of the Datsun 280 ZX*

On April 18, 1984, Officer Dapser released the contents of Jillette Mills's Datsun 280 ZX, as well as certain personal property confiscated from defendant's person, to West Los Angeles and Culver City police detectives. The detectives inventoried the personal property and other objects recovered from the vehicle, which included the following items introduced into evidence at defendant's trial: an American Tourister suitcase containing a plastic jar filled with pennies and labeled "black bean soy sauce," a Korean-made wood-handled kitchen knife, yellow rubber gloves, and a gold chain—all identified as having belonged to Kim; a sweatshirt depicting a location in Alaska; an Alpha Beta supermarket CASHEX card identified as having belonged to Susan Knoll; towels, athletic wear, and photographic equipment identified as having belonged to Jillette Mills; three hand-woven sweaters identified as having belonged to Bonnie Guthrie; a "Members Only" jacket, which contained a butcher knife, a knee-high nylon sock, and a business card

---

[4] Defendant asked Officer Dapser what he had been searching for, to which the officer replied, "I was looking for the marijuana roach that was on the console." In response, defendant said, "Don't waste your time looking for it."

from Jim Sutton's Lafayette Shell gasoline station; a key ring identified as having belonged to Janette Cullins; and a piece of paper with the word "SHYLAS"—the access code to Cullins's Great American Bank (originally San Diego Federal Savings and Loan) account; and a number of items emblazoned with the names of Las Vegas casinos. A pair of jeans recovered from the Datsun contained a yellow half-sock and a blue bandana.

### B. *The Defense Case*

The defense did not present any evidence.

## II. *Penalty Phase Evidence*

### A. *The Prosecution's Case*

The prosecution presented evidence in aggravation establishing that in the early morning hours of March 29, 1984, defendant, uninvited, entered the Ventura County residence of Jennifer S., 22 years of age, with whom he had been acquainted for approximately two weeks. During a period of four and one-half hours, defendant twice strangled Jennifer until she lost consciousness. After she regained consciousness, defendant tied her hands behind her back. Sometimes wielding a bone-handled knife, defendant forced her to orally copulate him on multiple occasions. Unable to attain an erection, defendant complained that Jennifer "could do it better." Shaking violently and uncontrollably, Jennifer asked for a drink of water. Instead, defendant located a bottle of wine and two wine glasses and "took the wine and . . . forced it against" her, causing it to spill onto Jennifer's face. Thereafter, defendant demanded and obtained cash kept at the residence. Subsequently, he pulled off Jennifer's clothes and raped her. At some point, defendant informed Jennifer he "liked cocaine," and Jennifer told him he could find a small amount in a cupboard. Defendant retrieved the drug, which she assumed he snorted, and he subsequently "calmed down quite a lot." Shortly after reassuring defendant that she would not call the police and feigning concern for defendant's well-being, Jennifer "ran out the front door and ran as fast as [she] could" to a neighbor's apartment, where she "pounded" and "kicked" the door. The neighbor answered and shortly thereafter notified the police.

The police took Jennifer to the Ventura County Medical Center, where she was treated for facial cuts, hip abrasions, and several broken fingernails, bits of which were recovered by police investigators from the floor of her residence. Jennifer testified that she was "fairly certain" that the facial cut she suffered was from the knife defendant had wielded.[5]

---

[5] Based upon the offenses defendant committed against Jennifer S., Ventura County law enforcement officials filed a criminal complaint against defendant and caused an arrest warrant to issue. Prior to trial in the present case, a Ventura County jury convicted defendant of

The prosecution also introduced into evidence abstracts of judgments reflecting defendant's prior felony convictions, a 1974 burglary conviction in Oregon and a 1977 burglary conviction in Alaska.

### B. *The Defense Case*

The defense evidence in mitigation was extensive, involving the testimony of 21 witnesses, as well as multifaceted, presenting various aspects of defendant's background and character, as summarized below.

First, defendant's older brother, Jerry Lee Carter, and their younger sister, Polly Anne Reasner, testified regarding the difficulties of growing up as the children of an alcoholic mother and alcoholic stepfather in the small, remote Alaskan town of Nome. Esther Carter, defendant's mother, was half Eskimo; Jim Carter, defendant's stepfather, served for several years as Nome's chief of police.[6] Defendant's parents argued and fought frequently, hurling profanities as well as furniture at each other. As a result, the children "wanted to get as far away from them as you could." As a young child, defendant (who was born in 1955), repeatedly ran away from home for days at a time, once reaching Anchorage several hundred miles away, and another time hiding in the wheel well of an aircraft. When defendant was eight or nine years of age, defendant's stepfather affixed a chain to defendant's ankle, attaching the other end of the chain to a bed, to prevent further similar incidents. A family friend, Bertha Adsuna, recalled that defendant was treated differently from his older brother, and that defendant—unlike Jerry—was dressed by their mother "like an orphan." When defendant was nine years of age, his parents sent him several hundred miles away to a boarding school for "problem children."

Second, several witnesses testified that in the late 1970's, defendant became an accomplished television cameraman, thereafter marrying and becoming the proud father of twin boys. He also engaged in activities not considered unusual for residents of Nome, such as climbing upon icebergs during the springtime ice break. In the early 1980's, however, defendant's

---

robbery, rape, four counts of oral copulation, and two counts of assault with a deadly weapon, and found that defendant personally used a knife in the commission of the offenses. Two prior serious felony convictions also were found to be true. Defendant was sentenced to serve a term of 56 years in prison. Only the facts underlying the offenses perpetrated against Jennifer S. were introduced at the penalty phase of the present proceedings—the jury was not informed of defendant's arrest, conviction, or sentence for having committed those offenses.

[6] The record is silent as to the identity or whereabouts of defendant's natural father. We refer to defendant's mother and stepfather as his parents. At the time of defendant's trial in 1989, defendant's stepfather was deceased, and his mother, who refused to discuss her son with a defense investigator, did not testify at trial.

enthusiasm for his career began to wane as marital problems and his addiction to cocaine increasingly dominated his life. By 1983, defendant and his wife were divorced, and defendant was not permitted to visit his children. According to his brother, defendant became "disgruntled," "heartbroken," and "angry." Defendant missed his sons, and according to a former colleague, Mary Alexander, following defendant's separation from his family "it was as if the light had gone out." Defendant told Beth Farley, whose friendship with defendant dated to their childhood, that because he could not see his children, he planned to move away from Alaska and begin a new life.

Third, a number of defendant's friends and former colleagues testified regarding defendant's dependability and trustworthiness, but also to his accelerating addiction to cocaine, a substance that defendant termed "marching powder." According to one witness, during several months prior to March 1984 defendant was using cocaine regularly, drinking heavily, and was "clearly out of control."

Fourth, two witnesses employed by Ventura County provided further details regarding the rape of Jennifer S. Detective William Ragsdale recalled that Jennifer had remembered that defendant's eyes were "glazed over" during the incidents on the morning of March 29, and that, at various intervals, defendant acted remorseful and acknowledged he "needed psychiatric help." Lynda Zych, a toxicologist, testified that Jennifer tested "positive for cocaine," but that a confirming test never was administered.

Finally, two witnesses testified regarding events following the attack upon Jennifer S. Andrew Holtz, a former colleague of defendant's, testified that on March 29, 1984, defendant telephoned him, sounding "very depressed," and expressed a desire to visit the Alaska Psychiatric Institute, located in Anchorage. Holtz encouraged defendant "to get in touch with the authorities in Ventura to straighten things out." Daniel Shields, an employee at the Los Angeles County jail, testified that during defendant's period of incarceration prior to trial, defendant had not presented any discipline problems.

## DISCUSSION

### I. *Pretrial Issues*

#### A. *Ineffective Assistance of Counsel at the Preliminary Hearing*

Defendant contends he was denied the effective assistance of counsel at his preliminary hearing because his attorney, Ezekiel Perlo, (1) performed only a perfunctory cross-examination of the prosecution's witnesses who testified pertaining to the death of Tok Kim and the murder of Jillette Mills, and

(2) failed to cross-examine any of the prosecution's witnesses called to testify regarding the murders of Bonnie Guthrie and Janette Cullins. Defendant asserts: "The record demonstrates that defense counsel was not responsible for any meaningful challenge to evidence presented over a five-day preliminary hearing that produced thirty-seven witnesses and twenty-seven exhibits." As a result of these alleged deficiencies at the preliminary hearing, defendant alleges that he suffered prejudice at trial. The contention lacks merit.

■ "In general, irregularities in pretrial commitment proceedings require reversal on appeal only where the defendant shows he was 'deprived of a fair trial or otherwise suffered prejudice' as a result. (*People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941].) Where the case involves an ineffective assistance claim of the sort at issue here [that is, the alleged failure to adequately cross-examine witnesses], no prejudice typically appears unless counsel's pretrial performance resulted in the loss of material evidence and caused tangible harm to the defense at trial. (See *People* v. *Coleman* (1988) 46 Cal.3d 749, 771–773 [251 Cal.Rptr. 83, 759 P.2d 1260] [preliminary hearing counsel's failure to contest prosecution's scientific evidence and conduct independent forensic investigation did not impair defense of rape-murder charge at trial, including introduction of expert medical testimony]; *People* v. *Aston* (1985) 39 Cal.3d 481, 494–495 [216 Cal.Rptr. 771, 703 P.2d 111] [unavailability of witness at preliminary hearing was 'cured' when witness later testified for defendant at suppression hearing and was available at trial].)" (*People* v. *Millwee* (1998) 18 Cal.4th 96, 121–122 [74 Cal.Rptr.2d 418, 954 P.2d 990].)

In the present case, defendant has failed to make the requisite showing. Perlo's performance at the preliminary hearing was not deficient. Defendant's assertions to the contrary ignore Perlo's appropriate questioning of various witnesses and instead merely speculate that more vigorous cross-examination of certain witnesses, such as Ray Blevins, Tok Kim's former boyfriend (who died prior to trial), might have led the trial court to preclude the prosecution from introducing evidence relating to the death of Kim and the murder of Janette Cullins. Defendant's assertions in this regard do not establish that counsel performed deficiently.

■ Moreover, at trial the prosecution presented overwhelming evidence linking defendant to the charged offenses. Thus, even if we were to assume for the sake of argument that the trial court erred in permitting the prosecution to introduce evidence pertaining to Kim and Cullins, defendant does not demonstrate that in the absence of such evidence, the result at trial would have been different. (See *People* v. *Coleman* (1988) 46 Cal.3d 749, 773 [251 Cal.Rptr. 83, 759 P.2d 1260] [in postconviction proceedings, the burden is on the defendant to establish prejudice as a result of counsel's pretrial performance].) Although at trial the defense presented no case-in-chief, defense

counsel vigorously cross-examined numerous witnesses for the prosecution. We further observe that the prosecution's evidence at trial relating to Kim was inconclusive as to cause of death, and that although the Cullins evidence linked defendant to that homicide, defendant had not yet been tried or convicted in that case—circumstances that considerably lessened the impact of such evidence.

On this record, which is similar to that in *People v. Millwee, supra,* 18 Cal.4th 96, 122, "[d]efendant identifies no exculpatory or mitigating evidence overlooked at any phase of the proceedings, nor does he demonstrate that counsel's performance at the preliminary hearing 'affected the ability of trial counsel to advocate defendant's case at trial.' [Citation.]" We therefore reject defendant's claim that counsel rendered ineffective assistance based upon counsel's performance at the preliminary hearing.[7]

## B. *Motion to Suppress Evidence*

Defendant contends the trial court erred in denying his section 1538.5 motion to suppress evidence seized from his person and from Jillette Mills's vehicle following his arrest. Defendant asserts that his detention and arrest were unlawful because they were not supported by probable cause and that the search of his person and the vehicle violated state and federal constitutional guarantees against unreasonable search and seizure. We reject defendant's position as to each of these points.

At the pretrial hearing on defendant's motion, Robert Dapser, the Arizona law enforcement officer who stopped and detained defendant on April 17, 1984, testified that he initiated the traffic stop only after receiving a call that a "white Datsun 280 Z with California personalized [license] plates" had been seen driving in a dangerous manner and after the officer personally observed a vehicle that matched that description driving erratically. Upon directing the driver to pull over and stop, Officer Dapser approached the vehicle, observed beer bottles and a burnt portion of a marijuana cigarette inside, and detected the scent of alcohol as well as the faint smell of burnt marijuana. Defendant's eyes appeared to Dapser to have been "rather glossed over," indicating to Dapser that defendant "was under the influence of something." Dapser took defendant into custody for possession of the marijuana cigarette and advised

---

[7] "With regard both to this claim and to every other claim raised in his brief, defendant asserts that each alleged error violates not only state law but multiple provisions of the federal and California Constitutions. In addressing each claim discussed in this opinion, we have considered defendant's contention that the alleged error violates the federal and California Constitutions, and our rejection of each claim of reversible error includes a determination that the alleged error does not warrant reversal under the state or federal Constitution." (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1199, fn. 2 [120 Cal.Rptr.2d 477, 47 P.3d 262].)

him of his rights under *Miranda, supra,* 384 U.S. 436, "for driving under the influence of alcohol and/or drugs." Less than 10 minutes later, Dapser was notified to detain the vehicle and all occupants at the request of law enforcement officials located in Culver City, California.

At the conclusion of the hearing on defendant's motion to suppress, the trial court denied the motion, finding: "I think the officer did have sufficient cause to stop, detain, and then arrest Mr. Carter under the facts and observations."

On appeal, defendant's arguments are substantially similar to his assertions in the trial court. For the following reasons, we find them unpersuasive.

■ " 'An appellate court's review of a trial court's ruling on a motion to suppress is governed by well-settled principles. [Citations.] [¶] In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] "The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review." [Citations.] [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law, . . . is also subject to independent review.' (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1301 [248 Cal.Rptr. 834, 756 P.2d 221].)" (*People v. Alvarez* (1996) 14 Cal.4th 155, 182 [58 Cal.Rptr.2d 385, 926 P.2d 365] (*Alvarez*); see also *People v. Superior Court (Keithley)* (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585] [the trial court's findings must be upheld if supported by substantial evidence].)

■ "The Fourth Amendment, made applicable to the states through the Fourteenth Amendment's due process clause (*Mapp* v. *Ohio* (1961) 367 U.S. 643, 643–660 [6 L.Ed.2d 1081, 1081–1093, 81 S.Ct. 1684]; *Wolf* v. *Colorado* (1949) 338 U.S. 25, 27–28 [93 L.Ed. 1782, 1785–1786, 69 S.Ct. 1359], overruled on another point, *Mapp* v. *Ohio, supra,* 367 U.S. at pp. 654–655 [6 L.Ed.2d at pp. 1089–1090]), guarantees 'the people' '[t]he right . . . to be secure . . . against unreasonable searches and seizures . . . .' '[A] Fourth Amendment "seizure" occurs when a vehicle is stopped at a checkpoint' by a law enforcement officer. (*Michigan Dept. of State Police* v. *Sitz* (1990) 496 U.S. 444, 450 [110 L.Ed.2d 412, 420, 110 S.Ct. 2481].) 'The question thus becomes whether such [a] seizure[] [is] "reasonable" under the Fourth Amendment.' (*Ibid.*)" (*Alvarez, supra,* 14 Cal.4th at pp. 182–183; see also

*Terry v. Ohio* (1968) 392 U.S. 1, 19 [20 L.Ed.2d 889, 88 S.Ct. 1868] [for any type of detention, the overall standard to which the government must adhere is that of reasonableness]; *People v. McGaughran* (1979) 25 Cal.3d 577, 584 [159 Cal.Rptr. 191, 601 P.2d 207] ["the officer may temporarily detain the offender at the scene for the period of time necessary to discharge the duties that he incurs by virtue of the traffic stop"].)

█ Further, any challenge to the admissibility of a search or seizure must be evaluated solely under the Fourth Amendment. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1171 [9 Cal.Rptr.2d 834, 832 P.2d 146]; *In re Lance W.* (1985) 37 Cal.3d 873, 879 [210 Cal.Rptr. 631, 694 P.2d 744]; see also *California v. Greenwood* (1987) 486 U.S. 35, 38 [100 L.Ed.2d 30, 108 S.Ct. 1625].) " 'An illegal search or seizure violates the federal constitutional rights only of those who have a legitimate expectation of privacy in the invaded [space] or the seized thing. (*United States v. Salvucci* (1980) 448 U.S. 83, 91–92 [65 L.Ed.2d 619, 628, 100 S.Ct. 2547].) The legitimate expectation of privacy must exist in the *particular area searched or thing seized* in order to bring a Fourth Amendment challenge.' (*People v. Hernandez* (1988) 199 Cal.App.3d 1182, 1189 [245 Cal.Rptr. 513], italics in original.)" (*People v. McPeters, supra,* 2 Cal.4th 1148, 1171.) The burden is on the defendant to establish that a legitimate expectation of privacy (*Rawlings v. Kentucky* (1980) 448 U.S. 98, 104 [65 L.Ed.2d 633, 100 S.Ct. 2556]) was violated by government conduct.

█ Our independent review has not disclosed any error in the superior court's application of these principles. In the present case, defendant, as the driver of a stolen vehicle, lacked a legitimate expectation of privacy to contest the search of that vehicle. (See *Rakas v. Illinois* (1978) 439 U.S. 128, 141, fn. 9 [58 L.Ed.2d 387, 99 S.Ct. 421] [" 'No . . . interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him. This would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched.' " (Italics omitted.)]; accord *People v. Melnyk* (1992) 4 Cal.App.4th 1532, 1533 [6 Cal.Rptr.2d 570].) To accept defendant's assertion that he had a legitimate expectation of privacy while driving a stolen vehicle would be to overlook the word "unreasonable" in the Fourth Amendment's proscription against "unreasonable searches and seizures."

As noted, Officer Dapser received information that a specific vehicle was being driven recklessly—information that soon was corroborated when he saw it drive by. Therefore, he had a reasonable basis to stop the vehicle and

detain the driver. Upon encountering defendant, Dapser had further indicia of unlawful conduct: defendant's eyes appeared glazed, the odor of alcohol and marijuana wafted from the car's interior, the passenger-side floorboard was littered with beer bottles, and a burnt marijuana cigarette was visible. Because possession of marijuana was a felony in Arizona at that time, the officer's observations provided him with a reasonable basis to arrest defendant and take him into custody.

Thus, even if we were to assume defendant's expectation of privacy was reasonable, his challenge to the seizure of incriminating evidence fails because his detention and arrest were lawful, thereby eliminating any reasonable expectation of privacy that would have existed had the vehicle not been stolen. (*New York v. Belton* (1981) 453 U.S. 454 [69 L.Ed.2d 768, 101 S.Ct. 2860].) Nor are we persuaded that the length of the detention prior to arrest—less than 10 minutes—was, as defendant asserts, "for an excessive time waiting for the dispatcher's report," or that Officer Dapser's ultimately unsuccessful search for the marijuana cigarette during that period required "an inordinate amount of time."

In sum, the trial court properly denied defendant's motion to suppress the evidence recovered from Jillette Mills's vehicle.

### C. *Motion to Strike Prior Burglary Convictions*

Defendant contends the trial court erred in (1) refusing to strike his prior burglary convictions from Oregon and Alaska, alleged as prior serious felonies within the meaning of section 667, subdivision (a), and section 1192.7, subdivision (c)(18); (2) declining to dismiss these alleged prior convictions pursuant to section 1385; and (3) admitting evidence of the prior convictions at the penalty phase pursuant to section 190.3, subdivision (c). Defendant argues each of these alleged errors denied his constitutional rights to due process of law, a fair trial, and a reliable sentence. We are unpersuaded.

Prior to the commencement of trial, defendant moved to strike the prior conviction allegations on the grounds that the Oregon and Alaska priors did not constitute "serious felony convictions" within the meaning of section 667, subdivision (a).[8] In defendant's view, certain distinctions between the language of the Oregon and Alaska burglary statutes on the one hand, and the

---

[8] At the time defendant brought his motion to strike, section 667, subdivision (a) provided in pertinent part:

"[A]ny person convicted of a serious felony who previously has been convicted of a serious felony in this state or any offense committed in another jurisdiction which includes all of the elements of any serious felony, shall receive, in addition to the sentence imposed by the court

California statute on the other, precluded the introduction of the out-of-state priors.[9] Specifically, defendant alleged that neither the Oregon nor the Alaska burglary statute included all of the elements of the California crime of residential burglary.

At a pretrial hearing conducted on March 20, 1987, the superior court rejected defendant's motion to strike his prior burglary convictions. The court observed: "It seems like the purpose of this rule is to look to see if and to avoid the holding of an individual responsible for a serious felony prior for conduct that in this state would not substitute for a serious felony. And based on my review of the documents and the points and authorities in this case, that isn't what we're facing here. [¶] . . . [¶] What we have here is that it appears that what the defendant was charged with and convicted of is conduct, precisely that which is required to come within [section] 459 as a first degree burglary." The court concluded, "The motion to strike is denied at this time."

On appeal, defendant contends the trial court should have stricken the prior serious felony enhancements that were based on his residential burglary

---

for the present offense, a five-year enhancement for each such prior conviction on charges brought and tried separately." (§ 667, subd. (a), as amended by Stats. 1986, ch. 85, § 1.5, p. 211.)

[9] The Oregon burglary statute in effect at the time of defendant's December 1974 offense provided in relevant part:

"(1) A person commits the crime of burglary in the first degree if he violates ORS 164.215 and the building is a dwelling, or if in effecting entry or while in a building or in immediate flight therefrom he:

"(a) Is armed with a burglar's tool as defined in ORS 164.235 or a deadly weapon, or;

"(b) Causes or attempts to cause physical injury to any person, or;

"(c) Uses or threatens to use a dangerous weapon." (Or. Rev. Stat., § 164.225.)

Oregon Revised Statutes section 164.215, referred to in the foregoing statute, provided: "A person commits the crime of burglary in the second degree if he enters or remains unlawfully in a building with intent to commit a crime therein." The Alaska burglary statute in effect at the time of defendant's December 1977 offense provided in relevant part: "A person who breaks and enters a dwelling house with intent to commit a crime in it, or having entered with that intent, breaks a dwelling house or is armed with a dangerous weapon in it, or assaults a person lawfully in it is guilty of burglary, and upon conviction is punishable by imprisonment in the penitentiary for no less than one year nor more than 10 years. . . ." (Alaska Stat., § 11.20.080.)

Alaska Statutes section 11.20.090 defined breaking of a dwelling house as follows: "An unlawful entry of a dwelling house with intent to commit a crime in it is a breaking and entering of the dwelling house for the purpose of section 80 of this chapter."

When defendant brought his motion to strike, section 459 provided in pertinent part: "Every person who enters any house, room, apartment . . . with intent to commit grand or petit larceny *or any felony* is guilty of burglary." (Stats. 1984, ch. 854, § 2, p. 2896, italics added.)

convictions in Oregon and Alaska, because the foreign convictions did not include all the elements of the "serious felony" of "residential burglary" (§§ 667, subd. (a)(1), (4), 1192.7, subd. (c)(18)) as defined in California (§ 459). Defendant further urges that the court violated then applicable law when it went behind the facial elements of the foreign convictions, and considered the entire records of the foreign convictions to determine whether the minimum elements of a California residential burglary were actually present.

As set forth in the margin (fn. 9, *ante*), the Oregon and Alaska statutes required only entry with intent to commit a "crime." (Or. Rev. Stat., §§ 164.215, 164.225(1); Alaska Stat., §§ 11.20.080, 11.20.090.) By contrast, Penal Code section 459, then and now, requires entry with intent to commit "*grand or petit larceny* or any *felony*." (Italics added.) Thus, defendant's Oregon and Alaska convictions conceivably could have been for conduct which, if committed in California, would not support a conviction under section 459.

As defendant observes, the law as it existed in 1984 allowed courts to look only at the face of a foreign conviction to determine whether its minimum elements established a "serious felony" under California law. (*People v. Crowson* (1983) 33 Cal.3d 623 [190 Cal.Rptr. 165, 660 P.2d 389].) But, as defendant acknowledges, we overruled *Crowson* in *People v. Myers* (1993) 5 Cal.4th 1193 [22 Cal.Rptr.2d 911, 858 P.2d 301]. *Myers* held that, in determining whether a foreign conviction satisfies the minimum elements of a "serious felony" in California, the court may examine "the entire record of the prior conviction." (*Id.*, at p. 1201; see also *People v. Guerrero* (1988) 44 Cal.3d 343, 355–356 [243 Cal.Rptr. 688, 748 P.2d 1150] [in determining the truth of a prior-conviction allegation, the trier of fact may look to the entire record of the conviction, overruling *People v. Alfaro* (1986) 42 Cal.3d 627 [230 Cal.Rptr. 129, 724 P.2d 1154].)

Defendant fails to explain his view that *Myers* is not fully retroactive, and no reason appears to depart from the general rule that judicial decisions, even those overruling prior authority, have full retroactive effect. (See, e.g., *Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1023 [22 Cal.Rptr.3d 876, 103 P.3d 276]; *Woosley v. State of California* (1992) 3 Cal.4th 758, 793–794 [13 Cal.Rptr.2d 30, 838 P.2d 758].) Retroactive application is particularly appropriate here, because *Myers* would apply to the consideration of the prior conviction at any new trial.

Although defendant additionally questions the "competence" of the foreign records on which the trial court relied, he fails to persuade us that the records are invalid or otherwise deficient. Our own review of those records reveals

that as to the Alaska conviction, defendant pleaded guilty to "unlawfully break[ing] and enter[ing] a . . . residence, . . . the breaking and entering being with the intent to commit the crime of larceny therein," and that as to the Oregon conviction, defendant was found guilty of "knowingly and unlawfully enter[ing] a dwelling [a residence] . . . with the intent to commit the crime of theft therein." (Cf. former § 459, "Every person who enters any house, . . . apartment, . . . with intent to commit grand or petit larceny or any felony is guilty of burglary" [Stats. 1984, ch. 854, § 2, p. 2896]; see also former § 460, subd. (1), "Every burglary of an inhabited dwelling house . . . is burglary of the first degree" [added by Stats. 1923, ch. 362, § 1, p. 747]; § 490a, "Whenever any law or statute of this state refers to or mentions larceny, . . . said law or statute shall hereafter be read and interpreted as if the word 'theft' were substituted therefor"; § 1192.7, subd. (c)(18), any burglary of the first degree is a "serious felony.") Because each one of defendant's prior convictions thus would satisfy the necessary elements to convict defendant of first degree burglary in California, we reject defendant's challenge.[10]

After the jury reached its guilt phase verdicts, defendant, outside the jury's presence, renewed his request that evidence of his prior burglary convictions be excluded from the jury's consideration, this time requesting that the trial court exercise its discretion under section 1385 to strike the allegations. The trial court appears to have denied the request, although the reporter's transcript does not explicitly so indicate.[11]

On appeal, defendant contends "it was in the interests of justice to dismiss the [prior conviction allegations] under section 1385, because the crimes charged were committed before the 1986 amendment to that section." We disagree. The circumstance that defendant's prior convictions were committed before the 1986 amendment that added subdivision (b) to section 1385 ("This section does not authorize a judge to strike any prior conviction of a serious felony . . .") did not preclude the trial court in 1989 from denying defendant's motion to strike the prior conviction allegations. No error or abuse of discretion appears.[12]

[10] Even if we were to agree with defendant that the trial court should have struck defendant's prior convictions from Oregon and Alaska on the ground that they were not serious felonies, the prosecution still was entitled to introduce evidence of those convictions at the penalty phase under section 190.3, factor (c), which permits the prosecution to introduce evidence of "the presence . . . of any prior felony conviction" regardless of whether it is a "serious felony."

[11] The clerk's transcript, however, reads: "Motion to strike priors pursuant to [section] 1385 [of the] Penal Code in the interest of justice is denied."

[12] In rejecting defendant's claim that the trial court erred in failing to dismiss the prior conviction allegations pursuant to section 1385, we need not and do not address the broader question whether, in a case tried after the 1986 amendment to that statute but involving a prior conviction of a serious felony that was committed before the enactment of that amendment, a trial court retained the authority to dismiss a prior conviction allegation under the statute.

 Defendant next contends the trial court erred in admitting the evidence of defendant's prior burglary convictions under section 190.3, subdivision (c) at the penalty phase. He is incorrect. (See *People v. Balderas* (1985) 41 Cal.3d 144, 201 [222 Cal.Rptr. 184, 711 P.2d 480] ["The plain meaning of subdivisions (b) and (c) of section 190.3 is that the jury must consider any *violent* criminal activity by the defendant, whether or not it led to prosecution and conviction, *and* any 'prior *felony conviction*' (italics added), whether the underlying offense was violent or nonviolent." (Fn. omitted.)].) Defendant's prior burglary convictions in Oregon and Alaska clearly qualify as prior felony convictions. Defendant offers no persuasive argument to the contrary.

Finally, even if we were to assume for the sake of argument that defendant is correct in asserting that the trial court erred in admitting defendant's prior burglary convictions at the penalty phase, we perceive no prejudice. The jury did not learn of defendant's prior convictions until after it already had considered the evidence that defendant had committed the charged murders and had found him guilty of those crimes as well as other offenses. Under these circumstances, there existed no reasonable possibility of a different outcome at the penalty phase had the prior burglary convictions not been admitted.

### D. Denial of Pretrial Motion to Exclude Other-crimes Evidence Pertaining to the Deaths of Tok Kim and Janette Cullins

Defendant contends the superior court abused its discretion in denying his motion to exclude evidence pertaining to the death of Tok Kim in Alameda County and the murder of Janette Cullins in San Diego County. He argues that the judgment must be reversed in its entirety due to the lower court's admission of this "other-crimes evidence" in purported violation of defendant's constitutional rights. We conclude defendant's position is without merit.

In March 1987, approximately two years prior to the commencement of defendant's trial, the prosecution informed the defense of its intention to introduce, at the guilt phase of defendant's trial, evidence of the then pending, unadjudicated crimes charged against defendant in Alameda and San Diego Counties. In July 1987, defendant responded to the prosecution's notice by filing a "motion to exclude evidence of pending prosecutions in Alameda and San Diego Counties." In July 1988, the superior court considered and summarily denied defendant's motion. Approximately one year later (on the eve of trial), defendant renewed the motion to exclude this evidence, limiting the motion to the Kim matter only and asserting that the prosecution

had failed to disclose laboratory and related police reports revealing that defendant had not been the donor of semen detected on a bedspread in Kim's apartment. The court summarily denied this motion as well.[13]

As we have summarized in the foregoing statement of facts, at the guilt phase of trial the prosecution, over defense objection, introduced evidence pertaining to the death of Tok Kim and the murder of Janette Cullins. Defendant had yet to be tried in those cases and, in the wake of the death judgments rendered in the present case and in the subsequently tried case involving Janette Cullins, the Alameda County District Attorney dismissed the charges against him based on the death of Tok Kim. As noted, defendant contends the trial court below erred in permitting the prosecution to introduce evidence of these crimes.

Character evidence is not admissible to show conduct on a specific occasion. (Evid. Code, § 1101, subd. (a).) This type of evidence sometimes is referred to as evidence of criminal disposition or propensity. (E.g., *People v. Sam* (1969) 71 Cal.2d 194, 203 [77 Cal.Rptr. 804, 454 P.2d 700].) The rule excluding such evidence, however, is qualified by Evidence Code section 1101, subdivision (b), which provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as . . . opportunity, intent, preparation, plan, knowledge, identity . . .) other than his or her disposition to commit such an act."

"Evidence that a defendant has committed crimes other than those currently charged is not admissible to prove that the defendant is a person of bad character or has a criminal disposition; but evidence of uncharged crimes is admissible to prove, among other things, the identity of the perpetrator of the charged crimes, the existence of a common design or plan, or the intent with which the perpetrator acted in the commission of the charged crimes. (Evid. Code, § 1101.) Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402–403 [27 Cal.Rptr.2d 646, 867 P.2d 757].) On appeal, the trial court's determination of this issue, being essentially a determination of relevance, is reviewed for abuse of discretion. (*People v. Scheid* (1997) 16 Cal.4th 1, 14 [65 Cal.Rptr.2d 348, 939 P.2d 748]; *People v. Alvarez* (1996) 14 Cal.4th 155, 201 [58 Cal.Rptr.2d 385, 926 P.2d 365]; *People v. Gordon* (1990) 50 Cal.3d 1223, 1239 [270 Cal.Rptr. 451, 792 P.2d 251]; see also *People v. Hayes*

---

[13] The latter motion was captioned: "Motion for mistrial, or in the alternative renewed motion in limine re 'Oakland' evidence of other misconduct."

(1990) 52 Cal.3d 577, 617 [276 Cal.Rptr. 874, 802 P.2d 376]; *U. S.* v. *Khan* (9th Cir. 1993) 993 F.2d 1368, 1376.)

"To be relevant on the issue of identity, the uncharged crimes must be highly similar to the charged offenses. (*People* v. *Ewoldt, supra,* 7 Cal.4th 380, 403.) Evidence of an uncharged crime is relevant to prove identity only if the charged and uncharged offenses display a ' "pattern and characteristics . . . so unusual and distinctive as to be like a signature." ' (*Ibid.,* quoting 1 McCormick on Evidence (4th ed. 1992) § 190, pp. 801–803.) 'The strength of the inference in any case depends upon two factors: (1) the *degree of distinctiveness* of individual shared marks, and (2) the *number* of minimally distinctive shared marks.' (*People* v. *Thornton* (1974) 11 Cal.3d 738, 756 [114 Cal.Rptr. 467, 523 P.2d 267], italics in original, disapproved on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].)" (*People v. Kipp* (1998) 18 Cal.4th 349, 369–370 [75 Cal.Rptr.2d 716, 956 P.2d 1169].)

Viewing the evidence in the light most favorable to the trial court's ruling, certain of the charged and uncharged offenses displayed common features that revealed a highly distinctive pattern. As noted in our summary of the evidence, Jillette Mills and Susan Knoll each was fatally strangled and their bodies found in a closed bedroom closet; in the uncharged offense involving Janette Cullins, the victim's body also was found strangled in her closed bedroom closet. Although defendant notes certain differences in the circumstances surrounding the victims' deaths, the combination of fatal strangulation and placement of a young woman's body in a closed bedroom closet is both highly distinctive and suggestive that the same person perpetrated the crimes involving Knoll, Mills, and Cullins.

To be highly distinctive, the charged and uncharged crimes need not be mirror images of each other. Thus, although there were certain differences in the crimes committed against Knoll and Mills, and those against Cullins, such distinctions went to the weight of the evidence and did not preclude the prosecution from introducing the evidence regarding Cullins's murder.

Although the evidence of Kim's death did not share the distinctive features of the murders charged in the present case, it clearly was relevant on the issues of intent and a common plan.[14] The vehicle owned by Tok Kim was missing at the time her body was found but later was discovered near the residence of Knoll and Mills. Subsequently, a white Datsun 280 ZX matching the description of Mills's vehicle, missing since the time Mills's body was

---

[14] Although no cause of death was established as to Kim, as noted a curtain tie was found beneath her neck. In his briefing, defendant characterizes Kim's death as an "uncharged homicide."

found, was observed in the vicinity of Cullins's apartment near the time of Cullins's murder. When arrested, defendant had on his person or in the Datsun an eclectic array of objects identified as having belonged to (1) each of the three victims in the murders charged in the present case, (2) Janette Cullins, and (3) Tok Kim.

The shared characteristics of the killings, as well as the presence of evidence associated with a particular victim or victims at events related to the next murder, indicate that when defendant committed the crimes charged in the present case as well as the uncharged crimes, he acted pursuant to a common plan to kill and steal from his victims.

██ "A lesser degree of similarity is required to establish relevance on the issue of common design or plan. (*People* v. *Ewoldt, supra,* 7 Cal.4th 380, 402.) For this purpose, 'the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual.' (*Id.,* at p. 403.) . . .

██ "The least degree of similarity is required to establish relevance on the issue of intent. (*People* v. *Ewoldt, supra,* 7 Cal.4th 380, 402.) For this purpose, the uncharged crimes need only be 'sufficiently similar [to the charged offenses] to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' [Citations.]" ' (*Ibid.*)" (*People v. Kipp, supra,* 18 Cal.4th 349, 371.) Considering the shared characteristics noted above, we conclude that the trial court did not abuse its discretion in implicitly determining that the charged and uncharged offenses were sufficiently similar to support an inference that defendant harbored the same intent—to kill and to steal—in each instance. (See *People v. Kipp, supra,* 18 Cal.4th 349, 371.)

██ As we stated in *Kipp,* "There is an additional requirement for the admissibility of evidence of uncharged crimes: The probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury. (*People* v. *Ewoldt, supra,* 7 Cal.4th 380, 404–405.) On appeal, a trial court's resolution of these issues is reviewed for abuse of discretion. (*Id.* at p. 405.) A court abuses its discretion when its ruling 'falls outside the bounds of reason.' (*People* v. *De Santis* (1992) 2 Cal.4th 1198, 1226 [9 Cal.Rptr.2d 628, 831 P.2d 1210].)" (*People v. Kipp, supra,* 18 Cal.4th 349, 371.)

We find no abuse of discretion. Evidence of the circumstances surrounding the death of Tok Kim was highly probative, as it helped to establish a link between her recent acquaintance with defendant and her sudden death, and

the murders of Susan Knoll, Jillette Mills, Bonnie Guthrie, and Janette Cullins that shortly followed. Because the five women each died within a period of approximately four days, the proximity of these incidents to each other "further enhanced" the probative value of the other crimes evidence. (See *People v. Kipp, supra,* 18 Cal.4th 349, 371.) Kim's Honda was discovered shortly after her death, hundreds of miles from her residence, parked in front of the apartment in which the bodies of Knoll and Mills were discovered, and at approximately the same time that Mills's car disappeared. Evidence of the circumstances of Cullins's death was probative for the same reason. Mills's missing white Datsun 280 ZX matched the description of the vehicle that a neighbor observed rapidly driving away from the apartment building in which Cullins (who also had been acquainted with defendant) had resided. The cause of Cullins's death, and the location of her body in a bedroom closet, closely resembled both the manner of killing and the concealment utilized by the perpetrator at the Knoll/Mills crime scene. As noted, at the time of defendant's arrest items linking him to all five deceased women were discovered on his person or in Mills's vehicle.

These evidentiary links were highly probative as to the identity of the perpetrator of the crimes, as well that person's murderous and larcenous common plan and intent. The prosecution was required to prove in its case-in-chief that defendant intended to kill Knoll, Mills, and Guthrie, each of whom was fatally strangled. When the trial court ruled admissible the evidence in question, defendant had not conceded either the issue of identity or intent, nor did the prosecution possess other evidence proving these material disputed facts so conclusively that evidence of the Kim and Cullins deaths should have been excluded as merely cumulative. (See *People v. Kipp, supra,* 18 Cal.4th 349, 372.)

"Against this substantial probative value on material and contested issues, we must weigh the danger of undue prejudice to defendant, of confusing the issues, or of misleading the jury." (*People v. Kipp, supra,* 18 Cal.4th 349, 372.) Evidence of the Kim and Cullins crimes "posed a substantial danger of prejudice to defendant because a jury would be inclined to view [such] evidence . . . as evidence of his criminal propensities, and because a jury might well view defendant as deserving of punishment" for the Kim and Cullins crimes regardless of his guilt of the Knoll, Mills, and Guthrie murders. (*Ibid.*) "But prejudice of this sort is inherent whenever other crimes evidence is admitted (*People v. Ewoldt, supra,* 7 Cal.4th 380, 404), and the risk of such prejudice was not unusually grave here." (*People v. Kipp, supra,* 18 Cal.4th 349, 372.) The Kim death and the Cullins murder were not significantly more inflammatory than the charged offenses; the prosecution was unable definitively to establish that Kim had died at the hands of another, and there was no evidence that Cullins suffered sexual assault as had Mills and Guthrie.

Moreover, the jury was instructed correctly pursuant to CALJIC Nos. 2.09 and 2.50 as to the limited purposes for which it might consider the evidence of the Kim and Cullins matters. The instructions conveyed that evidence relating to those events could not be considered to prove defendant's bad character or criminal disposition.[15]

██ Defendant also contends that in view of the summary nature of the trial court's ruling denying defendant's motion, the court "failed to engage in the balancing process required under Evidence Code section 352 or [Penal Code] section 954," and on that basis reversal is required. We disagree. The parties agreed to present the issue to the court based on the strength of their written submissions (that is, without oral argument), prompting the court to observe that the parties' arguments "certainly were completely handled in the papers." Although "the better practice" would have been for the trial court, prior to issuing its ruling, to have set forth on the record its balancing of the probative value of the evidence against its prejudicial effect (*Brown v. Smith* (1997) 55 Cal.App.4th 767, 793 [64 Cal.Rptr.2d 301]), its ruling did not have to be that explicit. (See *People v. Garceau* (1993) 6 Cal.4th 140, 177–179 [24 Cal.Rptr.2d 664, 862 P.2d 664] [trial court's failure to state on the record that it had weighed prejudice against probative value held not erroneous when parties had argued at length as to the admissibility of certain testimony that allegedly was unduly prejudicial to the defendant]; *People v. Raley* (1992) 2

---

[15] The jury was instructed pursuant to CALJIC No. 2.09, as follows:

"Evidence concerning Tok Chum Kim in Oakland and Janette Cullins in San Diego was admitted for the limited purpose of determining if it shows the identity of the person who committed the crime of which the defendant is accused.

"Do not consider such evidence for any purpose except the limited purpose for which it was admitted."

The jury also was instructed pursuant to CALJIC No. 2.50, as follows:

"Evidence has been introduced for the purpose of showing that the defendant committed [crimes] other than that for which [he] is on trial.

"Such evidence, if believed, was not received and may not be considered by you to prove that defendant is a person of bad character or that [he] has a disposition to commit crimes.

"Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show:

"[The existence of the intent which is a necessary element of the crime charged;]

"[The identity of the person who committed the crime, if any, of which the defendant is accused;]

"[A motive for the commission of the crime charged;]

"[The defendant had knowledge of the nature of things found in [his] possession;]

"[The defendant had knowledge or possessed the means that might have been useful or necessary for the commission of the crime charged;]

"[The defendant did not reasonably and in good faith believe that the person with whom [he] engaged or attempted to engage in a sexual act consented to such conduct;]

"[The crime charged is a part of a larger continuing plan, or scheme].

"For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case.

"You are not permitted to consider such evidence for any other purpose."

Cal.4th 870, 894–895 [8 Cal.Rptr.2d 678, 830 P.2d 712] [trial court's explicit rejection of the Evidence Code section 352 claim deemed to be sufficient, the court "having heard lengthy argument"]; *People v. Mickey* (1991) 54 Cal.3d 612, 655–656 [286 Cal.Rptr. 801, 818 P.2d 84] [in upholding admissibility of the defendant's letters that assertedly were privileged under Evidence Code section 980, observing that although the trial court could have been more explicit in explaining its reasoning, "we review the ruling, not the reasoning"]; see also *People v. Triplett* (1993) 16 Cal.App.4th 624, 626–629 [20 Cal.Rptr.2d 225] [reviewing the evolution of the case law in this area].) In the present case, the parties submitted the issue to the court on the strength of their thoroughly prepared written arguments. In view of the court's indication it had reviewed such submissions, the weighing process contemplated by Evidence Code section 352 may be inferred.

In view of the foregoing, we conclude the trial court did not exceed the bounds of reason in determining that the probative value of the evidence of the Kim and Cullins matters "was not substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*People v. Kipp, supra*, 18 Cal.4th 349, 372.)

Finally, even if we were to assume that the trial court erred in denying defendant's motion to exclude the evidence relating to the deaths of Kim and Cullins, reversal would not be required unless it is reasonably probable the outcome would have been more favorable to defendant had such evidence been excluded. (*People v. Kipp, supra*, 18 Cal.4th 349, 374.) In view of the strong evidence implicating defendant in the charged murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie, it is not reasonably probable that an outcome more favorable to defendant would have been reached in the absence of the evidence related to Kim and Cullins.

E. *Denial of Motion for Severance of the Culver City Crimes (Knoll and Mills) from the West Los Angeles Crimes (Guthrie)*

Defendant contends the trial court improperly denied his motion to sever defendant's trial on the "Culver City crimes" involving the murders of Susan Knoll and Jillette Mills, the rape of Mills, and the burglary of the apartment shared by Knoll and Mills (offenses that were alleged to have occurred on April 10, 1984) from the "West Los Angeles crimes" involving the murder and rape of Bonnie Guthrie and the burglary committed at her apartment (offenses that were alleged to have occurred on April 11, 1984). Defendant argues that in denying the motion to sever and thereby compelling him to face "a joint trial of offenses arising from separate incidents on different

dates," the trial court denied defendant a panoply of state and federal constitutional rights, requiring reversal of the entire judgment. In particular, defendant maintains that "while the offenses are of the same class, the crimes were not inextricably connected in their commission, and the so-called common markers between the Mills/Knoll and Guthrie homicides can only be termed 'minimally distinctive' under close scrutiny." Defendant further contends that the trial court erred in denying his motion to sever in the same summary fashion as the court had denied defendant's motion to exclude the other crimes evidence, and in failing explicitly to weigh the relevant factors on the record and exercise its discretion. None of these claims has merit.

"Section 954 provides that '[a]n accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately.' Because both offenses involved murder and thus belonged to the same class of crimes, the statutory requirements for joinder were satisfied. Therefore, defendant can predicate error in denying the motion to sever only upon a clear showing of potential prejudice. (*People* v. *Osband* (1996) 13 Cal.4th 622, 666 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *People* v. *Sandoval* (1992) 4 Cal.4th 155, 172–173 [14 Cal.Rptr.2d 342, 841 P.2d 862], affd. *sub nom. Victor* v. *Nebraska* (1994) 511 U.S. 1 [127 L.Ed.2d 583, 114 S.Ct. 1239].)[16]

■ "In reviewing this claim, we apply the familiar standard of review providing that the trial court's ruling may be reversed only if the court has abused its discretion. (*People* v. *Mayfield* (1997) 14 Cal.4th 668, 720 [60 Cal.Rptr.2d 1, 928 P.2d 485]; *People* v. *Davis* (1995) 10 Cal.4th 463, 508 [41 Cal.Rptr.2d 826, 896 P.2d 119]; see *People* v. *Osband, supra,* 13 Cal.4th 622, 666; *People* v. *Cummings* (1993) 4 Cal.4th 1233, 1284 [18 Cal.Rptr.2d 796, 850 P.2d 1].) An abuse of discretion may be found when the trial court's ruling ' "falls outside the bounds of reason." ' (*People* v. *Osband, supra,* 13 Cal.4th 622, 666.)

■ " ' "The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be

---

[16] "Proposition 115, adopted in June 1990, contained several new constitutional and statutory provisions on the subjects of joinder and severance. (See Cal. Const., art. I, § 30, subd. (a); § 954.1.) Defendant was tried prior to the effective date of Proposition 115, and accordingly we apply the law predating Proposition 115 in our review of defendant's claims regarding severance. (*People* v. *Arias* (1996) 13 Cal.4th 92, 126, fn. 7 [51 Cal.Rptr.2d 770, 913 P.2d 980].)" (*People* v. *Bradford* (1997) 15 Cal.4th 1229, 1314, fn. 13 [65 Cal.Rptr.2d 145, 939 P.2d 259].)

separately tried." [Citation.] [¶] "The determination of prejudice is necessarily dependent on the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial." [Citation.] Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case. [Citations.]' (*People v. Sandoval, supra,* 4 Cal.4th 155, 172–173; *People v. Mayfield, supra,* 14 Cal.4th 668, 721; *People v. Memro* (1995) 11 Cal.4th 786, 849–850 [47 Cal.Rptr.2d 219, 905 P.2d 1305]; *People v. Davis, supra,* 10 Cal.4th 463, 507–508; *People v. Mason* (1991) 52 Cal.3d 909, 933–934 [277 Cal.Rptr. 166, 802 P.2d 950]; *Williams v. Superior Court* (1984) 36 Cal.3d 441, 452–454 [204 Cal.Rptr. 700, 683 P.2d 699].)

"Furthermore, we have observed that the criteria enumerated in *Sandoval* are not equally significant. '[T]he first step in assessing whether a combined trial [would have been] prejudicial is to determine whether evidence on each of the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others. If so, any inference of prejudice is dispelled.' (*People v. Balderas* (1985) 41 Cal.3d 144, 171–172 [222 Cal.Rptr. 184, 711 P.2d 480]; see *People v. Mayfield, supra,* 14 Cal.4th 668, 721.) Cross-admissibility suffices to negate prejudice, but it is not essential for that purpose. Although ' "we have held that cross-admissibility ordinarily dispels any inference of prejudice, we have never held that the absence of cross-admissibility, by itself, sufficed to demonstrate prejudice." ' (*People v. Sandoval, supra,* 4 Cal.4th 155, 173.)" (*People v. Bradford, supra,* 15 Cal.4th 1229, 1314–1316.)

In the present case, the trial court's denial of defendant's motion to sever clearly was based on certain obvious similarities among the crimes. "Pursuant to Evidence Code section 1101, subdivision (b), evidence that a defendant has committed an offense, although inadmissible to demonstrate a defendant's *disposition* to commit crimes, may be received to establish, among other things, identity, intent, motive, or plan. To be admissible to demonstrate a distinctive modus operandi, the evidence must disclose common marks or identifiers, that, considered singly or in combination, support a strong inference that the defendant committed both crimes. (*People v. Miller* (1990) 50 Cal.3d 954, 988–989 [269 Cal.Rptr. 492, 790 P.2d 1289]; *People v. Bean* (1988) 46 Cal.3d 919, 937 [251 Cal.Rptr. 467, 760 P.2d 996]; see *People v. Memro, supra,* 11 Cal.4th 786, 851; *People v. Ewoldt*[*, supra*], 7

Cal.4th 380, 403 [27 Cal.Rptr.2d 646, 867 P.2d 757].)" (*People v. Bradford, supra*, 15 Cal.4th 1229, 1316.)

The Susan Knoll/Jillette Mills and Bonnie Guthrie offenses, having been committed approximately one day apart, each involved the murder by strangulation of young women whose belongings were found approximately one week later in defendant's possession. On this basis alone, the evidence connecting defendant to the Knoll/Mills and Guthrie crimes would be cross-admissible if the court had ordered separate trials, thereby dispelling any inference of prejudice. (*People v. Bradford, supra*, 15 Cal.4th at pp. 1315–1316.) Moreover, because both crime scenes involved murder and sexual assault, the evidence from each disclosed a commonality with regard to intent and plan (Evid. Code, § 1101, subd. (b)), while presenting little if any possibility that one of the charges or set of charges would have unduly inflamed the jury against defendant. Although all three women were not strangled in an identical manner—Mills and Guthrie were strangled by ligature, whereas Knoll was strangled manually—both crime scenes had in common a ligature strangulation, as well as the traumatic sexual assault of Mills and Guthrie. Nor did the prosecution join a "weak case" with a "strong" one—the evidence linking defendant to each crime was especially compelling. Further, Knoll and Guthrie were best friends, a circumstance that suggested one person committed the crimes against both victims in the two-day period, and that therefore supported the cross-admissibility of the evidence. The murders of each of the three women presented one or more special circumstances; because *each* one of the murders by itself formed the basis for capital charges to be brought against the perpetrator, *joinder* did not lead to one set of crimes being "elevated" to capital status.

Although the better practice would have been for the trial court to make clear on the record the basis for its denial of defendant's motion to sever, the court's failure to articulate its reasoning does not invalidate its ruling or undermine the correctness of that denial.

Further, we observe that even had defendant demonstrated that the evidence would not have been cross-admissible, he has failed to establish prejudice. He has not demonstrated that one offense or set of offenses was "significantly more likely to inflame the jury against defendant, since the murders were similar in nature and equally gruesome. Defendant has not shown that evidence of guilt was significantly stronger in one case, creating the danger that that case would be used to bolster the weaker case, because the prosecutor's evidence was nearly equal in strength" in establishing defendant's involvement in the Knoll/Mills and Guthrie murders. (*People v. Bradford, supra*, 15 Cal.4th at pp. 1317–1318.)

Under these circumstances, no abuse of discretion appears. We therefore reject defendant's claims of error.

> F. *Pretrial and Midtrial Motions Contesting the Sufficiency of the Evidence of Felony Murder in the Deaths of Susan Knoll, Jillette Mills, and Bonnie Guthrie, and of the Special Circumstances of Burglary and Rape*

Prior to trial, defendant moved pursuant to section 995 to strike and set aside the substantive charges and special circumstances pertaining to the murders and to other offenses involving victims Susan Knoll, Jillette Mills, and Bonnie Guthrie. The motion was denied. Defendant thereafter petitioned the Court of Appeal for writ relief, which also was denied. At the close of the prosecution's case-in-chief, defendant filed a motion for judgment of acquittal, pursuant to section 1118.1. This motion, too, was denied.

Defendant generally contends there was insufficient evidence (1) to support his conviction, based on the theory of felony murder, for the murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie, and (2) to find true the special circumstance allegations of burglary and rape. Defendant specifically asserts the evidence was inadequate to establish that he harbored a felonious intent upon entering the victims' residences; he notes the premises bore no sign of forced entry. Defendant's position is without merit.

The law applicable to a claim of insufficiency of the evidence is well settled: " 'In reviewing [a claim regarding] the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " ' [Citation.] If we determine that a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt, the due process clause of the United States Constitution is satisfied [citation], as is the due process clause of article I, section 15, of the California Constitution [citation]." (*People v. Osband, supra,* 13 Cal.4th 622, 690; see also *People v. Ochoa* (1998) 19 Cal.4th 353, 413–414 [79 Cal.Rptr.2d 408, 966 P.2d 442]; *People v. Morris* (1988) 46 Cal.3d 1, 19 [249 Cal.Rptr. 119, 756 P.2d 843].)

Section 187, subdivision (a), defines murder as "the unlawful killing of a human being, or a fetus, with malice aforethought." At the time the crimes

were committed, first degree murder could be accomplished by a "murder . . . committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288 . . . ." (Former § 189, as amended by Stats. 1982, ch. 950, § 1, p. 3440.) Rape was defined in pertinent part as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator [that was] [¶] . . . [¶] . . . accomplished against a person's will by means of force or fear of immediate and unlawful bodily injury on the person or another." (Former § 261, subd. (2), as amended by Stats. 1984, ch. 1635, § 79.5, p. 5865.) Burglary was defined, in pertinent part, as an entry into any "room, apartment . . . or other building . . . with intent to commit grand or petit larceny or any felony . . . ." (Former § 459, as amended by Stats. 1984, ch. 854, § 2, p. 2896.)

With regard to the murder charges, we observe that Susan Knoll, Jillette Mills, and Bonnie Guthrie each was fatally strangled; Knoll manually, Mills and Guthrie by ligature. There is no question that each of these killings was unlawful and was committed with malice aforethought. Defendant's palm print was discovered in the apartment shared by Susan Knoll and Jillette Mills where their bodies were found.

Similarly, the evidence was sufficient to establish rape; Mills's and Guthrie's bodies bore signs of having suffered traumatic sexual assault, and seminal fluid discovered on a white nightgown in the apartment was consistent with defendant's PGM type and that of 15.8% of the population.

With regard to the offense of burglary, evidence of a forced entry is not required to establish felonious intent; defendant's intent instead may be inferred from all of the facts and circumstances disclosed by the evidence. (*People v. Matson* (1974) 13 Cal.3d 35, 41 [117 Cal.Rptr. 664, 528 P.2d 752].) Defendant's commission of crimes in close temporal proximity, combined with a very similar modus operandi in each incident, strongly indicates that he entered the residences with the requisite felonious intent. (*Ibid.*)

Defendant was arrested driving Mills's stolen Datsun 280 ZX, containing an Alpha Beta supermarket CASHEX card identified as having belonged to Knoll; towels, athletic wear, and photographic equipment identified as having belonged to Mills; and three hand-woven sweaters identified as having belonged to Bonnie Guthrie.

In view of the evidence summarized above, the jury reasonably could have inferred that the murders of Knoll, Mills, and Guthrie occurred in the course of defendant's having committed the felonies of burglary and rape. The

evidence adduced at trial clearly was sufficient, for purposes of the felony-murder rule and the special circumstances alleged, to establish that defendant committed rape and burglary.

### G. *Motion to Reconsolidate the Los Angeles, Alameda, and San Diego County Cases*

As originally filed, the complaint against defendant charged all of the crimes allegedly committed in Alameda, Los Angeles, and San Diego Counties in a single pleading. Defendant subsequently moved to dismiss the charges arising from the Alameda and San Diego crimes committed against Tok Kim and Janette Cullins, respectively. The prosecution did not oppose the motion, instead informing defendant that if the motion were granted, the crimes committed in Alameda and San Diego Counties would form the basis for a refiling of the charges against defendant in those counties.[17]

On January 28, 1986, the court granted defendant's motion to dismiss the charges involving the crimes committed in Alameda and San Diego Counties. Defendant thereafter separately was charged in San Diego County for the murder of Janette Cullins, and was transferred to that county for arraignment, preliminary hearing, and other pretrial motions. Defendant also was charged in Alameda County with murder and related offenses involving Tok Kim.[18]

---

[17] At the hearing on defendant's motion to sever, the prosecutor observed:

"The law is very clear that venue objections must be made in a timely fashion or they are forever waived. This is the correct time for making such a motion, and I think there is no legally tenable ground the People would urge for the court to deny the motion. In other words, I think the motion is well-taken.

"I filed the case in its present form for two primary or three primary reasons. First, because it seemed to me quite clear that this is a series of crimes in the general sense connected in their commission. It made sense to me that there be one prosecution rather than three separate prosecutions, and in order to foreclose a later objection in Oakland and San Diego, it seemed to me important that the defense be given first an opportunity to have this case tried as one and secondly be put on notice that if only the Los Angeles crimes were charged here that it would be clear that both Oakland and San Diego were going to go forward with their cases as capital cases and that the defense would have to be prepared to defend the crimes committed in Oakland and in San Diego and could not then be heard in those two counties to urge that this should have been prosecuted all in Los Angeles County. [¶] . . . [¶]

"So, with that in mind, the defendant is put on notice now that there will be prosecutions in Oakland and San Diego. [¶] . . . [¶]

"Thus, what the defense has chosen to do is to accept the inevitability of three separate death penalty trials with the attendant risk of three death penalty verdicts by juries, three separate appeals, any [one] of which not being successful would result in the ultimate punishment."

[18] As previously noted (*ante*, at p. 1146), the Alameda County prosecution ultimately was dismissed after the Los Angeles and San Diego County death judgments were rendered against defendant.

On August 8, 1988, more than two and one-half years after the court granted defendant's motion to dismiss the Alameda and San Diego County charges, defendant—now represented by new counsel—moved to reconsolidate the Alameda, Los Angeles, and San Diego cases. At the hearing conducted 10 days later, defense counsel informed the court that the motion was made over defendant's objection.[19] After hearing the parties argue the issue and observing that the disagreement between defendant and his attorneys as to whether to seek reconsolidation "[d]oes raise an interesting issue," the court granted defense counsel's request for one additional day in which to review the matter with defendant. At the hearing the next day, defense counsel informed the court that notwithstanding counsel's efforts to persuade defendant to seek reconsolidation, defendant remained in "clear opposition" to the motion. The court determined that defendant's position on the issue was "paramount," and denied the motion to reconsolidate.[20]

On appeal, defendant contends the trial court erred in denying his motion to reconsolidate the Alameda, Los Angeles, and San Diego cases. Specifically, defendant contends that his trial attorneys' decision to seek reconsolidation over defendant's objection fell within counsel's "tactical prerogative" to "waive" defendant's right to a jury drawn from the vicinage where the crimes were committed, and that the trial court's denial of the motion violated defendant's rights to "due process of law, fair trial, burden of proof, effective assistance of counsel, death eligibility and reliable determinations of guilt and penalty."

Although it is questionable whether the trial court was correct in determining that defendant, rather than defense counsel, possessed the "paramount" authority to decide whether a motion to reconsolidate the charges should have been proffered (see, e.g., *People v. Guzman* (1988) 45 Cal.3d 915, 935–939 [248 Cal.Rptr. 467, 755 P.2d 917]), even if the trial court erred in this

---

[19] At the hearing on the motion to reconsolidate, defense counsel represented to the court: "I . . . am prepared to indicate with the utmost clarity, that Mr. Carter opposes the motion to reconsolidate. [¶] . . . [¶] Mr. Carter's position on the motion to reconsolidate, his personal position is that he is opposed to the motion."

[20] The court found: "The bottom line is that Mr. Carter is facing three chances to get the death penalty as the cases stand now. If they were consolidated, there would be but one.

"And just from a logical standpoint it would seem like his odds are better with consolidation than the cases being tried in three separate jurisdictions as they're set up now.

"On the other hand, it's the court's view that this is a monumental issue and that it is one of fundamental importance and at this point in time I cannot see overriding Mr. Carter's desires in telling the District Attorney to set in motion procedures to bring all these cases together. [¶] . . . [¶]

". . . I think this is the type of decision that Mr. Carter is entitled to make, and no matter what the court's personal view is to the benefit of his making that decision, I don't think it's the kind that can be overridden, I think Mr. Carter's decision will have to remain the paramount one in this issue and the motion to reconsolidate is denied."

determination we conclude that reversal of the judgment is not warranted because the error was not prejudicial. Had the trial court granted defense counsel's motion to reconsolidate the Alameda and San Diego charges with the Los Angeles charges, there is no reasonable probability (or, for that matter, possibility) that defendant would have fared better in a consolidated trial involving these additional charges than he did in a trial of the Los Angeles charges alone. Defendant presents no persuasive basis for concluding that a jury that imposed the death sentence for three murders would have imposed a lesser sentence if defendant had been charged in this proceeding with additional crimes, including murder.

Defendant contends that a trial court's error in failing to consolidate charges should be characterized as "structural error" that requires reversal without any showing of prejudice. (See, e.g., *People v. Cahill* (1993) 5 Cal.4th 478, 501–502 [20 Cal.Rptr.2d 582, 853 P.2d 1037].) Defendant presents no authority, however, to support the claim that a failure to consolidate charges arising from crimes committed in different counties constitutes structural error, and we conclude that the contention lacks merit. Although the severance of the Los Angeles charges from the San Diego and Alameda charges—on defendant's own motion—resulted in defendant's having to face two separate capital trials, in the absence of any showing how defendant was prejudiced in either trial it is clear that the failure to consolidate the cases did not undermine the basic fairness of either trial or warrant reversal of the judgment.[21]

H. *Pretrial Ruling Denying Exclusion of the Evidence Related to Kim or of the Testimony of Ray Blevins, Based on the Prosecution's Failure to Timely Disclose Exculpatory Semen Evidence at the Kim Crime Scene*

On June 15, 1989, five days before the prosecution commenced the presentation of its case-in-chief, defendant moved for a mistrial or, alternatively, for exclusion of the evidence pertaining to the death of Tok Kim or of the testimony of her former boyfriend Ray Blevins, on the ground the prosecution had failed to timely provide the defense with a 1986 laboratory report generated by the Oakland Police Department. The report indicated defendant was not the donor of semen found on a bedspread in Kim's apartment. Defendant argued that the prosecution's failure to respond in a timely fashion to a February 19, 1988 discovery order to produce any forensic evidence or related reports pertaining to the bedspread, coupled with Blevins's death in 1987, precluded the defense from ascertaining whether

---

[21] In view of our determination that the trial court's denial of the motion to reconsolidate may not be set aside on appeal, we need not and do not address the broader question under what circumstances an intercounty reconsolidation order might be proper or improper.

Blevins was the donor of the semen. In response, the prosecution argued that the report had not been timely disclosed because Oakland Police Department officials had failed to transfer it to the prosecutor and, in any event, the report was immaterial because the prosecution alleged that defendant had murdered Kim, not that he had raped her. The trial court denied defendant's motion in its entirety.

On appeal, defendant contends the trial court erred in denying his motion, asserting that the laboratory report was "highly material." We review the matter for abuse of discretion. (*People v. Jenkins* (2000) 22 Cal.4th 900, 957 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) No abuse of discretion appears. When the report was provided to the defense, the prosecution had yet to present its case-in-chief, and the defense still had time to formulate a response to the evidence. Moreover, as indicated above, a proffer of rape never had been part of the proffer of the other crimes evidence. Rather, the relevance of the evidence pertaining to Kim's death was twofold: (1) to demonstrate a similarity in the circumstances of her death to the murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie, pursuant to Evidence Code section 1101, subdivision (b), and (2) to establish a link between defendant and the Los Angeles County murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie based upon the circumstances that Kim's *vehicle* was parked outside the apartment occupied by Knoll and Mills, and that Mills's vehicle, containing possessions belonging to each of the victims, was being driven by defendant at the time of his arrest. The discovery of semen on Kim's *bedspread*, and the report establishing that defendant had not been the donor of that fluid, was, at best, of marginal significance in the prosecution's case against defendant with regard to the Los Angeles County murders. Therefore, defendant was not prejudiced by the prosecution's belated disclosure of the laboratory report prior to the swearing-in of the jury and the introduction of evidence.

Defendant makes the related assertion that the prosecutor misled the jury by arguing that the circumstances surrounding the deaths of each of the victims, including Tok Kim, had sexual assault as a common marker. The record belies this claim. In his closing summation to the jury, which was relatively brief in view of the number of crimes charged against defendant, the prosecutor did not assert that Kim had been raped or otherwise sexually assaulted, and instead made clear that only "two [victims] were raped" and that "[t]he evidence relating to Miss Kim [was] offered to you for your determination in how the defendant was involved in this and, if he was, how he relates to all of this." Later in his summation, the prosecutor asked, rhetorically if also ambiguously, "When did [defendant] form the intent to steal or to rape? Was this, in the case of Miss Kim, which is not before you as a finding that you have to make, an afterthought? Certainly it's possible." The fleeting reference to Kim in this context hardly suggested to the jury that

defendant had sexually assaulted her; to the contrary, the prosecutor explicitly reminded the jury that it need not make any findings as to Kim. Again, no prejudice appears.

### I. *Pretrial Ruling Admitting the Alameda County Eyewitness Identifications*

As part of the police investigation following the discovery of Tok Kim's body on April 13, 1984, Oakland Police Sergeant Raymond Conner prepared a photographic lineup containing defendant's photograph as well as the photographs of five other individuals (members of the Oakland Police Department, shown wearing street clothes, without indicia of their occupation). The lineup was shown to nine witnesses, eight of whom identified defendant as the man they saw with Kim, and one of whom alternated between selecting defendant's image and that of one other individual depicted in the lineup. The order in which the photographs were arranged was changed between presentations to the witnesses, who were separately shown the lineup. At a pretrial proceeding, defendant moved to suppress the photographic identifications as having been the product of an unduly suggestive lineup. Following an evidentiary hearing, in which Sergeant Conner testified, the court denied the motion, observing: "[C]ertainly there are some differences, as there always are in photographs, but I don't find that the photographic lineup was unduly suggestive."

On appeal, defendant renews his contention that the lineup was impermissibly suggestive, "resulting in a tainted in-court identification critical to the People's case." He asserts the testimony given by several of these witnesses at trial deprived him of his federal and state constitutional rights to due process of law, a fair trial, confrontation, an impartial jury, and reliable determinations of guilt, death eligibility, and penalty. Specifically, defendant contends: (1) he was the only person whose photograph depicted an individual wearing an orange shirt that resembled a "jail jumpsuit"; (2) the photograph of defendant was of "booking-photograph quality," as distinguished from the Polaroid photographs of the other individuals depicted in the lineup; (3) upon identifying defendant's photograph, the witnesses were asked to sign their names on the reverse side of the image, a technique that "subtl[y] . . . reinforce[d]" and tainted the witnesses' identification of defendant.

" 'In deciding whether an extrajudicial identification is so unreliable as to violate a defendant's right to due process, the court must ascertain (1) "whether the identification procedure was unduly suggestive and unnecessary," and, if so, (2) whether the identification was nevertheless reliable under the totality of the circumstances. (*People* v. *Gordon* (1990) 50 Cal.3d 1223,

1242 [270 Cal.Rptr. 451, 792 P.2d 251].)' (*People* v. *Wash* [(1993)] 6 Cal.4th [215,] 244 [24 Cal.Rptr.2d 421, 861 P.2d 1107].)" (*People v. Carpenter* (1997) 15 Cal.4th 312, 366–367 [63 Cal.Rptr.2d 1, 935 P.2d 708].) Whether we review deferentially or independently the trial court's finding regarding suggestiveness (see *id.*, at p. 367; *People v. Johnson* (1992) 3 Cal.4th 1183, 1216–1217 [14 Cal.Rptr.2d 702, 842 P.2d 1]), defendant's position lacks merit.

Our review of the photographs contained in the lineup indicates that defendant overstates the significance of the distinguishing characteristics seen in the photographs, and overlooks their more compelling general similarities. Each one of the six color photographs is approximately the same size, and depicts a middle-aged or somewhat younger adult male with a mustache and dark hair. Two of the individuals are shown wearing white T-shirts, two are seen wearing light-colored "dress" or "polo" shirts, one wears a plaid shirt, and one individual—defendant—is wearing an orange shirt. Nothing about defendant's shirt identifies it as a "jail jumpsuit" or any other type of jail-issued clothing, and even if it had, a conclusion that the lineup was unduly suggestive would not necessarily follow. (*People v. Johnson, supra*, 3 Cal.4th 1183, 1217 ["The fact that defendant was the only person depicted in jail clothing . . . was not unduly suggestive under the circumstances present here."].) The expressions exhibited by the individuals are roughly comparable: each has his eyes open and his mouth closed, except for one individual whose mouth is slightly parted. Such distinctions are immaterial. (*Id.*, at p. 1217 [minor differences in facial hair among the participants in a photo lineup held not to be suggestive].) Although the size of the white border around defendant's photograph is slightly larger than the border seen on the Polaroid images, and the Polaroid images are glossy while the image of defendant is semigloss, such trivial distinctions also are immaterial. (*Ibid.* [differences in background color and image size among the photographs held not to render the lineup impermissibly suggestive].) The witnesses clearly were instructed to consider the *persons* depicted, not whether a particular image was potentially distinguishable from the others based upon variations in photographic composition or processing.[22]

■ Nor do we attach significance to Sergeant Conner's request that the witnesses write their names on the backs of the particular photographs they identified. Although it would have been preferable to employ a more neutral

---

[22] Prior to viewing the photographs, the witnesses were admonished by Sergeant Conner: "You'll be asked to look at a group of photographs. The fact that the photographs are shown to you should not influence your judgment. You should not conclude or guess that the photographs contain the picture of the person that committed the crime. You're not obliged to identify anyone. [¶] It's just as important to free innocent persons from suspicion as to identify guilty parties. [¶] Please do not discuss the case with other witnesses or indicate in any way that you have or have not identified someone, other than to myself."

recordation procedure—for example, one in which a witness did not discover upon selecting an individual from the lineup that other witnesses previously had identified the same person—we disagree with defendant that the procedure utilized by Conner was unduly suggestive or represented a "subtle method of reinforcement." Because the witnesses' signatures were added only *after* each witness had made his or her selection, we find no basis for concluding that the witnesses were induced to identify defendant's image. (Compare *People v. Ochoa, supra,* 19 Cal.4th 353, 411–413 [photographic identification of the defendant upheld notwithstanding the circumstance that his photograph was the only one taken in profile: " 'A procedure is unfair which suggests *in advance of identification* by the witness the identity of the person suspected by the police.' " (Italics added.)].)

In sum, regardless of the applicable standard of review, we conclude that defendant has failed to meet his burden of establishing that the photo identification procedure used here was unduly suggestive. (See *People v. Carpenter, supra,* 15 Cal.4th 312, 367.) We therefore need not reach the question " 'whether the identification was nevertheless reliable under the totality of circumstances.' " (*People v. Carpenter, supra,* 15 Cal.4th 312, 366–367; see also *People v. Ochoa, supra,* 19 Cal.4th 353, 413; *People v. Johnson, supra,* 3 Cal.4th 1183, 1218.)[23]

### J. *Pretrial Ruling Admitting Photographs and Testimony of Victims' Relatives Identifying Victims' Property*

At a pretrial hearing, defense counsel made several motions in limine pertaining to evidence involving the three Los Angeles County murder victims, Jillette Mills, Susan Knoll, and Bonnie Guthrie, as well as the San Diego County murder victim, Janette Cullins, and the Alameda County deceased woman Tok Kim. Specifically, counsel offered a broad range of stipulations in an effort to prevent the prosecution from introducing exhibits depicting postmortem photographs of the five individuals (including closeup images of various wounds) and testimony of family members as to the victims' ownership of various items of personal property discovered in Mills's Datsun 280 ZX.[24]

---

[23] Assuming for the sake of argument that the witnesses' in-court identifications of defendant as the man whom they saw in Alameda County with Tok Kim were tainted by unduly suggestive identification procedures at the pretrial stage, any error clearly was harmless in view of other evidence that directly linked defendant to Kim and to the murder victims in Los Angeles and San Diego Counties.

[24] Defense counsel also requested, and the prosecutor agreed to, withdrawal of a photograph that depicted Kim when she was alive. The prosecutor also withdrew photographs depicting Guthrie and Cullins when they were alive.

Immediately prior to the parties' opening statements, outside the jury's presence, the defense renewed its offers to stipulate that on a certain date, Knoll and Mills died by strangulation. Counsel argued that the stipulation "must be accepted," emphasizing in particular the potentially prejudicial impact of one closeup photograph depicting a dark wound on the neck of Knoll's body, an image that counsel described as "terribly disturbing and in my opinion prejudicial." Counsel further offered stipulations as to the testimony to be given by family members. The prosecution rejected the proffered stipulations.

At trial, defense counsel renewed the offer to stipulate that Knoll and Mills "died of strangulation" and, in view of the prosecution's rejection of the proffered stipulations, counsel objected under Evidence Code section 352 to the introduction of two coroner's photographs, one depicting the wound to Knoll's neck, the other depicting bruises to Guthrie's vaginal area. The trial court overruled defendant's objections to the introduction of the photographs, observing: "I don't feel that they're disturbing to the point of being excludable."[25]

The trial court thereafter admitted the challenged photographic evidence and the testimony of various relatives identifying the items of personal property found in the Datsun 280 ZX.

On appeal, defendant renews his challenge to the above described evidence. He contends that because, in view of "the lack of substantive defense presented at [the] guilt phase, trial counsel were willing to stipulate to many facts they considered not in dispute," including the strangulation of victims Knoll, Mills, and Guthrie and the victims' ownership of the items found in the Datsun 280 ZX, the prosecution was required to accept the stipulations offered by the defense. Defendant further contends that the photographic evidence was unduly gruesome as well as cumulative, and that evidence

---

[25] The prosecution also introduced into evidence the following photographic evidence: (1) two photographs depicting Kim's clothed body lying facedown on the floor, each showing postmortem discoloration on her arms; (2) three photographs showing the clothed bodies of Knoll and Mills stacked in their apartment bedroom closet; (3) two photographs showing Guthrie's clothed body lying facedown on the floor of her apartment and one photograph showing her clothed body after investigators placed her on her back, revealing discoloration to her arms and face and a stain on the midsection area of her pants; (4) two coroner's closeup photographs, each showing a portion of Guthrie's body—one showing her discolored facial and neck area and wounds to her nose and lower lip, and one showing her bruised neck; (5) three photographs depicting Cullins's partially clothed and discolored body lying in her apartment bedroom closet, one of which showed a closeup of her stained left hand; (6) two photographs, including one depicting Cullins's partially clothed and discolored body lying in the apartment bedroom closet, and one showing an apparent bloodstain on the bedding, and (7) one coroner's closeup photograph depicting Cullins's neck area, showing an abrasion, discoloration, and an apparent bloodstain on her jaw.

pertaining to the personal property found in the car—that is, the "highly emotional" testimony given by Sandra Pender (Susan Knoll's sister), Jennifer Bollman (Jillette Mills's sister), and George Cullins (Janette Cullins's father)—"was clearly the subject of stipulation or other available procedures, such as identification by police personnel." Defendant assigns further error to the trial court's failure to engage in a weighing process as to the admissibility of the photographs in response to defendant's objection on Evidence Code section 352 grounds. Finally, defendant asserts that he was denied various of his state and federal constitutional rights because of "the trial court's erroneous rulings admitting inflammatory and prejudicial autopsy and family evidence [regarding the items found in the car]."

As we shall explain, none of defendant's contentions have merit.

We recently set forth the applicable analysis in *People v. Heard* (2003) 31 Cal.4th 946 [4 Cal.Rptr.3d 131, 75 P.3d 53]: "In reviewing the ruling of the trial court, we reiterate the well-established principle that 'the admissibility of this evidence has two components: (1) whether the challenged evidence satisfied the "relevancy" requirement set forth in Evidence Code section 210, and (2) if the evidence was relevant, whether the trial court abused its discretion under Evidence Code section 352 in finding that the probative value of the [evidence] was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice.' (*People v. Scheid* (1997) 16 Cal.4th 1, 13 [65 Cal.Rptr.2d 348, 939 P.2d 748].)" (*People v. Heard, supra,* 31 Cal.4th at p. 972.) We address these issues in turn.

### 1. *Relevance of the Photographs and Testimony of Relatives*

" 'The rules pertaining to the admissibility of photographic evidence are well-settled. Only relevant evidence is admissible (Evid. Code, § 350; *People v. Crittenden* [(1994)] 9 Cal.4th 83, 132 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Garceau*[, *supra*,] 6 Cal.4th 140, 176–177 [24 Cal.Rptr.2d 664, 862 P.2d 664]; *People v. Babbitt* (1988) 45 Cal.3d 660, 681 [248 Cal.Rptr. 69, 755 P.2d 253]), and all relevant evidence is admissible unless excluded under the federal or California Constitution or by statute. (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d).) Relevant evidence is defined in Evidence Code section 210 as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The test of relevance is whether the evidence tends " 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.]" (*People v. Garceau, supra,* 6 Cal.4th at p. 177.) The trial court has broad discretion in determining

the relevance of evidence (*ibid.*; *People* v. *Crittenden, supra,* 9 Cal.4th at p. 132; *People* v. *Babbitt, supra,* 45 Cal.3d at p. 681) but lacks discretion to admit irrelevant evidence. (*People* v. *Crittenden, supra,* 9 Cal.4th at p. 132; *People* v. *Burgener* (1986) 41 Cal.3d 505, 527 [224 Cal.Rptr. 112, 714 P.2d 1251].)' (*People v. Scheid, supra,* 16 Cal.4th 1, 13–14.)" (*People v. Heard, supra,* 31 Cal.4th 946, 972–973.)

In his opening brief, defendant does not challenge the relevance of the photographs depicting the deceased women, although in his reply brief he adopts a more critical stance. Defendant's ambivalent position is inconsequential. The images plainly were relevant to the proceedings at the guilt phase of trial (*People v. Heard, supra,* 31 Cal.4th 946, 973–975 [and cases cited therein]), as well as at the penalty phase, to demonstrate circumstances in aggravation. (*People v. Thompson* (1990) 50 Cal.3d 134, 182 [266 Cal.Rptr. 309, 785 P.2d 857].) Nor does defendant clearly assert a relevancy challenge to the testimony regarding the property found within the Datsun 280 ZX, although his characterization of that testimony as being of "minimal probative value," which in his reply brief is amplified to "irrelevant, cumulative, and prejudicial," could be construed as a challenge to its relevancy. To the extent defendant's characterization constitutes a relevance-based challenge, we reject it—the testimony linking the property to the women clearly fell within Evidence Code section 210's definition, and was not cumulative. (See *People v. Heard, supra,* 31 Cal.4th 946, 973–975 [and cases cited therein].)

### 2. *The Photographs and Testimony Were Not Unduly Prejudicial*

Defendant contends the trial court erred in denying his motion to exclude this evidence pursuant to Evidence Code section 352. Defendant maintains the photographs were gruesome and cumulative. He further contends the testimony given by relatives of Knoll, Mills, and Cullins was "highly emotional [and] outweighed the minimal probative value of such testimony." The People disagree with defendant's characterizations and contend the trial court did not abuse its discretion in finding that the probative value of the photographs and the testimony outweighed any potential prejudice. As we shall explain, we find no abuse of discretion.

"The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]" (*People v. Crittenden, supra,* 9 Cal.4th 83, 133–134 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

▆ The photographs at issue "served to illustrate and corroborate the testimony given by various prosecution witnesses regarding the circumstances of the crime[s]." (*People v. Heard, supra,* 31 Cal.4th 946, 976.) " '[I]nsofar as defendant is contending that the trial court was required to exclude the photograph[s] under Evidence Code section 352 because th[e] physical evidence was cumulative of the testimonial evidence presented, the trial court correctly rejected defendant's argument. (See *People v. Wilson* (1992) 3 Cal.4th 926, 938 [13 Cal.Rptr.2d 259, 838 P.2d 1212] [" '[W]e have often rejected the argument that photographs of a murder victim should be excluded as cumulative if the facts for which the photographs are offered have been established by testimony.' "]; accord, *People v. Kaurish* (1990) 52 Cal.3d 648, 684 [276 Cal.Rptr. 788, 802 P.2d 278]; *People v. Thompson* (1988) 45 Cal.3d 86, 115 [246 Cal.Rptr. 245, 753 P.2d 37].)' (*People v. Scheid, supra,* 16 Cal.4th 1, 19.)" (*People v. Heard, supra,* 31 Cal.4th at p. 976.)

▆ As to whether the photographs or the testimony in question had an unduly prejudicial effect, we observe that " '[w]e have described the "prejudice" referred to in Evidence Code section 352 as characterizing evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues. (*People v. Garceau, supra,* 6 Cal.4th 140, 178.) As we previously have observed, victim photographs and other graphic items of evidence in murder cases always are disturbing. (*People v. Hendricks* (1987) 43 Cal.3d 584, 594 [238 Cal.Rptr. 66, 737 P.2d 1350].)' (*People v. Crittenden, supra,* 9 Cal.4th at p. 134; accord, *People v. Fierro* (1991) 1 Cal.4th 173, 223 [3 Cal.Rptr.2d 426, 821 P.2d 1302].)" (*People v. Heard, supra,* 31 Cal.4th at p. 976.) Here, the challenged photographs depict the wounds suffered by Knoll and Guthrie; "that they are graphic and unpleasant to consider does not render the introduction of those images unduly prejudicial. (See *People v. Navarette* (2003) 30 Cal.4th 458, 496 [133 Cal.Rptr.2d 89, 66 P.3d 1182] [rejecting the defendant's contention that the 'sexually suggestive nature' of photographs taken of the victim rendered them unduly prejudicial, and holding that '[w]hen the victim of a murder has been stabbed directly between the breasts and left with her pants and underwear around her ankles, the defendant cannot complain that the jury is exposed to images of her nudity.']; see also *People v. Riel* (2000) 22 Cal.4th 1153, 1194 [96 Cal.Rptr.2d 1, 998 P.2d 969] ['The fact that the exhibits involved blood was due to the crime, not the court's ruling[s].'].)" (*People v. Heard, supra,* 31 Cal.4th at p. 976.)

Our independent review of the photographs introduced at the trial convinces us that, although they are unpleasant, they are not unduly gory or inflammatory. (*People v. Heard, supra,* 31 Cal.4th at pp. 976–977; *People v. McDermott* (2002) 28 Cal.4th 946, 998 [123 Cal.Rptr.2d 654, 51 P.3d 874]; *People v. Michaels* (2002) 28 Cal.4th 486, 531–532 [122 Cal.Rptr.2d 285, 49

P.3d 1032]; *People v. Anderson* (2001) 25 Cal.4th 543, 590–592 [106 Cal.Rptr.2d 575, 22 P.3d 347]; *People v. Pride* (1992) 3 Cal.4th 195, 243 [10 Cal.Rptr.2d 636, 833 P.2d 643]; *People v. Fierro, supra,* 1 Cal.4th 173, 223; *People v. Kelly* (1990) 51 Cal.3d 931, 963 [275 Cal.Rptr. 160, 800 P.2d 516]; *People v. Turner* (1990) 50 Cal.3d 668, 707 [268 Cal.Rptr. 706, 789 P.2d 887]; *People v. Coleman* (1988) 46 Cal.3d 749, 776 [251 Cal.Rptr. 83, 759 P.2d 1260].) "The photographs . . . do not appear to be of the sort that might inflame a jury. (See, e.g., *People v. Turner* (1984) 37 Cal.3d 302, 320, 321 and fn. 9 [208 Cal.Rptr. 196, 690 P.2d 669], overruled on another ground in *People v. Anderson* (1987) 43 Cal.3d 1104, 1149–1150 [240 Cal.Rptr. 585, 742 P.2d 1306] [upholding trial court's finding that four crime scene photographs, which included a photograph of one victim's head in a large pool of blood and of another victim lying face up with bleeding wounds, were 'not gruesome']; see also *People v. Allen* [(1986)] 42 Cal.3d 1222, 1258 [232 Cal.Rptr. 849, 729 P.2d 115] [victims' bodies were not depicted 'in a badly decomposed condition . . . or after they had been grossly disfigured during autopsy'].)" (*People v. Heard, supra,* 31 Cal.4th at p. 977.)

Further, "as we observed in *People v. Scheid, supra,* 16 Cal.4th 1, 20, 'the trial court clearly and properly could find that the photograph[s were] not so gruesome as to have impermissibly swayed the jury *in light of the testimony detailing each and every fact relating to the crime scene and victims.*' " Certain "witnesses for the prosecution testified in detail as to what they observed when they first encountered [the bodies]. (See *People v. Allen, supra,* 42 Cal.3d 1222, 1258 [observing that the inflammatory nature of nine photographs 'was relatively slight in comparison with the heinous nature of the crime presented to the jury through the testimony of witnesses'].)" (*People v. Heard, supra,* 31 Cal.4th at p. 977.) The jurors having heard that testimony, the photographic images taken of the victims once their bodies had been taken to the coroner's facility were unlikely to have elicited an improper response from the jurors.

Nor were the photographs unduly prejudicial on the ground they were cumulative by reason of their corroboration of facts independently established by testimony. (See, e.g., *People v. Heard, supra,* 31 Cal.4th at pp. 977–978, and cases cited therein.) Similarly, although the testimony of the victims' friends and family members identifying objects found in the Datsun 280 ZX may have been punctuated with emotion that is not unexpected in a capital trial (for example, Mills's sister, Jennifer Bollman, cried during her testimony), such testimony was not unduly prejudicial in view of the expression of that emotion or because ownership of the identified items might have been established by stipulation or other means. The circumstance that the defense might have preferred that the prosecution establish a particular fact by stipulation, rather than by live testimony, does not alter the probative value of such testimony or render it unduly prejudicial. The prosecution was

not required to accept such a stipulation or other "sanitized" method of presenting its case. (*People v. Garceau, supra,* 6 Cal.4th 140, 182; see also *People v. Box* (2000) 23 Cal.4th 1153, 1199 [99 Cal.Rptr.2d 69, 5 P.3d 130]; *People v. Crittenden, supra,* 9 Cal.4th 83, 133.)

Moreover, as was the situation in *People v. Heard, supra,* 31 Cal.4th at page 978, "even if the photographs engendered a disturbing response among the jurors, we believe the risk defendant would be prejudiced by that response was minimal, because the jury knew defendant had committed the acts described by the witnesses who had appeared before them." We believe that risk, as well as the risk that jurors somehow might have been improperly moved by the testimony of friends and family members toward a guilty verdict, was further minimized here by the circumstance that the defense at the guilt phase rested without calling a single witness.

■ Accordingly, we conclude the trial court reasonably determined that the probative value of the photographic and testimonial evidence outweighed its potentially prejudicial effect. Although, in the interest of creating a clearer record, the court could have been more explicit in setting forth its reasoning in denying defendant's motions and overruling defense objections relating to the challenged evidence (see *People v. Green* (1980) 27 Cal.3d 1, 25 [164 Cal.Rptr. 1, 609 P.2d 468] ["the record must affirmatively show that the trial judge did [affirmatively] weigh prejudice against probative value"]), we are persuaded that the court engaged in a deliberative weighing process and acted within its discretion under Evidence Code section 352 in admitting the photographic and testimonial evidence. (*People v. Heard, supra,* 31 Cal.4th at p. 978; *People v. Crittenden, supra,* 9 Cal.4th at p. 134; *People v. Wilson* (1992) 3 Cal.4th 926, 938 [13 Cal.Rptr.2d 259, 838 P.2d 1212]; *People v. Mickey, supra,* 54 Cal.3d 612, 656; *People v. Cox* (1991) 53 Cal.3d 618, 666 [280 Cal.Rptr. 692, 809 P.2d 351]; *People v. Benson* (1990) 52 Cal.3d 754, 786 [276 Cal.Rptr. 827, 802 P.2d 330].)

3. *Even if the Trial Court Had Erred, No Prejudice Would Have Occurred*

"Even if we were to agree with defendant that the trial court erred in admitting the photographic [or testimonial] evidence in question, we nonetheless would conclude that any error in admitting such evidence was harmless under the *Watson* standard." (*People v. Heard, supra,* 31 Cal.4th at p. 978; see *People v. Allen, supra,* 42 Cal.3d 1222, 1258, applying the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

■ "Under the *Watson* standard, the erroneous admission of a photograph warrants reversal of a conviction only if the appellate court concludes

that it is reasonably probable the jury would have reached a different result had the photograph been excluded. (*People* v. *Watson, supra,* 46 Cal.2d at p. 836.)" (*People v. Scheid, supra,* 16 Cal.4th 1, 21.) The photographic evidence at issue did not disclose to the jury any information that was not presented through the testimony of witnesses; the testimonial evidence merely established that items of property found in the Datsun 280 ZX belonged to certain victims, thereby helping to establish a link between defendant and those victims. Although the photographic and testimonial evidence may have been unpleasant for the jury to confront, it was not unusually disturbing or unduly gruesome, and was no more inflammatory than the testimony provided by other witnesses for the prosecution (such as the medical examiners, who offered their expert opinions as to the victims' suffering during the fatal strangulations). "Under these circumstances, we conclude it is not reasonably probable that the admission of the photograph[ic and testimonial evidence] affected the jury's verdict." (*People v. Heard, supra,* 31 Cal.4th at p. 978, citing *People v. Gurule* (2002) 28 Cal.4th 557, 625 [123 Cal.Rptr.2d 345, 51 P.3d 224] and *People v. Allen, supra,* 42 Cal.3d at p. 1258.)

### K. *Pretrial Ruling Admitting Preliminary Hearing Testimony Given by Witness Ray Blevins*

Tok Kim's former boyfriend, Ray Blevins, testified at defendant's preliminary hearing that he saw Kim and defendant together at midday on or "around" April 1, 1984. Blevins also identified certain objects as being similar to those he had seen in Kim's apartment. Some of these objects were seized in the search of the Datsun 280 ZX that defendant was driving at the time of his arrest. Defendant's attorney at the preliminary hearing briefly cross-examined Blevins. Several months later, but prior to the commencement of defendant's trial, Blevins died.

In pretrial proceedings, defendant moved to exclude from his trial the testimony given by Blevins at the preliminary hearing "on the ground that the lack of any meaningful cross-examination denied [defendant] his Sixth Amendment right of confrontation, and prevent[ed] him from presenting any effective defense to the events in Alameda County." The motion was denied. On the eve of trial, defendant renewed the motion to exclude this testimony, and that motion again was denied. At trial, the prosecution read into the record Blevins's testimony given at the preliminary hearing.

On appeal, defendant contends the admission of Blevins's testimony violated Evidence Code section 1291, as well as defendant's right of confrontation under the state and federal Constitutions. Specifically, defendant asserts the court should have excluded the testimony because at the preliminary hearing defense counsel made "no effort . . . to focus on Blevins as a

third-party suspect in Kim's murder," despite counsel's knowledge that Blevins and Kim had argued bitterly just prior to her death. According to defendant, Blevins's prior testimony should have been found inadmissible pursuant to Evidence Code section 1291 "because there had been no meaningful cross-examination by [defense counsel] at [the] preliminary hearing, and therefore no adequate showing the preliminary hearing testimony was reliable." Defendant, however, misconstrues the applicable law.

■■■ A criminal defendant has a constitutionally guaranteed right to confront and cross-examine the witnesses against him or her. (U.S. Const., 6th & 14th Amends.; *Pointer v. Texas* (1965) 380 U.S. 400, 403–405 [13 L.Ed.2d 923, 85 S.Ct. 1065].) The right of confrontation is not absolute, however, and may "in appropriate cases" bow to other legitimate interests in the criminal trial process. (*Chambers v. Mississippi* (1973) 410 U.S. 284, 295 [35 L.Ed.2d 297, 93 S.Ct. 1038]; accord, *Barber v. Page* (1968) 390 U.S. 719, 722 [20 L.Ed.2d 255, 88 S.Ct. 1318].) An exception to the confrontation requirement exists where the witness is unavailable, has given testimony at a previous judicial proceeding against the same defendant, and was subject to cross-examination by that defendant. (*Crawford v. Washington* (2004) 541 U.S. 36, 59 [158 L.Ed.2d 177, 124 S.Ct. 1354]; *Barber v. Page, supra,* 390 U.S. at p. 722; accord, *People v. Wilson* (2005) 36 Cal.4th 309, 339–348 [30 Cal.Rptr.3d 513, 114 P.3d 758]; *People v. Stritzinger* (1983) 34 Cal.3d 505, 515 [194 Cal.Rptr. 431, 668 P.2d 738]; see also *California v. Green* (1970) 399 U.S. 149, 167–168 [26 L.Ed.2d 489, 90 S.Ct. 1930] [where a defendant has had an opportunity to cross-examine a witness at the time of his or her prior testimony, that testimony is deemed sufficiently reliable to satisfy the confrontation requirement].) Further, the federal Constitution guarantees an opportunity for effective cross-examination, not a cross-examination that is as effective as a defendant might prefer. (*United States v. Owens* (1988) 484 U.S. 554, 559 [98 L.Ed.2d 951, 108 S.Ct. 838].)

■■■ California permits the use of the prior testimony of a witness against a criminal defendant only when the unavailability of the witness and the reliability of the testimony are established. (§ 686; Evid. Code, § 1291, subd. (a)(2).) A witness is deemed unavailable if he or she is deceased. (Evid. Code, § 240, subd. (a)(3).) The testimony is deemed reliable if "[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." (Evid. Code, § 1291, subd. (a)(2).)

■■■ "In *People v. Zapien* [(1993)] 4 Cal.4th 929, 975 [17 Cal.Rptr.2d 122, 846 P.2d 704], this court recognized that the '[a]dmission of the former testimony of an unavailable witness is permitted under Evidence Code section

1291 and does not offend the confrontation clauses of the federal or state Constitution—not because the opportunity to cross-examine the witness at the preliminary hearing is considered an exact substitute for the right of confrontation at trial [citation], but because the interests of justice are deemed served by a balancing of the defendant's right to effective cross-examination against the public's interest in effective prosecution.' The court further determined that a defendant's motive in cross-examining a witness at a preliminary hearing may differ somewhat from the motive at trial, but nevertheless the earlier testimony may be admissible at the trial under section 1291 because the 'motives need not be identical, only "similar." ' (*People* v. *Zapien, supra,* 4 Cal.4th at p. 975, citing *People* v. *Alcala* (1992) 4 Cal.4th 742, 784 [15 Cal.Rptr.2d 432, 842 P.2d 1192].) Following similar reasoning and principles, in *People* v. *Wharton* (1991) 53 Cal.3d 522 [280 Cal.Rptr. 631, 809 P.2d 290] the court held the defendant's interest and motive in cross-examining the alleged rape victim at the preliminary hearing in a prior unrelated criminal prosecution was sufficiently similar to the defendant's interest and motive at the penalty phase of a subsequent capital trial to warrant the admission of the preliminary hearing testimony under Evidence Code section 1291. (53 Cal.3d at p. 589.)" (*People v. Samayoa* (1997) 15 Cal.4th 795, 850 [64 Cal.Rptr.2d 400, 938 P.2d 2].)

In the present case, defendant's motive and interest in cross-examining Blevins at the preliminary hearing were closely similar, if not identical to, defendant's objectives at the guilt phase of the trial—namely, to attempt to discredit the prosecution's theory as to the date on which defendant initially encountered Tok Kim (in turn, suggesting that someone other than defendant encountered Kim at the Lafayette bar on the evening of April 1, 1984). The record indicates that at the preliminary hearing, defense counsel sought to establish that Blevins saw defendant and Kim together around midday April 1, 1984, several hours prior to the time the prosecution's other witnesses placed the pair together initially.

In view of the foregoing, we conclude the trial court properly, if implicitly, concluded that defendant's "motive and interest" in cross-examining Blevins at the preliminary hearing and at the trial were sufficiently similar to satisfy the requirements of Evidence Code section 1291.

■ Defendant further contends the admission of Blevins's preliminary hearing testimony violated defendant's federal constitutional right of confrontation, because defense counsel's brief cross-examination constituted incompetent representation. We disagree. As we previously have explained: "as long as a defendant was provided the *opportunity* for cross-examination, the admission of preliminary hearing testimony under Evidence Code section 1291 does not offend the confrontation clause of the federal Constitution

simply because the defendant did not conduct a particular form of cross-examination that in hindsight might have been more effective." (*People v. Samayoa, supra*, 15 Cal.4th 795, 851, italics omitted; see also *People v. Zapien* (1993) 4 Cal.4th 929, 975 [17 Cal.Rptr.2d 122, 846 P.2d 704]; *People v. Alcala, supra*, 4 Cal.4th 742, 784 [the requirement that the party have a similar interest and motive is satisfied notwithstanding the decision of defense counsel to alter the nature or scope of cross-examination].)

It is undisputed that at the time of trial, Blevins was dead and thus unavailable as a witness. Blevins's testimony at the preliminary hearing, where defendant had an interest and motive to cross-examine him similar to what defendant had at the trial, therefore was admissible. The trial court did not err in permitting the prosecution to introduce that testimony against defendant at trial.

## II. *Jury Selection Issues*

### *Defendant's Challenge to the Jury Selection Procedures*

Defendant contends the jury selection procedures employed at his trial were improper, mandating a reversal of the judgment. Specifically, he contends: (1) the trial court failed to administer the oath of truthfulness on penalty of perjury to 28 prospective jurors, (2) the prosecutor engaged in misconduct by interposing improper objections to defense counsel's voir dire examination, resulting in the improper restriction of voir dire, and (3) the trial court erred in denying a number of challenges for cause and also abused its discretion by denying defendant peremptory challenges in addition to the 20 specified in Code of Civil Procedure section 231, subdivision (a).

Although defendant's initial contention is correct insofar as he asserts the trial court erred in failing to administer the oath to prospective jurors, for the reasons set forth below we conclude that defendant has failed to establish prejudice and that none of defendant's other contentions has merit.

### A. *The Oath of Truthfulness on Penalty of Perjury Administered to Prospective Jurors*

On March 20 to 21, 1989, the trial court commenced jury selection by screening one panel of prospective jurors. On March 27, 1989, the court screened a second panel. On May 1 to 2, 1989, the court screened a third panel. With regard to the latter two panels of prospective jurors, the trial court apparently failed to administer the oath to prospective jurors mandated

by Code of Civil Procedure former section 232, subdivision (a).[26] Defendant moved for a mistrial or, alternatively, to excuse the 28 prospective jurors who had not been given the oath at the commencement of the voir dire examination. The court denied these motions.

After conducting further voir dire examination, the prosecution and the defense both informed the court that the jury as constituted was acceptable. At that point, the court administered the oath to jurors mandated by Code of Civil Procedure former section 232, subdivision (b).[27] According to defendant, 14 of the prospective jurors who were not administered the oath prescribed by Code of Civil Procedure section 232, subdivision (a) for prospective jurors at the outset of the voir dire examination became actual jurors or alternates.

Defendant contends the trial court's error at the commencement of the voir dire process in failing to administer the oath of truthfulness to the prospective jurors who comprised the second and third panels was a "structural defect" and therefore was reversible per se, citing *Arizona v. Fulminante* (1991) 499 U.S. 279, 307–309 [113 L.Ed.2d 302, 111 S.Ct. 1246], and *People v. Cahill* (1993) 5 Cal.4th 478, 502 [20 Cal.Rptr.2d 582, 853 P.2d 1037]; see also *People v. Pelton* (1934) 116 Cal.App. Supp. 789, 791 [116 Cal.App. 789, 7 P.2d 205] (holding that a conviction by an unsworn jury renders the verdict "a nullity justifying a reversal").

We disagree with defendant's position. First, neither *Arizona v. Fulminante, supra,* 499 U.S. 279 (holding that the harmless-error rule applies to erroneously admitted coerced confessions), nor *People v. Cahill, supra,* 5

---

[26] Former Code of Civil Procedure section 232, subdivision (a), provided: "Prior to the examination of prospective trial jurors in the panel assigned for voir dire, the following acknowledgement shall be administered to the panel, which shall be acknowledged by the prospective jurors with the statement 'I do':

" 'You do, and each of you, understand and agree that you will accurately and truthfully answer, under penalty of perjury, all questions propounded to you concerning your qualifications and competency to serve as a trial juror in the matter pending before this court; and that failure to do so may subject you to criminal prosecution.' " (Stats. 1988, ch. 1245, § 2, p. 4153.)

[27] Former Code of Civil Procedure section 232, subdivision (b), provided: "As soon as the selection of the trial jury is completed, the following acknowledgement and agreement shall be obtained from the trial jurors, which shall be acknowledged by the statement 'I do':

" 'You do, and each of you understand and agree that you will well and truly try the cause now pending before this court, and a true verdict render according only to the evidence presented to you and to the instructions of the court.' " (Stats. 1988, ch. 1245, § 2, p. 4153.)

The Legislature slightly amended subdivisions (a) and (b) of the statute shortly after defendant's trial, but these modifications have no bearing upon the issues that confront us in the present case. (Code Civ. Proc., § 232, subds. (a), (b), as amended by Stats. 1989, ch. 1416, § 10, p. 6225.)

Cal.4th 478 (holding that the erroneous admission of a coerced confession does not require automatic reversal under California law), addressed the juror-oath question presented here and therefore are unhelpful to defendant's case. The fundamental or "structural" defects discussed in those decisions consisted of significant irregularities, unlike the present situation, where the trial court partially but not fully complied with the oath-giving provisions set forth in Code of Civil Procedure section 232. (See *Arizona v. Fulminante, supra,* 499 U.S. at pp. 309–310; *People v. Cahill, supra,* 5 Cal.4th 478, 501–502.) Similarly, the decision in *People v. Pelton, supra,* 116 Cal.App. Supp. 789, unlike the present case, involved the trial court's failure to administer the oath to jurors mandated by Code of Civil Procedure section 232, subdivision (b). These decisions do not support defendant's assertion that the trial court's failure to administer the oath of truthfulness to prospective jurors, as provided in Code of Civil Procedure section 232, subdivision (a), constitutes a structural defect. Indeed, although empanelling one or more jurors who are actually biased against the defense would constitute structural error (*In re Carpenter* (1995) 9 Cal.4th 634, 654 [38 Cal.Rptr.2d 665, 889 P.2d 985], citing *Arizona v. Fulminante, supra,* 499 U.S. 279, 309), here the trial court's error in failing to swear some of the prospective jurors has not been shown to have resulted in the inclusion of any biased jurors on the panel, and defendant's claim of structural error fails for that reason.

Second, although there is a dearth of California case law examining the factual situation presented here, our decision in an analogous case, *People v. Lewis* (2001) 25 Cal.4th 610, 629–631 [106 Cal.Rptr.2d 629, 22 P.3d 392], is instructive. In *Lewis,* we addressed the question whether the trial court erred in failing to administer the oath to prospective jurors prior to their answering written questionnaires regarding their views on the death penalty and other matters. (*Id.,* at p. 629.) Observing that the prospective jurors had signed their questionnaires under penalty of perjury and were sworn under Code of Civil Procedure section 232, subdivision (a), prior to being personally questioned in open court, we held that although the defendant was "correct that prospective jurors should have been sworn under Code of Civil Procedure section 232[, subdivision (a),] before filling out the questionnaires, he fails to establish that he was prejudiced by the trial court's failure to administer the oath at that juncture. [Citations.]" (*People v. Lewis,* at pp. 630–631; see also *People v. Cruz* (2001) 93 Cal.App.4th 69, 72–74 [113 Cal.Rptr.2d 86] [no prejudicial error where the oath taken pursuant to Code of Civil Procedure section 232, subdivision (b), did not ask the jurors to agree to follow the instructions of the court].)

For similar reasons as those found in *Lewis,* we reject defendant's assertion of prejudicial error here. Although the trial court omitted giving the first oath, the jury ultimately was instructed as to its duty to follow the trial court's instructions and was presumed to have performed its official duty, and

defendant has failed to establish that he was prejudiced by the trial court's failure to administer the required oath at the outset of questioning some of the prospective jurors. We further observe that, as in *People v. Lewis, supra,* 25 Cal.4th 610, 629–631, the prospective jurors each filled out a juror questionnaire that was signed under penalty of perjury, a circumstance that undoubtedly impressed upon the prospective jurors the gravity of the matter before them and the importance of being truthful and thereby ameliorated at least in part the trial court's failure to timely administer the oath set forth in Code of Civil Procedure section 232, subdivision (a). In view of the virtual certainty that these prospective jurors understood that they were required to answer truthfully the questionnaires, we reasonably may infer that the same prospective jurors similarly understood that they were required to respond truthfully to the questions posed during the voir dire examination—much of which was essentially a followup to the prospective jurors' answers given in response to the questions set forth in the questionnaires.

Accordingly, on these facts we believe the jury understood that it was required to answer truthfully the questions posed during the voir dire examination. We therefore conclude the court's error in not administering the oath to some of the prospective jurors was not prejudicial to defendant.

### B. *Prosecutor's Objections to Defense Counsel's Questions During Voir Dire*

In the course of defense counsel's examination of eight prospective jurors, the prosecutor interposed objections on the ground that counsel's questions asked the prospective jurors to "prejudge" the case. None of these eight individuals became a member of defendant's jury (although one individual was selected as an alternate juror). Prior to the parties' presentation of their respective cases, defendant moved for a mistrial or, in the alternative, for excusal of the prospective jurors, asserting that the prosecutor's objections impeded and disrupted counsel's voir dire examination. The trial court denied the motion.

On appeal, defendant reiterates his contention that the prosecutor impermissibly interfered with defense counsel's voir dire examination of the prospective jurors and on that basis contends the trial court erred in denying his motion. He is mistaken; our review of the voir dire examination of the prospective jurors in question reveals that the prosecution's objections to defense counsel's questions were proper. The two passages of the hearing transcript cited by defendant as examples of the prosecutor's objections reveal no impropriety on the part of the prosecutor:

"[Defense counsel]: Then, is it fair to say that if indeed the opposite were true, that is, it was not only not exemplary but there were other—there was

evidence of other activity—criminal activity, that in that situation it would be difficult to see anything other than a death verdict?

"[Prosecutor]: Excuse me. I object. It asks the juror to prejudge the evidence.

"The court: Objection sustained. [¶] . . . [¶]

"[Defense counsel]: . . . . It would be some amount of extraordinary background evidence of an exemplary nature before you could even consider it?

"[Prosecutor]: Just a moment please. Now, I have an objection and it asks the juror to prejudge.

"[Defense counsel]: I would ask the [prospective] juror to go outside."

 To the contrary, insofar as defense counsel's questions sought to ascertain the prospective jurors' views as to hypothetical cases not before the court, they were improper and the court acted within its discretion in prohibiting such questioning. (*People v. Noguera* (1992) 4 Cal.4th 599, 646 [15 Cal.Rptr.2d 400, 842 P.2d 1160].) Insofar as counsel's questions sought to commit a prospective juror to vote in a certain way given a particular set of facts, the questions similarly were improper. (See *People v. Williams* (1981) 29 Cal.3d 392, 408 [174 Cal.Rptr. 317, 628 P.2d 869] ["We reaffirm that it is not 'a function of the examination of prospective jurors to educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law.' "].)

Moreover, even were we to conclude that the prosecution's objections were improper, any error clearly would be harmless in view of the circumstance that none of the eight prospective jurors became a member of defendant's jury.

### C. *Peremptory Challenges*

During jury selection, defendant challenged for cause Prospective Jurors Hickert, Kotz, Hughes, MacDonald, Craddock, Richards, Swope, and Humphrey. The trial court denied each of these challenges. Although Prospective Juror Craddock was selected as an alternate juror, none of these individuals was impaneled as a member of defendant's jury. After exercising 18 out of the 20 peremptory challenges available to it, the defense informed

the court that the jury as constituted was acceptable. The prosecution similarly indicated its acceptance of the jury.

Defendant contends the trial court committed reversible error under the federal and state Constitutions in denying the challenges to excuse the above-named prospective jurors based upon their views regarding the death penalty. (See *Wainwright v. Witt* (1985) 469 U.S. 412, 423–424 [83 L.Ed.2d 841, 105 S.Ct. 844]; U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 1, 7, subd. (a) (15), (16). As noted, however, when the defense accepted the jury, it had not exhausted all of its peremptory challenges.

"In order successfully to claim error in the denial of a challenge for cause of a prospective juror, a defendant on appeal must demonstrate that the ruling affected his or her right to a fair and impartial jury." (*People v. Horton* (1995) 11 Cal.4th 1068, 1093 [47 Cal.Rptr.2d 516, 906 P.2d 478]; see *People v. Crittenden, supra,* 9 Cal.4th 83, 121; *People v. Garceau, supra,* 6 Cal.4th 140, 174.) Because defendant exercised peremptory challenges to remove the prospective jurors whom he unsuccessfully had challenged for cause, these individuals could not have compromised the impartiality of the jury. As a result, "under *Witt,* [defendant] cannot claim constitutional error based upon the trial court's denial of those challenges for cause." (*People v. Horton, supra,* 11 Cal.4th at p. 1093; see also *People v. Johnson, supra,* 3 Cal.4th 1183, 1211.) Indeed, "[i]t is well settled that even if the trial court erred in denying a defendant's motion to remove a juror for cause, that error will be considered harmless if '[n]one of the prospective jurors whom defendant found objectionable actually sat on his jury.' " (*People v. Hawkins* (1995) 10 Cal.4th 920, 939 [42 Cal.Rptr.2d 636, 897 P.2d 574].) "Moreover, defendant did not communicate to the trial court any dissatisfaction with the jury selected." (*Ibid.*)

In sum, defendant's right to an impartial jury was not violated, and any error by the trial court in denying defendant's motions to exclude the above mentioned members of the jury venire for cause would not have been prejudicial. (See *People v. Horton, supra,* 11 Cal.4th 1068, 1093; *People v. Hawkins, supra,* 10 Cal.4th 920, 939.)[28]

---

[28] On June 19, 1989, the day set for trial to commence, the defense requested that the trial court grant three peremptory challenges in addition to the 20 prescribed by statute. (Code Civ. Proc., § 231, subd. (a).) As indicated above, however, defendant had not exhausted all 20 of the challenges available to him. The trial court denied the request. On appeal, defendant assigns error, but we previously have rejected virtually identical claims (see, e.g., *People v. Pride, supra,* 3 Cal.4th 195, 230–231) and do so again here.

### III. *Jury Instruction Issues*

#### A. *Instructions Regarding the Las Vegas Evidence and Evidence of "Flight"*

At the outset of trial, and outside the jury's presence, the defense moved to exclude certain items that were recovered from the Datsun 280 ZX subsequent to defendant's arrest. These items included: a glass cup bearing the words "Silver City Casino, Las Vegas, Nevada," a booklet of casino coupons (characterized by the prosecutor as "drink tickets") with one ticket bearing the word "void" and "4/17/84" (the date of defendant's arrest), and a key with an attached green token identifying the Westward Ho Casino (hereinafter sometimes collectively referred to as the Las Vegas evidence). Defendant contended that the Las Vegas evidence was irrelevant and, even if relevant, unduly prejudicial as being improperly suggestive of a lack of remorse by defendant. In response, the prosecutor asserted that the listed items were relevant because they were recovered from the vehicle defendant was driving when arrested and established the route defendant had taken following his commission of the charged offenses. The defense offered to stipulate as to the route taken by defendant in the days leading up to his arrest in Arizona, but the prosecution declined to accept the stipulation. The trial court overruled defendant's objections to the introduction of the Las Vegas evidence, which briefly was identified at trial through the testimony of Sergeant Gary McEwen.

Immediately prior to the parties' closing arguments, defendant renewed his objection to the introduction of the Las Vegas evidence on the grounds of lack of relevancy and undue prejudice. (See Evid. Code, §§ 210, 352.) The trial court granted defendant's motion, finding that as to the Las Vegas evidence, "I didn't feel that they were probative of any disputed fact. [¶] The fact remains that the defendant was in Arizona heading eastbound and was not in California, and the fact that he may or may not have gone through Las Vegas I did not feel had any relevance and was not probative."[29]

Defendant moved for a mistrial based upon the trial court's finding that the Las Vegas evidence erroneously had been introduced into evidence. Alternatively, the defense requested that the court admonish the jury with a curative instruction. The court denied the motion for a mistrial, but admonished the jury as follows: "We've had a lot of exhibits marked. Not all of them were received [into evidence]. [¶] You're instructed to disregard exhibits 21

---

[29] The trial court also granted defendant's motion to exclude certain other items introduced into evidence, including a knife found inside the pocket of the black jacket retrieved from the Datsun 280 ZX, and a tote bag identified as having belonged to Janette Cullins, containing audio cassette tapes.

through 23 [the Las Vegas evidence]. It's a drinking glass, coupons, key chain and a key. Also Exhibit 4-E, which was a kitchen knife and the tape cassettes that were inside Exhibit 14, which was a gray Lancome Bag. [¶] You must also disregard any testimony about those things, and they should play no part in your thoughts or deliberations."

Although agreeing with defendant as to the asserted irrelevancy of the Las Vegas evidence, the trial court stopped short of prohibiting the prosecution from arguing to the jury that in its deliberations the jury could consider defendant's "flight" from California. Indeed, the trial court made clear that exclusion of the Las Vegas evidence "does not take away flight as an issue." Ultimately, the prosecutor did argue defendant's flight as demonstrating consciousness of guilt. When the trial court read its instructions to the jury, however, the court did not read CALJIC No. 2.52, the standard instruction pertaining to flight. Outside the presence of the jury, the prosecutor commented: "I noticed in your honor's reading of the instructions that there was no [CALJIC] No. 2.52 instruction which I had requested and which I thought I saw in the instructions when we went through them the other day." The prosecutor added that he was not asking that the jury be brought back to hear the court read CALJIC No. 2.52, but requested that the instruction be included with the written packet of instructions given to the jury. The defense objected to the giving of the instruction on the grounds that the defense did not contest the circumstance that defendant was arrested in Arizona, and that the omitted instruction focused the jury's attention on the Las Vegas evidence that the court ultimately had deemed irrelevant. The trial court overruled the objection, finding that the prosecution was "entitled to the instruction," which was inserted into the packet with the other instructions.

On appeal, defendant contends reversal is warranted on the grounds that introduction of the Las Vegas evidence was unduly prejudicial, the trial court's curative instruction was inadequate, and the court's instruction as to flight was violative of defendant's state and federal constitutional rights. For the reasons set forth below, we reject each of these contentions.

Defendant asserts that to the extent the irrelevant Las Vegas evidence was indicative of a lack of remorse on defendant's part, it was violative of his state and federal constitutional rights to "due process of law, fair trial, burden of proof, death eligibility, and reliable guilt and penalty phase determinations," and that the introduction of such evidence was prejudicial because "it create[d] the likelihood a non-statutory factor in aggravation will be considered by the jury in violation of the Eighth Amendment's" proscription against vague and unreliable penalty determinations. We disagree. In view of the trivial nature of the Las Vegas evidence relative to the other evidence presented by the prosecution at the guilt and penalty phases, the trial court's

clear and comprehensive admonition to the jury to disregard that evidence, and the substantial evidence supporting the jury's guilt and penalty phase determinations, we conclude that the trial court's curative instruction was adequate and that any error in admitting the Las Vegas evidence could not have been unduly prejudicial.

Defendant further asserts "[t]here was no evidence of consciousness of guilt to warrant a flight instruction." In support of this contention, defendant argues that there was no evidence he fled immediately after the commission of the charged offenses, that during his travels in the several days leading up to his arrest in Arizona he had not been confronted with (and therefore could not have fled from) the charges filed against him, and that at every point during his detention and arrest in Arizona he was cooperative. Defendant maintains that in view of these circumstances, the trial court erred in furnishing the jury with a written copy of CALJIC No. 2.52.

We reject defendant's contention. Section 1127c requires a trial court in any criminal proceeding to instruct as to flight where evidence of flight is relied upon as tending to show guilt.[30] CALJIC No. 2.52, which is derived from section 1127c, advises the jury "that evidence of flight alone is insufficient to establish guilt, but may be considered with other proven facts in deciding the question of guilt or innocence." (*People v. Visciotti* (1992) 2 Cal.4th 1, 60 [5 Cal.Rptr.2d 495, 825 P.2d 388].) Contrary to defendant's position, the instruction neither requires knowledge on a defendant's part that criminal charges have been filed, nor a defined temporal period within which the flight must be commenced, nor resistance upon arrest. (*Ibid.*) In view of the evidence introduced by the prosecution establishing that defendant left California in the days immediately following the charged offenses and was in possession of the vehicle belonging to murder victim Jillette Mills when he was arrested in Arizona, the flight instruction plainly was warranted here. (*Ibid.* [a jury could infer that the defendant's flight reflected consciousness of guilt].) As noted, the instruction merely permitted the jury to consider evidence of flight in deciding defendant's guilt or innocence; it did not suggest that the jury should consider such evidence as dispositive.

Moreover, even if we were to conclude the instruction should not have been given, any error would have been harmless. The instruction did not

---

[30] Section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows:

"The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

assume that flight was established, but instead permitted the jury to make that factual determination and to decide what weight to accord it. (*People v. Visciotti, supra,* 2 Cal.4th at p. 61.)[31]

### B. *Instructions on Lesser Included Offenses*

At the close of the guilt phase of defendant's trial, and outside the presence of the jury, defendant requested that the court instruct the jury on second degree murder and second degree felony murder.[32] Defense counsel argued that the jury "really ought to have instructions on those . . . lesser included . . . areas that would be reasonably within their frame of a verdict . . . ." The prosecutor objected: "There is not one wit of evidence [*sic*], nor a scintilla either, for that

---

[31] Having determined that the trial court's curative instruction was adequate, and its instruction pursuant to CALJIC No. 2.52 was proper, we reject defendant's contention that the erroneous admission of the Las Vegas evidence, in combination with the instruction on flight, violated defendant's state and federal constitutional rights.

[32] Defendant requested that the trial court instruct the jury as follows:

"Murder of the second degree is the unlawful killing of a human being with malice aforethought when there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish deliberation and premeditation. [(CALJIC No. 8.30.)]

"Murder of the second degree is also the unlawful killing of a human being when:

"1. The killing resulted from an intentional act,

"2. The natural consequences of the act are dangerous to human life, and

"3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.

"When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being. [(CALJIC No. 8.31.)]

"The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs [during] [as the direct casual [*sic*] result of] the commission or attempted commission of the crime of [grand theft] is murder of the second degree when the perpetrator had the specific intent to commit such crime.

"The specific intent to commit [grand theft] and the commission or attempted commission of such crime must be proved beyond a reasonable doubt. [(CALJIC No. 8.32.)]

"Murder is classified into two degrees, and if you should find the defendant guilty of murder, you must determine and state in your verdict whether you find the murder to be of the first or second degree. [(CALJIC No. 8.70.)]

"If you are convinced beyond a reasonable doubt that the crime of murder has been committed by a defendant, but you have a reasonable doubt whether such murder was of the first or of the second degree, you must give defendant the benefit of the doubt and return a verdict fixing the murder as of the second degree. [(CALJIC No. 8.71.)]

"Before you may return a verdict in this case, you must agree unanimously not only as to whether the defendant is guilty or not, but also, if you should find him guilty of an unlawful killing, you must agree unanimously as to whether he is guilty of murder of the first degree or murder of the second degree. [(CALJIC No. 8.74.)]"

Defendant additionally requested that the trial court instruct the jury regarding homicide generally, as follows:

"Homicide is the killing of one human being by another, either lawfully or unlawfully. Homicide includes murder and manslaughter, which are unlawful, and the acts of excusable and justifiable homicides, which are lawful. [(CALJIC No. 8.00.)]"

matter, having to do with second degree murder or any other lesser crime, given the medical testimony and the unique facts of the case. [¶] I don't think any theory [of admissibility] has been advanced until now, and either by cross-examination or any other—anywhere else in this case, and I don't see it under the facts." Acknowledging that "when you have crimes of degrees they have to be told about it, and sometimes it's an issue," the trial court rejected defendant's request, finding: "Here it's either first [degree murder] or nothing [i.e. acquittal] [¶] . . . [¶] The court's . . . ruling is to reject the murder of the second degree instructions. I don't see that as a theory in this case."

On appeal, defendant contends the trial court deprived him of various constitutional rights and thus committed reversible error in declining to give the requested instructions pertaining to second degree murder and second degree felony murder, and further, that the court had a sua sponte duty to give such instructions even if defendant had not requested them. In support of this argument, defendant emphasizes that he "is entitled under [the] state and federal Constitutions to have the jury instructed on lesser-included offenses *arising from the evidence.*" (Italics added.) He contends that in addition to the possible verdicts of a first degree murder conviction and an acquittal, the jury ought to have been afforded the "third option" of convicting defendant of second degree murder. (See *Beck v. Alabama* (1980) 447 U.S. 625, 637 [65 L.Ed.2d 392, 100 S.Ct. 2382].)

■ We discern no error in the trial court's refusal to give the instructions requested by defendant. "California decisions have held for decades that even absent a request, and even over the parties' objections, the trial court must instruct on a lesser offense necessarily included in the charged offense *if there is substantial evidence the defendant is guilty only of the lesser.* [Citations.]" (*People v. Birks* (1998) 19 Cal.4th 108, 118 [77 Cal.Rptr.2d 848, 960 P.2d 1073], italics added.) In the present case, we agree with the trial court that there was not substantial evidence to warrant the second degree murder instructions requested by defendant.

As described above, the prosecution's evidence demonstrated that Susan Knoll, Jillette Mills, and Bonnie Guthrie were murdered at their residences in similar fashion within days of each other. All three had been fatally strangled—Mills and Guthrie by ligature, and Knoll by what the medical examiner described as the use of "considerable compression force" (and had suffered blunt force injuries consistent with having struggled against her assailant). Not only does the manner in which each of these three killings was perpetrated *strongly* indicate in itself that each of the killings was willful, premeditated, and deliberate, but the entire course of conduct clearly revealed by the evidence, taken as a whole, is inconsistent with any suggestion that the

killings were not willful, premeditated, and deliberate. Furthermore, the evidence additionally demonstrated that each of the murders occurred during the commission of either rape or burglary, a circumstance that in itself establishes the offenses as first degree murders under the felony-murder doctrine. (§ 189.) Defendant fails to point to any substantial evidence that would support a jury's determination that the killing of any of the victims constituted second degree, rather than first degree, murder.

Defendant cites a number of decisions in support of his contrary contention, but these cases either have been overruled or involve inapposite factual situations. (See *People v. Geiger* (1984) 35 Cal.3d 510 [199 Cal.Rptr. 45, 674 P.2d 1303] [a defendant has a right to instructions on lesser related offenses that merely bear some relationship to the charged offense, overruled on that point in *People v. Birks, supra*, 19 Cal.4th 108, 136]; *People v. Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697] [modifying the defendant's conviction of first degree felony murder to second degree murder where the defendant was an immature 17-year-old youth involved in a conspiracy with other youths to "rip-off" a marijuana farm and discharged his firearm when confronted by the victim, who displayed a shotgun]; *Vickers v. Ricketts* (9th Cir. 1986) 798 F.2d 369 [prisoner was stabbed and fatally strangled by his cellmate, who had a brain disorder related to an epileptic condition].)

The trial court therefore properly refused to instruct the jury regarding second degree murder and second degree felony murder. Because no evidence was presented indicating a basis for finding any of the killings to have been an excusable or justifiable homicide, the court also properly refused to give the homicide instruction. (CALJIC No. 8.00.)

C. *Instructions Regarding Felony Murder and Special Circumstances*

The trial court instructed the jury as to first degree felony murder and as to special circumstances. (CALJIC Nos. 8.21, and 8.80, respectively.)[33]

---

[33] The trial court instructed the jury as follows:

"The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission of the crime of burglary or the commission of the crime of rape is murder of the first degree when the perpetrator had the specific intent to commit such crime.

"The specific intent to commit a burglary, the specific intent to commit a rape and the commission of such crime must be proved beyond a reasonable doubt. [(CALJIC No. 8.21.)]"

The court further instructed:

"If you find the defendant in this case guilty of murder of the first degree, you must then determine if one or more of the following special circumstances are true or not true:

"(1) That the murder of Jillette Mills was committed by the defendant while he was engaged in the commission of the crime of rape;

On appeal, defendant contends the trial court should have instructed the jury that it could not find the special circumstance allegations of burglary murder, rape murder, and multiple murder true unless it found that defendant possessed the intent to kill Susan Knoll, Jillette Mills, and Bonnie Guthrie. Defendant argues that the trial court's error in failing so to instruct constitutes a "structural defect" in the proceedings that is reversible per se (see *Arizona v. Fulminante, supra,* 499 U.S. 279, 307–309), or that alternatively constitutes an error that cannot be characterized as being harmless beyond a reasonable doubt (see *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]) and therefore requires setting aside the findings of special circumstances and reversing the judgment of death. (See *People v. Marshall* (1997) 15 Cal.4th 1, 41–44 [61 Cal.Rptr.2d 84, 931 P.2d 262].) We reject defendant's position, for the reasons that follow.

 "In 1983, this court held that intent to kill was an element of felony-murder special circumstances whether or not the defendant was the actual killer. (*Carlos v. Superior Court* (1983) 35 Cal.3d 131, 153–154 [197 Cal.Rptr. 79, 672 P.2d 862].) Although we overruled *Carlos* in *People v. Anderson*[, *supra*], 43 Cal.3d 1104, 1147, holding that the intent-to-kill requirement applied only to an accomplice [and] not to the actual killer, *Carlos* remained applicable to [(and the trial court was required to instruct the jury on)] intent to kill in . . . all cases involving a defendant charged with a felony-murder special circumstance if the offense was committed during the 'window' period between our decisions in *Carlos* and *Anderson*. [Citations.]" (*People v. Marshall, supra,* 15 Cal.4th 1, 41–42.)

---

"(2) That the murder of Jillette Mills was committed by the defendant while he was engaged in the commission of the crime of burglary;

"(3) That the murder of Susan Knoll was committed by the defendant while he was engaged in the commission of the crime of burglary;

"(4) That the murder of Bonnie Guthrie was committed by the defendant while he was engaged in the commission of the crime of rape;

"(5) That the murder of Bonnie Guthrie was committed by the defendant while he was engaged in the commission of the crime of burglary;

"(6) That the defendant has in this case been convicted of more than one offense of murder in the first degree.

"The People have the burden of proving the truth of a special circumstance. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true.

"*If you find beyond a reasonable doubt that the defendant was the actual killer, you need not find that the defendant intended to kill a human being in order to find the special circumstance to be true.*

"You must decide separately each special circumstance alleged in this case. If you cannot agree as to all of the special circumstances, but can agree as to one or more, make your finding as to the one or more upon which you do agree.

"In order to find a special circumstance alleged in this case to be true or untrue, you must agree unanimously.

"You will state your special finding as to whether the special circumstance is or is not true on the form that will be supplied. [(CALJIC No. 8.80).]" (Italics added.)

In the present case, the jury found a total of six special circumstance allegations to be true—one allegation of multiple murder, two allegations of rape murder (as to Mills and Guthrie), and three allegations of burglary murder (as to Mills, Knoll, and Guthrie). (§§ 190.2, subd. (a)(3), (17)(C) & (G).) The murders occurred in April 1984, during the *Carlos/Anderson* "window" period. Accordingly, the jury in this case could find the special circumstance allegations to be true "only if it found that defendant acted with intent to kill." (*People v. Marshall, supra,* 15 Cal.4th 1, 42.) Nonetheless, as defendant asserts and the People concede, the trial court's instruction on special circumstances, CALJIC No. 8.80, in relevant part informed the jury that defendant's intent was inconsequential: "If you find beyond a reasonable doubt that the defendant was the actual killer, you need not find that the defendant intended to kill a human being in order to find the special circumstance to be true." (See fn. 33, *ante.*)

■ "We have consistently held that when a trial court fails to instruct the jury on an element of a special circumstance allegation, the prejudicial effect of the error must be measured under the test set forth in *Chapman* v. *California*[, *supra*,] 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824, 828, 24 A.L.R.3d 1065]. [Citations.] Under that test, an error is harmless only when, beyond a reasonable doubt, it did not contribute to the verdict. (*Chapman, supra,* at p. 24 [87 S.Ct. at p. 828].)" (*People v. Williams* (1997) 16 Cal.4th 635, 689 [66 Cal.Rptr.2d 573, 941 P.2d 752].) We have held that " 'error in failing to instruct that a special circumstance contains a requirement of the intent to kill is harmless [beyond a reasonable doubt] when "the evidence of defendant's intent to kill . . . was overwhelming, and the jury could have had no reasonable doubt on that matter." ' " (*People v. Marshall, supra,* 15 Cal.4th 1, 42.)

In the present case, the evidence was overwhelming that defendant possessed the intent to kill when he murdered Susan Knoll, Jillette Mills, and Bonnie Guthrie. As noted, within a very brief period all three victims were killed by strangulation—Knoll by manual strangulation, Mills and Guthrie by ligature strangulation. The latter two victims also suffered traumatic sexual assaults. That evidence, considered with the evidence that the bodies of Knoll and Mills were concealed within a closet, and that in each instance defendant departed from the crime scene with selected possessions of each victim, is consistent only with intentional killings. No evidence was presented that would have supported a finding of unintentional murder. Under these circumstances, we conclude that no reasonable jury, properly instructed, would have failed to find that defendant acted with the requisite intent to kill. We are satisfied that the trial court's instruction removing that issue from the jury's consideration was harmless beyond a reasonable doubt. (See *People v. Johnson* (1993) 6 Cal.4th 1, 46–47 [23 Cal.Rptr.2d 593, 859 P.2d 673] [intent to kill properly found where one victim was strangled and set on fire, and the

other victim was beaten to death]; see also *People v. Osband, supra,* 13 Cal.4th 622, 683 [concealing of victim's body beneath dresser drawers "further supports the view that [the defendant] intended to kill"].)

### D. *Guilt Phase Instructions in General*

The trial court instructed the jury pursuant to several pattern jury instructions at the conclusion of the guilt phase, including CALJIC Nos. 2.01 (sufficiency of circumstantial evidence, generally), 2.02 sufficiency of circumstantial evidence to prove specific intent), 2.50 (evidence of other crimes), 2.50.1 (evidence of other crimes by the defendant proved by a preponderance of the evidence), 2.50.2 (definition of preponderance of the evidence), 8.83 (sufficiency of circumstantial evidence to prove special circumstance), and 8.83.1 (sufficiency of evidence to prove mental state). Defendant contends that decisions rendered by this court rejecting constitutional challenges to these instructions (see, e.g., *People v. Wilson, supra,* 3 Cal.4th 926, 942–943; *People v. Mickey, supra,* 54 Cal.3d 612, 669–671) are "inconsistent with principles set forth by the United States Supreme Court" and should be reconsidered.

Defendant has provided no basis for reconsidering our prior decisions upholding the validity of these pattern jury instructions. (See, e.g., *People v. Wilson, supra,* 3 Cal.4th 926, 942–943; *People v. Mickey, supra,* 54 Cal.3d 612, 669–671.) We therefore reject defendant's challenge.

### IV. *Alleged Ineffective Assistance of Counsel*

Defendant contends his trial counsel rendered ineffective assistance at the guilt phase by conceding defendant's guilt, as demonstrated by counsel's failure to (1) make an opening statement, (2) present any evidence on defendant's behalf, and (3) make any substantive argument in his summation (which comprised four and one-half pages of the reporter's transcript) as to whether the prosecution had sustained its burden of proof as to defendant's guilt of the crimes charged or the truth of the special circumstances alleged. Relying upon *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], defendant further contends that during the guilt phase summation, his counsel improperly drew adverse attention to defendant's assertion of the privilege against self-incrimination. Defendant also contends counsel inappropriately conceded guilt in his penalty phase summation.[34]

As we explain, defendant fails to demonstrate that counsel rendered constitutionally deficient performance, or that such performance was prejudicial to the defense.

---

[34] Defendant's argument encompasses issues relating to both the guilt and the penalty phases. In the interest of clarity and brevity, we address these issues together.

"In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 104 S.Ct. 2052, 2068]; *People v. Ledesma* (1987) 43 Cal.3d 171, 217 [233 Cal.Rptr. 404, 729 P.2d 839].) A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. (*Strickland v. Washington, supra,* at p. 687 [104 S.Ct. at p. 2064]; *In re Andrews* (2002) 28 Cal.4th 1234, 1253 [124 Cal.Rptr.2d 473, 52 P.3d 656].) If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 [62 Cal.Rptr.2d 437, 933 P.2d 1134].) Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus. (*Id.* at pp. 266–267.)" (*People v. Carter* (2003) 30 Cal.4th 1166, 1211 [135 Cal.Rptr.2d 553, 70 P.3d 981]; see also *People v. Cunningham* (2001) 25 Cal.4th 926, 1003 [108 Cal.Rptr.2d 291, 25 P.3d 519] [same]; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1059 [5 Cal.Rptr.2d 230, 824 P.2d 1277] ["The decisions whether to waive opening statement and whether to put on witnesses are matters of trial tactics and strategy which a reviewing court generally may not second-guess."].)

Each one of counsel's decisions—to forgo making an opening statement, present a defense, or offer more than a brief summation—was tactical. In view of the strong evidence directly linking defendant to the charged murders, as well as the looming prospect of other capital trials in Alameda and San Diego Counties arising out of the deaths of Tok Kim and Janette Cullins, reasonably competent counsel could have determined to hear the prosecution's case prior to deciding whether to present a defense, and further could have determined that counsel's summation ought to be limited to inviting the jury to consider whether the prosecution actually had met its burden of establishing guilt beyond a reasonable doubt. (See generally *People v. Mitcham, supra,* 1 Cal.4th 1027, 1059.) Indeed, in his summation, counsel alluded to the other criminal cases pending against defendant to suggest a reason why defendant did not take the stand, and emphasized the significance of the reasonable doubt instruction.[35]

---

[35] Defense counsel argued: "While all the instructions that the judge will give you are important, critical to deciding the guilt of any person, is the instruction about reasonable doubt. In short, you will hear words to this effect, that you may not find Mr. Carter guilty unless you

Reasonably competent counsel could have determined that an extended summation would present the danger of focusing the jury's attention upon the heinous details of the crimes committed. Likewise, reasonably competent counsel also could have determined that in view of the strong evidence linking defendant to the murders, a guilty verdict was virtually a foregone conclusion, and that defendant's prospects of avoiding the death penalty would be improved if the defense refrained from placing its "credibility" at risk by suggesting an implausible defense and instead focused upon challenging the testimony of certain witnesses who testified for the prosecution.[36]

Thus, reasonable defense counsel could have had a number of legitimate tactical reasons for refraining from making an opening statement, presenting witnesses in defense, or summarizing the case more extensively. The record before us does not fully reveal why counsel elected to proceed in the manner in which defendant now complains, and defendant's claim must fail for that reason. (*People v. Mitcham, supra*, 1 Cal.4th 1027, 1059.) To the extent the record on appeal does provide insight into the basis for counsel's decision not to present a defense at the guilt phase, counsel's strategy was a tactical one influenced by the relative strengths and weaknesses of a decision to present a defense, as well as by the pendency of the murder charges against defendant in other counties. (See *post*, at pp. 1192–1193.)[37]

As noted, defendant also complains that his counsel "drew adverse attention to [defendant's] assertion of the privilege against self-incrimination." At issue is counsel's argument to the jury, in which he hypothesized a number of reasons why a defendant might elect not testify, including the observation, "some people tell the truth in this kind of setting, some people lie poorly." Defendant asserts that counsel's remark was an improper comment upon defendant's invocation of his constitutional right not to testify, in contravention of *Griffin v. California, supra*, 380 U.S. 609. In response, the People respond that counsel's comment did not draw adverse attention to defendant's silence.

---

believe beyond a reasonable doubt the truth of the charge or charges to a moral certainty. [¶] I would expect [the prosecutor], when he replies, as is his right to reply to this argument since he has the burden, to tell you that this does not mean beyond all possible doubt. That's true. But you will hear the words 'to a moral certainty.' [¶] . . . [¶] You've heard reference to other pending cases in San Diego and Oakland, and so there are some times that defendants do not testify for many, many reasons."

[36] Defendant acknowledges that "[o]f the more than 50 witnesses presented by the People, the defense cross-examined roughly half. . . ."

[37] Defendant acknowledged at the hearing on his motion for new trial that he had understood the risks and perils of a defense strategy that involved his taking the witness stand. (See *post*, at pp. 1196–1197.)

In his guilt phase summation, defense counsel argued to the jury:

"In this decision your process is analytical; that is, have the crimes been proven beyond a reasonable doubt to a moral certainty, and has it been proven beyond a reasonable doubt to a moral certainty that [defendant] is the person who committed one or more of the acts charged?

"[Defendant] *did not testify*. The court will instruct you that you may not consider this in any way, shape, or form. *You may not hold it against him.* However, experience tells us that people often have trouble with that concept. 'Well, if I were the defendant, I would testify. I would be up there screaming about it.'

"Let me say a word about this: *There are many reasons that a defendant may or might not testify in a case*, speaking hypothetically. There is, for example, the possibility that his lawyer might instruct you not to testify, even though he wanted to. There is on the contrary the possibility that his lawyer wants him to and he does not want to for various reasons.

"He may be articulate, he may be too articulate. He may be scared. I'll tell you, it is not easy to be a witness. If any of you have ever been a witness, where from time to time one comes up in one's career at the bar, I'm always amazed that you were just plain nervous up there even after all your experience in law school [*sic*].

"Some people tell the truth in this kind of setting, some people lie poorly.

"You've heard reference to other pending cases in San Diego and Oakland, and so *there are some times that defendants do not testify for many, many reasons. There are many, many reasons why the defendant may not testify, and I give you hypothetically various reasons that occur from time to time so that you do not consider any of it and hold it against him*." (Italics added.)

As an initial matter, we observe that the decisions finding *Griffin* error have not extended to the situation of a defendant who asserts that *his or her own attorney* invited the jury to draw an adverse inference from the defendant's failure to testify. (*Griffin v. California, supra*, 380 U.S. 609, 615 ["We . . . hold that the Fifth Amendment . . . forbids either comment *by the prosecution* on the accused's silence or instructions *by the court* that such silence is evidence of guilt." (Italics added.)].) Defendant does not cite any authority in support of the broad reading of *Griffin* that he advances here—to the contrary, the decisions upon which defendant relies are distinguishable, involving either a *prosecutor's* comment upon a defendant's silence (*People v. Morris, supra*, 46 Cal.3d 1, 35–36; *People v. Modesto* (1967) 66 Cal.2d 695, 711 [59 Cal.Rptr. 124, 427 P.2d 788]), or the trial of a case against multiple defendants in which the comment was made by counsel for a codefendant

(*People v. Hardy* (1992) 2 Cal.4th 86, 157–161 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People v. Haldeen* (1968) 267 Cal.App.2d 478, 481 [73 Cal.Rptr. 102]) or a codefendant sought to make such a comment (*People v. Jones* (1970) 10 Cal.App.3d 237, 243–244 [88 Cal.Rptr. 871]). The absence of authority on the point is not surprising, because if—by merely reminding the jury at summation that the defendant did not testify—*defense counsel* thereby would inject *Griffin* error into the proceedings, counsel would be placed in the awkward and untenable position of deciding whether to infringe upon his or her client's constitutional privilege against self-incrimination in order to increase the likelihood that any conviction would be vulnerable to a grant of a new trial or reversal on appeal. *Griffin* does not stand for such a proposition.

Moreover, even if we were to overlook the foregoing fundamental defect in defendant's position, no *Griffin* error appears. Viewing defense counsel's remarks in their proper context, it is clear that counsel was not suggesting that the jury draw any sort of adverse inference from defendant's silence. Nor did counsel's comments represent a "concession of [defendant's] guilt" as defendant asserts. Rather, the passage quoted above reveals that counsel merely sought to explain to the jury that there are "many reasons" why a defendant may not testify, including the *"hypothetical*[]" possibility that "[s]ome people tell the truth in this kind of setting, some people lie poorly," and that the jury should not hold such silence against him. (Italics added.) Counsel's references to defendant's failure to testify were made "so that you do not consider any of it and hold it against him," and manifestly did not constitute the type of comments that *Griffin* declared invalid. (See *Griffin v. California, supra,* 380 U.S. 609, 613–615.)[38]

Defendant's reliance upon *United States v. Swanson* (9th Cir. 1991) 943 F.2d 1070 similarly is misplaced. *Swanson* held that defense counsel effectively abandoned and betrayed his client and aided the prosecution by arguing to the jury that there was no reasonable doubt his client was the person who committed the bank robbery charged in the indictment. By contrast, defense counsel's performance in the present case did not constitute abandonment. In

---

[38] At defendant's request, the trial court instructed the jury pursuant to CALJIC Nos. 2.60 and 2.61, as follows:

"A defendant in a criminal trial has a constitutional right not to be compelled to testify. You must not draw any inference from the fact that a defendant does not testify. Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way. [(CALJIC No. 2.60.)]

"In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him. No lack of testimony on defendant's part will supply a failure of proof by the People so as to support a finding against him on any such essential element. [(CALJIC No. 2.61.)]"

view of the strong prosecution evidence linking defendant to the charged offenses, as well as to the murder cases then pending against defendant in Alameda and San Diego Counties, defense counsel reasonably could believe that their client's interests would best be served by treating the case "as a penalty case," rather than by presenting a defense or relying upon defendant's testimony. Consistent with that strategy, at the close of the guilt phase counsel argued to the jury that a defendant might choose not to testify for any one or more of several reasons. Defense counsel's argument clearly was proper.[39]

Next, defendant offers myriad contentions—most briefly stated and quite conclusory in nature—in an effort to demonstrate he was deprived of the effective assistance of counsel. These contentions encompass a wide array of both general and specific claims, including defense counsel's failure to present a coherent defense and more vigorously challenge the following: the prosecution's witnesses by cross-examination, the identification evidence discovered during the Kim investigation, the evidence linking defendant to Mills's murder (by highlighting evidence that Mills habitually kept personal items in her vehicle), the special circumstances allegations, the purportedly confusing jury instructions submitted to the trial court by the prosecution, and the absence of pinpoint jury instructions. All of these contentions, however, amount to or relate to trial tactics and, as noted previously, must be rejected because the record before us does not reveal why defense counsel elected to proceed in the manner they did and of which defendant now complains. (*People v. Mitcham, supra,* 1 Cal.4th 1027, 1059.)

For the same reasons, we reject defendant's similar attack on the manner in which counsel represented defendant at the penalty phase of the trial.

In sum, defendant fails to demonstrate on this record that defense counsel rendered ineffective assistance at trial. To the contrary, the record indicates that counsel was placed in the extremely challenging position of representing a defendant clearly linked to the deaths of five women, four of whom died by strangulation within days of each other, as well as to the near fatality by strangulation of a sixth woman. The record before us does not suggest that counsel's performance in defending against the charges in the manner summarized above, in the face of the prosecution's strong case against their client, "fell below an objective standard of reasonableness under prevailing professional norms," nor that "defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the

---

[39] Defendant also cites, "by way of comparison," this court's decisions in *People v. Samayoa, supra,* 15 Cal.4th 795, *In re Avena* (1996) 12 Cal.4th 694 [49 Cal.Rptr.2d 413, 909 P.2d 1017], and *People v. Cain* (1995) 10 Cal.4th 1 [40 Cal.Rptr.2d 481, 892 P.2d 1224]. None of these cases is helpful to defendant's argument.

outcome." (See *Strickland v. Washington, supra,* 466 U.S. 668, 694; *People v. Ledesma, supra,* 43 Cal.3d 171, 217.) Defendant's related claims, that counsel committed *Griffin* error and inappropriately conceded defendant's guilt at the penalty phase, lack merit for the reasons previously discussed.

## V. *Conflict of Interest Issues*

### *The Conflict Between Defendant and His Trial Counsel, Defendant's Desire to Testify, and the Motion for New Trial*

In a multi-pronged argument, defendant contends the trial court failed to inquire adequately into defendant's conflict with his attorneys regarding the presentation of a defense during the guilt phase of the proceedings (including defendant's desire to testify), failed to appoint new counsel once the conflict was disclosed, and improperly denied defendant's motion for a new trial. As we shall explain, none of defendant's contentions has merit. (See fn. 34, *ante.*)

### A. *Factual and Procedural Background*

On July 5, 1989, at the conclusion of the People's case-in-chief at the guilt phase, defendant's trial counsel requested an in camera hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]. At the hearing, conducted outside the presence of the jury and the prosecution, defense counsel informed the court that notwithstanding the circumstance that several defense witnesses were available to be called, counsel was prepared as part of the defense strategy to rest without putting on a defense, and that defendant "emphatically disagrees with that strategy." The trial court agreed with defense counsel's reasoning that "in these matters the decisions should be with the counsel."

On July 10, 1989, prior to the presentation of the parties' closing arguments, defense counsel requested a second in camera hearing under the authority of *Marsden.* During a brief hearing, counsel informed the court that during the July 5 *Marsden* hearing, he had neglected to mention that "by not putting on the witnesses, it also precluded the potential of [defendant's] testifying . . . ."

Later that same day, after the parties had argued their respective cases to the jury, defense counsel informed the court during an in-camera hearing that defendant "asked me to spread upon the record that he does not agree with the closing argument that counsel made, that he had asked me what it was, and that he was not informed of the type of argument. [¶] And he certainly does not feel that it was adequate, and this just compounds the problem of

lack of defense by the argument that counsel made, and he asked me to spread that upon the record."

On July 17, 1989, the jury returned its guilt phase verdict. Later that same day, defense counsel requested a third *Marsden* hearing, informing the court that "[defendant] continues to express disappointment [in] the manner in which to this point the case has been handled by counsel." Defense counsel continued: "[Defendant requests the court] to appoint Mr. Rowan Klein . . . to . . . prepare and file a new trial motion or some motion pre-penalty phase. . . . [¶] I will say that counsel opposes that motion. We have opposed other things before, and we would oppose that." The trial court denied defendant's motion, stating: "[I]t is just not timely. The motion to appoint Mr. Klein, even the motion for new trial, isn't—now is not the time to raise such a motion. Certainly, if at some time it looks like Mr. Klein's expertise would be of some assistance, I'd entertain the motion; but now I don't think is the appropriate time to even consider it. That request is denied . . . ."

On August 7, 1989, the jury returned its penalty phase verdict. Approximately four weeks later, on September 5, 1989, the court conducted a fourth *Marsden* hearing, wherein defense counsel informed the court of their client's request that they be relieved and replaced by Attorney Rowan Klein. The court granted the request.

On January 9, 1990, defendant, assisted by his newly appointed attorney, filed a motion for new trial that asserted: (1) defendant erroneously was denied his constitutional rights to testify and to present a defense at the guilt phase of trial; (2) the trial court erroneously failed to afford defendant a hearing regarding his allegations that a conflict of interest existed between him and his attorneys; (3) defendant did not validly waive his constitutional right to testify; (4) the trial court erroneously admitted evidence of other alleged homicides; and (5) the trial court erroneously determined that defendant lacked standing to object to evidence that was seized from the vehicle in which he was arrested.

At the hearing on defendant's motion for new trial, one of defendant's trial counsel, Howard Gillingham, testified that defendant "wanted to put on at all times a full-blown defense . . . . [¶] There was no question that [defendant], from early on, wanted to . . . contest the guilt at the special circumstance level. No question about that." Gillingham added: "Near the end of the case-in-chief, . . . we definitely knew that [defendant] did not agree with our approach." Gillingham explained the term, "our approach" to mean: "Our approach was this case was a potential death case, and at some point I, along with [cocounsel] Miss Morrissey, made the decision that that's how it had to be litigated. . . . [¶] As an example, the review of the voir dire of the jurors

was almost entirely death-focused, so right from the beginning . . . the tentative decision was it was going to be tried as a penalty case."

Gillingham affirmed that the position of both attorneys representing defendant was not to present a defense and that defendant would not testify at the guilt phase. When Gillingham conveyed this position to defendant near the conclusion of the guilt phase of the trial, defendant's response, according to Gillingham, was "[a]gitated. Total disagreement, which I must say, has been vindicated. We sort of had that feeling. [¶] . . . [¶] [W]e knew that [defendant] wanted to contest the guilt phase. . . ." Gillingham stated that defendant wanted to put on a defense and wanted to testify. On cross-examination, Gillingham acknowledged that he and defendant's cocounsel considered the decision not to present a defense at the guilt phase to have been tactical in nature, and that factors influencing counsel's decision included the strength and weaknesses of presenting a defense as well as the pending murder cases against defendant in Alameda and San Diego Counties.

Defendant testified that shortly after Gillingham was appointed to represent him, "I told him that I wanted to present a defense and that during the guilt phase I was more concerned about the guilt phase and I felt it was necessary for me to testify. [¶] . . . [¶] I questioned the way he was conducting voir dire. I wasn't happy with what he was doing, with what he was focusing on. [¶] . . . [¶] He wasn't really paying any attention to the guilt aspect. He was more concerned with the penalty phase. That is what I felt, anyway." According to defendant, on "the day before the prosecution rested," Gillingham "told me that he didn't plan to call any witnesses and that he wasn't going to put on a defense. [¶] . . . [¶] He also stated, well, if he didn't put on a defense and I am going to testify, I asked him about that, and he said if we are not going to put on a defense I was not going to be testifying." Defendant's reaction to counsel's strategy was, "I was upset. I indicated pretty strongly that I wasn't happy with him. [¶] . . . [¶] I told him I wanted to call witnesses, put on a defense and testify."

On cross-examination, defendant acknowledged that his trial attorneys had opined it was in defendant's best interest that defendant not testify: "they said it was a tactical decision." Defendant also acknowledged understanding that if he had testified at trial, he would have been subject to cross-examination by the prosecutor, including questions regarding the items taken from Tok Kim and Janette Cullins found in the car defendant was driving when apprehended, and that defendant would be asked to explain how those items came into his possession and that such answers "more than likely" would have been communicated to the prosecutor's counterparts in Alameda and San Diego Counties and ultimately used against defendant in proceedings conducted in those counties.

Defendant further testified on cross-examination that during the *Marsden* hearings, defense counsel accurately summarized the disagreements that existed between defendant and counsel.

During an in-camera portion of the hearing, defendant's new counsel recited the names of several persons whom he identified as having been potential defense witnesses but who were not called to testify at the guilt phase of the trial in light of prior trial counsel's decision not to put on a case-in-chief. Counsel thereafter argued extensively in favor of the motion for new trial, which was denied.

### B. *The Issues*

#### 1. *Defendant's Conflict with His Attorneys at Trial*

Defendant contends that he was denied his constitutional right to present a defense, including his right to testify, and that the trial court failed adequately to inquire as to the nature of the conflict. As we shall explain, we reject these arguments.

Although "a defendant in a capital trial [has] the right to have his only viable defense to the guilt or special circumstance charges presented at the initial stage of trial" (*People v. Frierson* (1985) 39 Cal.3d 803, 815 [218 Cal.Rptr. 73, 705 P.2d 396 (plur. opn. of Kaus, J.)), and counsel lacks the authority to override the defendant's decision to present such a defense at the guilt phase of the trial (*People v. Burton* (1989) 48 Cal.3d 843, 856 [258 Cal.Rptr. 184, 771 P.2d 1270]), in the present case the record does not establish that defendant had a viable defense. (See *id.*, at p. 857 ["[d]efendant's reliance on *Frierson* . . . is misplaced, since the record does not show that any defense he wished to present had credible evidentiary support"]; see also *People v. Cox, supra*, 53 Cal.3d at p. 671 ["When the record reflects a tactical choice to curtail presentation of defense evidence or closing argument with the defendant's purported knowledge and acquiescence, it would amount to an untoward interference with the attorney-client relationship to suggest the trial court has an obligation to question the defendant as to his concurrence in counsel's trial strategy and to secure a waiver of any rights incidentally relinquished."].) Here, the record supports the People's position that defendant, "a person with a sophisticated view of the criminal justice system from the inside," complained sufficiently during proceedings conducted in the trial court so as to create a colorable appellate issue, but not sufficiently to obligate the trial court to relieve his counsel.[40]

---

[40] We believe that the prosecutor's argument in summation at the hearing on defendant's motion for new trial aptly summarizes the state of the record: "[L]ooking at the transcript, the court could . . . and should draw the conclusion that what happened was Mr. Carter was a

Accordingly, defendant's claim that he was denied the opportunity to present a defense, and to "conflict-free, effective representation," should be denied.

With respect to defendant's asserted desire to testify at trial, we are guided by well settled rules: " 'Every criminal defendant is privileged to testify in his own defense, or to refuse to do so.' (*Harris* v. *New York* (1971) 401 U.S. 222, 225 [28 L.Ed.2d 1, 91 S.Ct. 643, 645].) The defendant's 'absolute right not to be called as a witness and not to testify' arises from the Fifth Amendment to the United States Constitution and article I, section 15 of the California Constitution. (*Cramer* v. *Tyars* (1979) 23 Cal.3d 131, 137 [151 Cal.Rptr. 653, 588 P.2d 793].) Although tactical decisions at trial are generally counsel's responsibility, the decision whether to testify, a question of fundamental importance, is made by the defendant after consultation with counsel. (*People* v. *McKenzie* (1983) 34 Cal.3d 616, 631, fn. 9 [194 Cal.Rptr. 462, 668 P.2d 769]; *U.S.* v. *Martinez* (9th Cir. 1989) 883 F.2d 750, 755, vacated on other grounds (1991) 928 F.2d 1470; see also *People* v. *Robles* (1970) 2 Cal.3d 205, 215 [85 Cal.Rptr. 166, 466 P.2d 710].)" (*People* v. *Hines* (1997) 15 Cal.4th 997, 1032 [64 Cal.Rptr.2d 594, 938 P.2d 388].)

Moreover, we previously have rejected the position that a trial court must obtain an affirmative waiver on the record whenever a defendant fails to testify at trial. (*People* v. *Alcala, supra*, 4 Cal.4th 742, 805–806 ["When the record fails to disclose a timely and adequate demand to testify, 'a defendant may not await the outcome of the trial and then seek reversal based on his claim that despite expressing to counsel his desire to testify, he was deprived of that opportunity.' [Citations.]"]; see also *Florida* v. *Nixon* (2004) 543 U.S. 175 [160 L.Ed.2d 565, 125 S.Ct. 551, 561] [although defense counsel "was obliged to, and in fact several times did, explain his proposed trial strategy" to the defendant, counsel "was not additionally required to gain express consent before conceding [the defendant's] guilt"]; *People* v. *Cox, supra*, 53 Cal.3d 618, 671 [" '[A] trial judge may safely assume that a defendant, who is ably represented and who does not testify[,] is merely exercising his Fifth Amendment privilege against self-incrimination and is abiding by his counsel's trial strategy; otherwise, the judge would have to conduct a law seminar prior to every criminal trial.' "].)

---

defendant who wanted things his way. [Defense Counsel] Mr. Gillingham did not do them his way for valid legally sufficient reasons, and Mr. Gillingham indicated this . . . displeasure of Mr. Carter, but in the end, Mr. Carter acceded to Mr. Gillingham's trial strategy. He was present during all of these proceedings, and he is not a novice in this business. He is not a person who is not unfamiliar [*sic*] with the courts and the court system. He has not hesitated in the past to comment. I suggest this motion should be denied in its entirety. There is no error at all."

■ Here, as noted above, defendant had ample opportunity during the course of three *Marsden* hearings to inform the court that he wished to testify, against the advice and over the objection of defense counsel, *even if defense counsel were permitted to decline to present any other defense witnesses who would support defendant's own testimony.* In view of defense counsel's repeated efforts during the *Marsden* hearings to inform the trial court of the conflicts that had arisen with his client, the trial court reasonably could have determined that had defendant told his counsel that defendant insisted upon testifying despite the absence of any other defense witnesses, his counsel would have conveyed that demand to the trial court. In view of the circumstance that counsel never told the trial court that defendant had made such a demand, on this record we may not assume that defendant in fact had insisted upon testifying even where no other defense witnesses would be presented to support his testimony. (Compare *People v. Robles, supra,* 2 Cal.3d 205, 214-215 [a defendant has the right to testify in his or her own defense, over counsel's objection, when the defendant insists upon being permitted to testify].)

Similarly, defendant's further contention that the trial court failed adequately to inquire into his conflict with trial counsel similarly is belied by the record before us. As noted above, the court conducted three *Marsden* hearings during the course of the trial for the purpose of permitting the airing of the conflict between defendant and his attorneys. During these hearings, defense counsel brought to the court's attention defendant's dissatisfaction with counsel's trial strategy and tactics. Although at the hearing on the motion for new trial, defendant testified that counsel had not informed the court at the July 5th and July 10th *Marsden* hearings of all the witnesses whom defendant wanted to call, we are satisfied from the record before us that in the course of conducting three *Marsden* hearings, the trial court adequately inquired as to the issues raised by the defense, and that counsel fairly characterized the nature of the conflict for the trial court.

### 2. *Failure to Appoint New Counsel*

Defendant contends that in view of the conflict between him and his trial counsel, the trial court was obligated to appoint new counsel, and the court's failure to do so constitutes reversible error. As we have indicated in the immediately preceding section, however, the record does not indicate that any defense that defendant sought to present had "credible evidentiary support" (*People v. Burton, supra,* 48 Cal.3d 843, 857; see *People v. Jones* (1991) 53 Cal.3d 1115, 1139 [282 Cal.Rptr. 465, 811 P.2d 757]; see also *People v. Frierson, supra,* 39 Cal.3d 803, 815 ["a defendant in a capital trial . . . retain[s] the right to have his only *viable* defense to the guilt or special circumstance charges presented at the initial stage of the trial" (italics

added)].) In view of that circumstance, the trial court was under no obligation to interrupt the trial proceedings to order the appointment of new counsel. We therefore reject defendant's contention that the trial court erred in not appointing new counsel upon learning of the conflict between defendant and his counsel regarding trial tactics and strategy.

### 3. *Motion for New Trial*

In view of defendant's foregoing contentions, but without additional argument beyond what he has cited in support thereof, defendant asserts the trial court committed reversible error in denying defendant's motion for a new trial. As we previously have explained, however, defendant fails to persuade us that his conflict with defense counsel over trial tactics and strategy (including the decision whether defendant should testify), the trial court's inquiries into that conflict, or the court's refusal to appoint new counsel prior to the conclusion of the penalty phase, either singularly or in the aggregate, deprived defendant of his state or federal constitutional rights. Having discerned no error in this regard, we conclude the trial court properly denied defendant's motion for a new trial.

### VI. *Penalty Phase Issues*

#### A. *The Admissibility of Evidence of Defendant's Attack on Jennifer S.*

Prior to the commencement of trial, defendant moved to exclude from the penalty phase the evidence of (1) defendant's prior conviction for the Ventura County sexual assault committed upon Jennifer S., and (2) the facts underlying that conviction. Defendant asserted he was denied the effective assistance of counsel during the Ventura County proceedings, that but for counsel's deficient performance he would have been acquitted in that case, and that therefore the Ventura County conviction and the facts underlying that conviction should be excluded from the penalty phase.

At the hearing on defendant's motion, the prosecution conceded that because the conviction had not occurred before the charged murders, it was not a "prior" conviction within the meaning of section 190.3, factor (c), and thus evidence *of the conviction itself* was not admissible under that provision. (See *People v. Balderas, supra,* 41 Cal.3d 144, 203.) Accordingly, the court granted defendant's motion to exclude evidence of the conviction.

With regard to the direct evidence of defendant's attack upon Jennifer S. underlying the conviction, however, the trial court denied defendant's motion. Accordingly, as described earlier (*ante,* at p. 1135), at the penalty

phase the prosecution introduced the testimony of Jennifer S. and other evidence relating to defendant's brutal attack upon her.

On appeal, defendant renews his challenge to the trial court's ruling denying his motion to exclude the evidence underlying the Ventura County conviction. He argues that had he not been represented ineffectively in Ventura County, "he would have been acquitted of the charges there and the evidence would not have been admissible against him here," relying on the portion of section 190.3 providing that "in no event shall evidence of prior criminal activity be admitted for an offense for which the defendant was prosecuted and acquitted." (See *People v. Sheldon* (1989) 48 Cal.3d 935, 948–952 [258 Cal.Rptr. 242, 771 P.2d 1330].) Defendant points in particular to the Ventura County prosecutor's assertedly improper reference to defendant's failure to testify in that case (see *Griffin v. California, supra*, 380 U.S. 609), implicitly asserting that had defense counsel in those proceedings more vigorously and effectively challenged the prosecutor's comments, the conviction would not have been sustained.

We conclude that defendant's contention lacks merit. To begin with, in the prior proceeding both the trial court and the Court of Appeal explicitly rejected the claim that the prosecutor's comments undermined the validity of the conviction.[41] Furthermore, even if defendant nonetheless properly could challenge the prior conviction on this ground at this point (an issue we need not and do not decide), and even if the error upon which defendant relies had been prejudicial, the very most that defendant would have been entitled to would have been an order striking the prior conviction for purposes of this proceeding, *not* the entry of an acquittal. (See *People v. Horton, supra*, 11 Cal.4th at pp. 1126–1141.) Because, in any event, as already noted, evidence of the conviction itself was not admitted in the present case, defendant's challenge to the prosecutor's conduct in the Ventura proceeding or to defense counsel's allegedly ineffective assistance in that proceeding has no bearing upon the validity of the trial court's admission of evidence of the conduct underlying the prior conviction.

With regard to that evidence, past cases make clear that the introduction of evidence of the Ventura assault was proper under section 190.3, factor (b), which authorizes the trier of fact at the penalty phase to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence," whether such violent criminal conduct occurred prior

---

[41] Defense counsel in the Ventura proceedings moved for a mistrial based on the prosecutor's improper comments, but the trial court denied the motion. On appeal, the Court of Appeal, in an unpublished decision, affirmed defendant's conviction, concluding "[t]his was not a close case," and that the *Griffin* error "was harmless beyond a reasonable doubt."

to or after the charged capital offense. (See, e.g., *People v. Avena* (1996) 13 Cal.4th 394, 426–428 [53 Cal.Rptr.2d 301, 916 P.2d 1000] [unlike prior felony convictions, evidence of violent conduct is admissible even if it occurred after the capital crime]; *People v. Clair* (1992) 2 Cal.4th 629, 676–677 [7 Cal.Rptr.2d 564, 828 P.2d 705] [possession of knife during burglary is sufficient to establish implied threat of force or violence]; *People v. Miranda* (1987) 44 Cal.3d 57, 97 [241 Cal.Rptr. 594, 744 P.2d 1127] [upholding constitutionality of section 190.3, factor (b)]; *People v. Balderas, supra*, 41 Cal.3d 144, 204–205 [evidence of other criminality, if proved beyond a reasonable doubt, "is simply one factor the penalty [phase] jury is to consider in deciding the appropriate punishment for the capital offense"].) No error appears.

### B. *Adequacy of the Jury Instructions Given*

Defendant raises a number of contentions related to the standard jury instructions given by the trial court. As we shall see, none of these contentions has merit.

First, defendant contends the standard California instructions "do not adequately channel sentencing discretion by clear and objective standards that provide specific and detailed guidance for the sentencing authority, resulting in arbitrary and capricious sentencing decisions in violation of the Eighth Amendment." We repeatedly have rejected similar claims. (See, e.g., *People v. Williams* (1997) 16 Cal.4th 153, 267–268 [66 Cal.Rptr.2d 123, 940 P.2d 710]; *People v. Osband, supra*, 13 Cal.4th 622, 702–703; *People v. Sanders* (1995) 11 Cal.4th 475, 563–564 [46 Cal.Rptr.2d 751, 905 P.2d 420].) We are not persuaded to reconsider those decisions.

Second, defendant contends that on the second day of the jury's penalty deliberations, the trial court failed to respond adequately to two questions submitted by the jury that sought guidance as to the meaning of the terms "extenuating," "mitigating," and "aggravating" circumstances, and that the failure of the trial court to make an adequate record of its response deprived defendant of his right to due process of law by denying him meaningful appellate review of the proceedings. The jury's questions, submitted in a pair of notes signed by the jury foreman, inquired: "[1] We would like the legal definition of: extenuating[,] mitigating[, and] aggravating [*sic*]. [2] If a member of the jury finds that the aggravating circumstances [are] greater than the mitigating circumstances, may the juror vote for life? If a member of the jury finds that the mitigating circumstances [are] greater than the aggravating circumstances, may the juror vote for death?"

With regard to the jury's request for definitions, the record is silent as to how, if at all, the trial court responded.[42] We find entirely speculative, however, defendant's assertion that the jury's request that the trial court elaborate on certain legal definitions "raises serious doubts about the reliability of the sentencing process conducted here." Even if we infer from the record that the trial court, either intentionally or inadvertently, ignored the jury's request for definitions of the terms "extenuating," "mitigating," and "aggravating" circumstances, and did not discuss the matter with counsel, any error (see § 1138) was harmless, because those terms did not require further definition.

As to the second note from the jury, the trial court answered "yes" and "no," respectively.[43] The jury thereafter continued its deliberations and, without submitting any further inquiries to the court, reached its verdict five days later. Although the better practice would have been for the court (or the parties) to ensure that the proceedings responsive to the jury's questions were reported, on the record before us we are unable to discern any error in the trial court's handling of the jury's inquiries.[44]

Finally, defendant contends that because he was personally absent from court when the jury submitted the foregoing inquiries (although his counsel was present), reversal of the death judgment is mandated. Although defendant did not waive his presence at any stage of the trial, his failure to demonstrate prejudice from his absence at this stage of the proceedings forecloses his claim. (See *People v. Bradford, supra,* 15 Cal.4th 1229, 1358.)

### C. *Alleged Prosecutorial Misconduct*

Defendant contends certain comments made by the prosecutor on eight distinct occasions during closing argument constituted prejudicial misconduct in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

---

[42] The matter was discussed several years later when the parties attempted to settle the record, prior to filing their briefs in this court. Defense counsel observed at the record settlement hearing that although the clerk's transcript contains the questions submitted by the jury, there is no corresponding reporter's transcript indicating whether the trial court discussed the questions with counsel. The reporter's transcript for the date in question, August 2, 1989, indicates only that "the jury retired for further deliberations."

[43] At the record settlement hearing, the trial court recalled: "I am confident that the jury was never brought out, that—I have some vague recollection, but I could be in error—that we had contact with either [defense counsel] and we all agreed that those were the correct answers."

[44] Defendant contends that the inadequate record violates a panoply of defendant's rights under the state and federal Constitutions. In the absence of any showing by defendant that any matter not reported was of consequence and prejudicial, defendant's claim lacks merit. (See *People v. Alvarez, supra,* 14 Cal.4th 155, 196, fn. 8 ["The record on appeal is inadequate, however, only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal. [Citation.] It is the defendant's burden to show prejudice of this sort."].)

"Improper remarks by a prosecutor can ' "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." ' (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [106 S.Ct. 2464, 2471, 91 L.Ed.2d 144]; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 642 [40 L.Ed.2d 431, 94 S.Ct. 1868, 1871]; cf. *People v. Hill* (1998) 17 Cal.4th 800, 819 [72 Cal.Rptr.2d 656, 952 P.2d 673].) Under state law, a prosecutor who uses deceptive or reprehensible methods to persuade either the court or the jury has committed misconduct, even if such action does not render the trial fundamentally unfair. (*People v. Hill, supra,* 17 Cal.4th at p. 819; *People v. Berryman* (1993) 6 Cal.4th 1048, 1072 [25 Cal.Rptr.2d 867, 864 P.2d 40] (*Berryman*); *People v. Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610] (*Price*).)

"Nevertheless, as a general rule, to preserve a claim of prosecutorial misconduct, the defense must make a timely objection and request an admonition to cure any harm. The rule applies to capital cases. (*Berryman, supra,* 6 Cal.4th at p. 1072 [rejecting defendant's claim of prosecutorial misconduct both for failure to object or request admonition at trial[,] and on the merits]; *Price, supra,* 1 Cal.4th at pp. 447, 460–462 [declining to address whether prosecutors committed misconduct[,] because defense did not object at trial]; *People v. Monteil* (1993) 5 Cal.4th 877, 914 [21 Cal.Rptr.2d 705, 855 P.2d 1277] . . . [although trial counsel objected to prosecutor's remarks at trial, the failure to request admonition failed to preserve claim of prosecutorial misconduct on appeal].)" (*People v. Frye* (1998) 18 Cal.4th 894, 969–970 [77 Cal.Rptr.2d 25, 959 P.2d 183]; see also *People v. Ochoa, supra,* 19 Cal.4th 353, 427.)

With regard to seven of the eight instances of alleged prosecutorial misconduct, defense counsel did not object when the comments were made. Further, the record before us fails to disclose a basis for applying any exception to the general rule requiring both an objection and a request for a curative instruction. (See *People v. Frye, supra,* 18 Cal.4th at p. 970.) Accordingly, insofar as defendant's claim of prosecutorial misconduct relates to comments that were not objected to, the claim is barred. (*Ibid.*)

The instance in which an objection to the purported misconduct was interposed consisted of the prosecutor's arguing to the jury: "What kind of a man does things like this? Well, the defense has tried to tell you what kind of a man, and they have not told you very much. They have had, as any criminal defendant facing the nature of these charges, a great deal of time to find people, to call them. Virtually unlimited money—" At that point, defense counsel objected. The trial court ruled: "The objection is sustained as [to] monetary [*sic*]."

On appeal, defendant contends that although the trial court sustained his objection, defendant did not seek an admonition because to do so "would have been futile and not cured the prejudice." We disagree. Defendant's objection having been sustained, defendant bore the burden of seeking a curative admonition from the court. He refrained from doing so. Although defendant asserts here that such corrective action would have been pointless, his argument is unpersuasive. The prosecutor's reference to money was fragmentary and ambiguous. It appears likely that the reference had minimal potential effect upon the jurors. Whatever potential for harm arose from the prosecutor's remark was assuaged by the court's ruling and certainly was capable of elimination by means of an admonition, had one been requested.

Moreover, the prosecutor's brief remark was fleeting and of marginal significance. The trial court's ruling alerted the jury to the inappropriate nature of the comment. In addition, the prosecutor's other comments—about which defendant has waived his right to complain based upon his failure to object below—came within the bounds of fair comment or at most constituted trivial improprieties. Under these circumstances, and in view of the nature of defendant's crimes, we conclude that any possible error was harmless, because defendant has failed to establish "a reasonable likelihood the jury understood or applied the complained-of [statements] in an improper or erroneous manner." (*People v. Frye, supra*, 18 Cal.4th 894, 970.)[45]

### D. *Motion for New Trial Based on Alleged Juror Misconduct*

Prior to sentencing, defendant moved for a new trial on various grounds that already have been discussed. (See *ante*, at pp. 1195–1200.) At the hearing on the motion, defendant orally conveyed an additional ground upon which he urged the trial court to grant his motion, juror misconduct. Defense counsel contended: "The basis of the allegation is that there may have been perjury committed by [Juror K.] in the questionnaire she completed for the court and counsel. Specifically Question 61 which says: 'Have you ever been in a situation where you feared being hurt or being killed as a result of violence of any sort?' Answer was: 'No.' " The defense argued that Juror K., who was 31 years of age when she completed the juror questionnaire, feared being raped, slept with a knife under her bed, and therefore committed

---

[45] Defendant includes in his claim of prosecutorial misconduct at the penalty phase a similar claim of prosecutorial misconduct at the guilt phase. With respect to defendant's asserted claims of error directed at the prosecution's closing argument at the guilt phase, defendant did not interpose a single objection. As we have explained *ante*, because defendant failed to object the trial court did not act to cure any purported harm through admonition. Defendant's failure to assert a timely objection and request such an admonition constitutes a failure to preserve the claim on appeal. (*People v. Ochoa, supra*, 19 Cal.4th 353, 427; *People v. Frye, supra*, 18 Cal.4th 894, 969-970.)

perjury when she responded in the negative to Question 61. The defense added that Juror K. communicated her concealed fear to Juror C-M.

The prosecutor argued that the issue raised by Question 61 "is directed toward a specific instance" and did not apply to the "general fear" on the part of Juror K. noted by defense counsel, adding that there was no evidence before the court of any misconduct. The trial court voiced some misgivings over the defense's claim, observing: "I think we all fear violence [—] [I]f we don't, then there is something wrong with us, I imagine," but permitted defense counsel to question Juror K., as set forth below.[46]

---

[46] "Counsel: Ma'am, you were a juror in this case?

"Juror K.: Yes.

"Counsel: On March 20th, 1989, do you remember filling out a questionnaire, it is about 18 pages, signed under penalty of perjury?

"Juror K.: Yes.

"Counsel: Prior to that time, did you ever sleep with a knife under your bed?

"Juror K.: Prior to what time?

"Counsel: Prior to March 20th, 1989, did you ever sleep with a knife under your bed?

"Juror K.: At one time.

"Counsel: Why did you do that?

"Juror K.: I got an apartment for the first time when I was—I can't even remember—18 or 19, and I lived by myself, and prior to that time, I had never been alone and, after I first moved in, every little creak in my house, and tree branch, or whatever, I was paranoid for a short period of somebody breaking in, or whatever, because there is no one else around as my parents, or roommates at school, or whatever, and I think the incident you are referring to, one night I woke up, could not go to sleep, and I said, well, if anything does happen, I am going to defend myself, so I went into my kitchen. I got a knife, and I put it between my mattresses, and I then—that didn't help, so I spent the entire night up still, and I don't know exactly when, but I can tell you I probably got up the next morning and thought how silly and put it back. It was very brief and that was it.

"Counsel: Did you fear any particular kind of crime being committed?

"Juror K.: Well, somebody breaking in and, you know, raping and murdering, you know 18 years old—

"Counsel: Had there been anything in the community that you had read about—

"Juror K: No.

"Counsel:—that contributed to that fear?

"Juror K.: No.

"Counsel: Was this when you were living in Pasadena?

"Juror K.: Yes, that is where I had my first apartment.

"Counsel: And did you ever tell anybody that you feared the fact that there had been rapes in the Pasadena community?

"Juror K.: No, I don't know that I was aware of a lot of that happening.

"Counsel: Had you ever been burglarized prior to that time?

"Juror K.: No.

"Counsel: Did you fear any—well, have you ever been in a situation where you feared any kind of violence?

"Juror K.: Are you referring to that particular time or moment?

"Counsel: Any time. Any time prior to March 20th?

"Juror K.: No, no, not really.

After hearing further argument from the parties, the trial court without comment denied the motion for new trial.

On appeal, defendant contends that Juror K. "intentionally concealed her direct experience in *voir dire* and her questionnaire responses," in contravention of defendant's rights under the United States and California Constitutions "to [an] impartial and unbiased jury, due process, fair trial, present a defense, determination based on material facts and evidence at trial, and to death eligibility and reliable determinations of guilt and penalty." Defendant asserts that in view of the charges filed against defendant (including burglary, rape, and murder), Juror K.'s testimony—"revealing fears of being victim to the very crimes at issue in [defendant's] case"—must be presumed to establish prejudicial concealment in the absence of affirmative and competent rebuttal, citing *In re Stankewitz* (1985) 40 Cal.3d 391, 402 [220 Cal.Rptr. 382, 708 P.2d 1260]; *People v. Pierce* (1979) 24 Cal.3d 199, 207 [155 Cal.Rptr. 657, 595 P.2d 91]; and *Dyer v. Calderon* (9th Cir. 1988) 151 F.3d 970, 973, fn. 2).

In response, the People contend that the court's ruling "necessarily rested on implied findings that Juror K. did not conceal the information, and/or that it was not material, and/or that any concealment was not deliberate, and/or that Juror K. had no actual bias against appellant." The People further contend that the present case is unlike those relied upon by defendant.

Both parties refer to other answers provided by Juror K. on the questionnaire: Question 57 asked, "Have you or anyone close to you been the victim of a crime, reported or unreported?" to which Juror K. answered affirmatively, indicating that she been the victim of burglaries in San Jose, Pasadena, and West Lost Angeles. Question No. 71 asked, "Any other comments?" to which Juror K. responded, "[E]veryone has feares [*sic*] + you don't know what will happen in the next minute."

---

"Counsel: So the time that you put the knife under your bed, you didn't fear any particular violence—

"[Objection sustained.]

"Counsel: Did you consider the time that you put the knife under your bed as being a situation where you feared violence[?]

"Juror K.: I had trouble sleeping because of noises going on, or whatever, and it was all in my imagination. Like I said, I probably got up in the morning and thought how silly and, quite frankly, I hadn't and haven't thought about that incident at all for the last 12 years.

"Counsel: In you[r] mind, isn't that a situation where you feared violence against you—

"[Objection overruled.]

"Juror K.: That night?

"Counsel: Yes.

"Juror K.: Yes.

"Counsel: Thank you."

In previous decisions, we have reviewed at some length the principles that guide our examination of a claim of juror misconduct during voir dire. (See, e.g., *In re Carpenter, supra,* 9 Cal.4th 634, 646-660; *In re Hitchings* (1993) 6 Cal.4th 97, 110–123 [24 Cal.Rptr.2d 74, 860 P.2d 466].) We need not reiterate here those extensive discussions; suffice it to say for present purposes that "juror misconduct involving the concealment of material information on voir dire raises the presumption of prejudice," and that "[t]his presumption of prejudice ' "may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party [resulting from the misconduct]. . . ." ' [Citations.]" (*In re Hitchings, supra,* at p. 119; see also *Dyer v. Calderon, supra,* 151 F.3d 970, 973, fn. 2 ["The presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice."].)

Applying the foregoing standards, it is clear that Juror K.'s failure to answer Question 61 more completely did not constitute misconduct and, even if we were to assume that misconduct did occur, the presumption of prejudice was rebutted by the substance of her testimony at the hearing on defendant's motion for new trial. Assuming, for the sake of argument, that defendant is correct in asserting that Juror K.'s answer to Question No. 61 was *inaccurate,* her statement at the hearing that "I hadn't and haven't thought about that incident at all for the last 12 years" diminished if not dispelled its potential significance.[47]

Further, even if Juror K. in fact had concealed the information, the circumstances that the incident was "very brief" and occurred more than a decade earlier, and that Juror K. realized because she had been burglarized that "everyone has feares [*sic*]," established that the omitted information was

---

[47] Because the issue is not germane to the resolution of the issues presented here, we need not and do not have occasion to address the question whether a juror's concealment of information must be intentional. (See *In re Hitchings, supra,* 6 Cal.4th 97, 114–116 [declining to answer the question]; *Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 110, fn. 5 [95 Cal.Rptr. 516, 485 P.2d 1132] [same]; compare *People v. Diaz* (1984) 152 Cal.App.3d 926, 932 [200 Cal.Rptr. 77] [concealment need not be intentional] and *People v. Blackwell* (1987) 191 Cal.App.3d 925, 929 [236 Cal.Rptr. 803] [same] with *People v. Kelly* (1986) 185 Cal.App.3d 118, 125–128 [229 Cal.Rptr. 584] [disagreeing with *Diaz*], and *People v. Jackson* (1985) 168 Cal.App.3d 700, 704–706 [214 Cal.Rptr. 346] [same]; see also *McDonough Power Equip. v. Greenwood* (1984) 464 U.S. 548, 555–556 [78 L.Ed.2d 663, 104 S.Ct. 845] [an honest yet mistaken answer to a question on voir dire rarely amounts to a constitutional violation, and even an intentionally dishonest answer is not fatal provided that the falsehood does not reflect a lack of impartiality].)

immaterial to her overall qualifications or suitability to serve as a juror. Those qualifications clearly were established in the course of counsel's voir dire.[48]

Moreover, even if we were to assume Juror K.'s answer to Question No. 61 was inaccurate, evasive, and material, the circumstance that as a teenager living alone for the first time, Juror K. was "paranoid for a short period of someone breaking in," leading her to keep a kitchen knife in close proximity overnight, does not provide any basis for concluding that she harbored undisclosed juror *bias*. Accordingly, the presumption of prejudice was rebutted.[49]

We further note defendant's misplaced reliance upon our decisions in *In re Stankewitz, supra*, 40 Cal.3d 391, and *People v. Pierce, supra*, 24 Cal.3d 199, and the United States Court of Appeals' decision in *Dyer v. Calderon, supra*, 151 F.3d 970. In *Stankewitz*, the petitioner successfully sought a writ of habeas corpus following his conviction of first degree murder, alleging he was denied a fair trial because one of the jurors, a police officer, had violated the court's instructions and " 'consulted' his own outside experience as a police officer on a question of law" as to when a robbery takes place. (40 Cal.3d at p. 399.) We characterized the juror's determination as being "totally wrong," and concluded that because the juror "stated it again and again to his fellow jurors [he] thus committed overt misconduct." (40 Cal.3d at pp. 399–400, fn. omitted.) In *Pierce*, the defendant obtained a reversal of his conviction for second degree murder upon the ground of juror misconduct, because one of the jurors had ignored the court's repeated admonitions not to discuss the case with third persons by discussing the proceedings during the course of the trial with a police officer acquaintance who had testified as a prosecution witness in the case. (24 Cal.3d at p. 209.) In *Dyer*, in which the

---

[48] During voir dire examination, Juror K. also made a few passing references to convicted murderer Charles Manson, indicating that she believed he would have been an individual eligible to receive the death penalty. On appeal, defendant contends that Juror K.'s "voir dire answers take on even greater significance when read with her concealed fears" and with "[w]hatever else may be said about Juror [K.]'s fears of Charles Manson." Our review of the record indicates there is no basis for concluding that Juror K.'s brief references to Manson are supportive of defendant's position. Moreover, both the prosecutor and defense counsel took the opportunity to ask followup questions on voir dire regarding Juror K.'s knowledge of the Manson case.

[49] With regard to defendant's related claim of misconduct arising from Juror K.'s reportedly having told Juror C-M. of her concealed fears, we observe that the record on appeal does not indicate what Juror K. said to the other juror and when she said it. Defense counsel had the opportunity to call Juror C-M. at the hearing on defendant's motion for new trial, but did not do so. The record before us thus provides no basis for concluding that prejudicial misconduct occurred, and the claim therefore fails.

court reversed a first degree murder conviction, a juror answered "no" to questions asking whether a relative or close friend ever had been a victim of any type of crime or had been accused of any offense other than a traffic offense, notwithstanding the circumstance that the juror's brother had been murdered and her estranged husband had been arrested for rape. None of these decisions, involving egregious transgressions in derogation of the jurors' oaths, is remotely apposite to the misconduct alleged to have occurred here.

 " 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.' " (*People v. Williams, supra,* 45 Cal.3d 1268, 1318 [rejecting a claim of juror misconduct based upon allegations that during a capital trial a juror consumed tranquilizers and engaged in a discussion regarding " 'the religious aspects of the penalty phase' "].) Our review of the relevant portions of the record described above leads us to conclude that the trial court properly denied defendant's motion for a new trial based upon alleged juror misconduct. We agree with that court's implied finding that Juror K.'s fear of an intruder more than a decade earlier was highly unlikely to have influenced her role as a juror. Defendant's assertions to the contrary lack support and thus are unpersuasive. No abuse of discretion by the trial court occurred.

### E. *Section 190.4, Subdivision (e) Motion*

Approximately five months after the jury returned its penalty phase verdicts, the court considered defendant's automatic motion for modification of the death sentence. At a hearing, the court stated that it had reviewed the evidence introduced at trial, found the jury's verdicts as to guilt and its findings as to special circumstances to be supported by the weight of the evidence, considered the factors in aggravation and mitigation as set forth in section 190.3, and concluded that "the aggravating circumstances substantially outweigh[ed] the mitigating circumstances." The court on that basis denied defendant's application for modification of the death sentence.

On appeal, defendant contends the trial court improperly denied the motion, because (1) prior to ruling on the motion, the court considered other-crimes evidence introduced at the guilt phase of trial (notably the deaths of Tok Kim and Janette Cullins), and (2) following the hearing on the motion to modify but prior to imposing the death judgment, the court considered victim-impact statements. Defendant's position is without merit.

 " 'In ruling on a verdict-modification application, the trial judge is required by section 190.4[, subdivision] (e) to "make an independent determination whether imposition of the death penalty upon the defendant is proper

in light of the relevant evidence and the applicable law." [Citations.] That is to say, he must determine whether the jury's decision that death is appropriate under all the circumstances is adequately supported. [Citation.] And he must make that determination independently, i.e., in accordance with the weight he himself believes the evidence deserves.' (*People v. Marshall* [(1990)] 50 Cal.3d [907,] 942 [269 Cal.Rptr. 269, 790 P.2d 676].)

 "On appeal, we subject a ruling on such an application to independent review: the decision resolves a mixed question of law and fact; a determination of this kind is generally examined de novo [citation]. Of course, when we conduct such scrutiny, we simply review the trial court's determination after independently considering the record; we do not make a de novo determination of penalty." (*People v. Mickey, supra*, 54 Cal.3d 612, 703–704; see also *People v. Jones* (1997) 15 Cal.4th 119, 191 [61 Cal.Rptr.2d 386, 931 P.2d 960] [same].)

Defendant contends initially that the trial court improperly considered the other-crimes evidence involving the deaths of Tok Kim and Janette Cullins in a light different from that considered by the jury—that is, the jury may have considered the evidence in the context of establishing intent, identity, or common plan, whereas the trial court at the section 190.4, subdivision (e) hearing considered the Kim and Cullins evidence in aggravation. As the People point out, however, the trial court was entitled to consider the Kim and Cullins evidence as a factor in aggravation under the category of criminal activity involving the use of force or violence. (§ 190.3, factor (b).) In any event, any error in this regard clearly would have been nonprejudicial, because the court's comments in extensively reviewing the list of aggravating and mitigating evidence and finding that the circumstances in aggravation "substantially outweigh[ed]" the circumstances in mitigation make clear that there is no reasonable possibility that such an error would have affected the trial court's denial of the application for modification of the death sentence.

With regard to defendant's claim pertaining to improper reliance by the trial court upon victim-impact evidence, we perceive no error. The court heard and denied defendant's application for modification of the death sentence on January 11, 1990. No victim-impact statements were made in connection with that motion. Although the record contains 12 letters (either undated or bearing 1989 dates) written by family and friends of the victims Knoll, Mills, and Guthrie generally expressing extreme anger, loss, and sadness, the record does not indicate that the court considered any of these statements prior to denying the application for modification of defendant's death sentence.[50] On January 30, 1990, immediately prior to the court's

---

[50] The People assert that the letters were received by the court on January 30, 1990, the date the court entered the judgment of death, but do not include a reference to the record, which

imposition of the judgment of death, it heard similar statements made by Jillette Mills's mother, Sue Ann Mills, Bonnie Guthrie's sister, Jennifer Bollman, and Susan Knoll's sister, Sandra Pender.

Defendant assigns error to the court's consideration of the statements submitted by the victims' family members and friends. His contention fails for two reasons. First, he failed to object to the statements in question and therefore forfeited appellate review of this claim. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1183 [64 Cal.Rptr.2d 892, 938 P.2d 950]; *People v. Hill* (1992) 3 Cal.4th 959, 1013 [13 Cal.Rptr.2d 475, 839 P.2d 984].)

Second, defendant's claim fails on the merits. We previously have rejected similar contentions that *Booth v. Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529], prohibiting victim impact statements, extends to proceedings under section 190.4, subdivision (e). (*People v. Ramos, supra*, 15 Cal.4th at p. 1184; *People v. Benson, supra*, 52 Cal.3d 754, 812; cf. *Payne v. Tennessee* (1991) 501 U.S. 808, 830 and fn. 2 [115 L.Ed.2d 720, 111 S.Ct. 2597], overruling *Booth v. Maryland, supra*, 482 U.S. 496.) Nevertheless, we also have observed that "the scope of a modification motion does not encompass statements of the victim's relatives or any other evidence not presented to the jury during the penalty phase trial. [Citations.]" (*People v. Ramos, supra*, 15 Cal.4th at p. 1184.) Here, however, the record is clear that in denying defendant's application to modify the death sentence, the trial court relied solely upon the evidence presented to the jury and was guided by the factors enumerated in section 190.3; as indicated above, the three oral statements now challenged by defendant were made approximately three weeks after the court denied the application, and nothing in the record indicates that the trial court considered the letters at any time. Thus, the record before us provides no basis for concluding that the trial court in ruling on the application improperly considered any matter that was not placed before the jury.[51]

### F. *Cumulative Error*

Defendant contends that the cumulative effect of the asserted errors committed at his trial led to a miscarriage of justice, requiring reversal of the guilt and penalty phase judgments. Having determined that defendant's trial

does not indicate whether the letters in fact were received on that date. In his reply brief, however, defendant does not challenge the People's reference to January 30, 1990, as the date on which the court received the letters.

[51] Nor do we find any merit in defendant's claim that the trial court improperly admitted "prejudicial victim-impact evidence" in the form of the victims' family members' identification of items of personal property recovered from the vehicle driven by defendant at the time of his arrest. This testimony properly was admitted. (See *ante*, at pp. 1164–1171.)

was nearly devoid of any error, and that to the extent any error was committed it was clearly harmless, we conclude that defendant's contention as to cumulative error lacks merit.

### G. *The Delay Between Imposition of Sentence and Execution*

Defendant was sentenced to death on January 30, 1990, and counsel was appointed to pursue his automatic appeal more than four years later, on March 18, 1994. Defendant contends that the passage of this period of time, in addition to the approximately 11 years that have elapsed since then (during which time defendant has pursued his automatic appeal and claims on habeas corpus in state and federal court), are "largely the result of inadequate resources provided by the state to review death verdicts, and the complexity of review mandated by past abuses." Defendant contends that in view of these asserted circumstances, the judicial process compels him "to endure the uncertainty and ever-present tension on death row for such an extended period of time constitut[ing] cruel and unusual punishment in violation of the Eighth Amendment . . . ." (See *Lackey v. Texas* (1995) 514 U.S. 1045 [131 L.Ed.2d 304, 115 S.Ct. 1421] (mem. opn. on denial of cert. by Stevens, J.) [observing that neither retribution nor deterrence is served when prisoners serve 17 years under a sentence of death].)

Defendant's contention resembles a claim that we declined to address in *People v. Barnett* (1998) 17 Cal.4th 1044, 1182–1183 [74 Cal.Rptr.2d 121, 954 P.2d 384]. As we explained in *Barnett*, "[b]ecause defendant's claim is dependent upon evidence and matters not reflected in the record on appeal, we decline to consider it at this juncture." (*Id.*, at p. 1183.) For similar reasons, we decline to address defendant's claim.

### H. *Use of Lethal Injection*

Defendant contends the use of lethal injection as a method of execution constitutes cruel and unusual punishment and on that basis is unconstitutional. We previously have rejected the identical claim (see, e.g., *People v. Samayoa, supra*, 15 Cal.4th 795, 864; *People v. Holt* (1997) 15 Cal.4th 619, 702 [63 Cal.Rptr.2d 782, 937 P.2d 213]), and defendant fails to present any reason for us to reconsider our prior decisions. We therefore reject defendant's contention.

## DISPOSITION

The judgment is affirmed in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied October 26, 2005.